ESTATE OF HELEN MAY WHEELER, DECEASED, HENRY H. WHEELER, JR. AND FLORENCE WHEELER NEAL, [1] EXECUTORS, ET AL., [2] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Estate of Wheeler v. Comm'r
Docket Nos. 986-69, 987-69, 988-69, 989-69, 990-69.
United States Tax Court
T.C. Memo 1978-15; 1978 Tax Ct. Memo LEXIS 500; 37 T.C.M. (CCH) 51; T.C.M. (RIA) 780015; January 16, 1978, Filed *500 Carl A. Stutsman, Jr. and Jack R. White, for the petitioners. Marion Malone, for the respondent. DAWSON
MEMORANDUM FINDINGS OF FACT AND OPINION DAWSON, Judge: These consolidated cases were heard by former Special Trial Judge John H. Sacks pursuant to the provisions of section 7456(c), Internal Revenue Code of 1954. Subsequent to the trial and upon oral agreement of the parties, the cases were transferred to Judge Howard A. Dawson, Jr., by an order of the Chief Judge, for the preparation of the Findings of Fact and Opinion. Respondent determined deficiencies in petitioners' Federal income and estate taxes and additions to tax as follows: Dkt. No. 986-69 (Estate Tax) Year
Deficiency Addition to Tax footnote 3
$532,957.45
$266,478.73
Dkt. No. 987-69 (Income Tax)
1956
$135,999.86
$ 67,999.93
1957
214,498.03
107,249.02
1958
32,205.29
16,102.65
1959
2,237.00
1960
5,427.91
1961
8,001.00
1962 footnote 4
34,735.49
1963 footnote 4
32,754.76
1964 footnote 4
18,687.15
Dkt. No. 988-69 (Income Tax)
1965
3,068.75
Dkt. No. 989-69 (Income Tax)
1949
289,731.56 144,865.78 footnote 5
1950
544,245.82 274,367.11 footnote 5 1951
280,426.56 143,536.64 footnote 5
1952
198,413.14 99,206.57 footnote 5
1953
402,117.66 201,058.83 footnote 5
1954
131,301.02
65,650.51
1955
109,671.12
54,835.56
Dkt. No. 990-69 (Corporate Income Tax)
1953
230,939.41 115,469.71 footnote 5
1954
19,161.86
1955
14,391.32
1956
2,289.99
1,145.00
footnote *501 3 Except as noted, additions to tax were imposed pursuant to section 6653(b) of the 1954 Code. Where noted, additions to tax were imposed under the statutory authority of section 293(b), Internal Revenue Code of 1939, as in effect at that time (hereinafter referred to as 1939 Code). footnote 4 At trial, respondent, by amendment to his answer, alleged increased deficiencies in joint Federal income taxes for the taxable years 1962, 1963, and 1964, in the respective amounts of $83,902.21, $35,446.48, and $14,311.50 and asserted a claim therefor under the provisions of section 6214(a) of the 1954 Code. footnote 5 See fn. 3, supra.
Fraud is the principal issue for resolution. If we conclude that respondent has not proved fraud by clear and convicing evidence, then the assessment and collection of income and estate taxes in various dockets and years are barred by the statute of limitations. On the other hand, if we conclude that fraud has been proved for a particular year or docket, then such taxes are open for assessment and collection. Specifically, the assessment of the entire amounts of the deficiencies in Docket Nos. 986-69, 989-69 and 990-69 is barred absent fraud. Additionally, *502 in Docket No. 987-69, assessment of the tax for the year 1957 is barred absent a finding of fraud, and the year 1956 is barred unless there is a finding of either fraud or a 25 percent omission from gross income [6] for that year. In the cases involving the individual petitioners there are income adjustments relating to certain alleged unreported income cleared through the Advance Account of L.A. Decomposed Granite Company; unreported income cleared through the Stock Subscription Account of Park Water Co.; unrecorded advances in aid of construction; unreported income *503 cleared through the Notes Payable Account of Park Water Co.; additional receipts from LADG; unreported property sales, disallowed business bad debts and losses; and various other adjustments. In the corporate tax case there are income adjustments relating to alleged unreported profits from completed jobs; improperly charged off costs on an uncompleted job; and a loss on jobs in progress. In the estate tax case there are a substantial number of allegedly omitted assets, including cash in banks, a mortgage note, natural gold and advances to the Wheeler children and others. In addition, there are issues involving the value of the Park Water Co. stock on the date of Helen Wheeler's death and the ownership of some of that stock. FINDINGS OF FACT Some of the facts were stipulated by the parties. The stipulation of facts and attached exhibits are incorporated herein by this reference. Henry H. Wheeler, Jr. and Florence Richardson Neal, the executors of the Estate of Helen May Wheeler and the Estate of Henry H. Wheeler, Sr., were legal residents of Balboa Island, California, and Santa Monica, California, respectively, when the petitions were filed in these proceedings. Violet E. Wheeler *504 was a legal resident of Los Angeles, California, at that time. The principal office of L.A. Decomposed Granite Company was located in Los Angeles, California, when its petition was filed herein. I. GENERAL A. Identification of Taxpayers and Tax Returns Involved. Petitioners in Docket No. 989-69 are the Estate of Henry H. Wheeler, Sr., Deceased, Henry H. Wheeler, Jr. and Florence Richardson Neal, Executors and the Estate of Helen May Wheeler, Deceased, Henry H. Wheeler, Jr. and Florence Richardson Neal, Executors. Henry and Helen Wheeler were married in 1916. They filed joint income tax returns on Form 1040, for the years 1949 through 1954. Helen May Wheeler died January 9, 1955, and Henry Wheeler (hereinafter sometimes referred to as "Wheeler"), the surviving spouse, filed a joint income tax return, on Form 1040, with her estate for the year 1955. All of said returns were filed with the District Director of Internal Revenue at Los Angeles, California. Henry H. Wheeler, Sr., died on January 22, 1977. Subsequent to the filing of said joint return for the year 1955, a fiduciary income tax return on Form 1041 was filed for the estate of Helen M. Wheeler, for the year ending *505 December 31, 1955. An amended return on Form 1040 was filed by Wheeler for the calendar year 1955, excluding items of income and expense shown as allocable to the estate of his deceased wife. Petitioners in Docket Nos. 987-69 and 988-69 are the Estate of Henry H. Wheeler, Sr., Deceased, Henry H. Wheeler, Jr. and Florence Richardson Neal, Executors and Violet E. Wheeler (sometimes hereinafter called "Violet (Motz) Wheeler"). Wheeler and Violet E. Motz were married in 1956 and filed joint income tax returns on Form 1040 for the years 1956 through 1965, with the District Director at Los Angeles. The petitioner in Docket No. 986-69 is the Estate of Helen May Wheeler, Deceased, Henry H. Wheeler, Jr. and Florence Richardson Neal, Executors. A Federal estate tax return on Form 706 was filed on June 29, 1956, with the District Director at Los Angeles. Petitioner in Docket No. 990-69 is Los Angeles Decomposed Granite Company (hereinafter called "LADG"), a California corporation, organized prior to 1927. LADG filed corporate income tax returns on Form 1120 for the years 1953 through 1956 with the District Director at Los Angeles. B. Background Facts Relating to Taxpayers, Park Water *506 Co. and the Individuals Who Prepared Their Tax Returns. Wheeler was born in Kansas on December 24, 1892, and moved to California in 1911. He attended the University of Southern California, receiving a degree of A.M. in 1915. Shortly thereafter he moved to Needles, California, and worked as a teacher. He remained there until 1921, when he became a teacher of mathematics and physics at South Pasadena High School near Los Angeles. He resigned his teaching position in 1926 and has been self-employed or employed as an officer in various companies which he has controlled from that date to the date of his death. In about 1927, Wheeler acquired a 1/3 interest in the stock of LADG through a default on a loan of $1,500 which he made. LADG was engaged in mining and selling decomposed granite, a form of soil useful in road building, surfacing automobile parking lots, and school playgrounds. By 1929, Wheeler had acquired all of the stock of LADG consisting of 400 shares. In 1935, Wheeler transferred 25 shares of LADG stock each to Violet (Motz) Wheeler and O. D. Collins, both of whom were employees of the corporation, in lieu of year-end bonuses. On February 23, 1953, O. D. Collins' 25 *507 shares of stock of LADG were transferred to Henry H. Wheeler, Jr., Florence A. Richardson and Henry Cassel, Wheeler's son, daughter, and nephew, respectively. The stock ledger of LADG shows that on October 28, 1954, Certificate No. 44 for 175 shares was issued to Thomas N. Neale and Certificate No. 45 for 175 shares was issued to Herald E. Williams and that the shares had been transferred from Wheeler's Certificates 35 and 40, respectively. In January 1957, all of the stock of LADG was sold to a group of disinterested third parties as follows: Purchaser
No. of Shares
Transferred From
John Skochdopole
100
Herald Williams
James M. Brown
100
Herald Williams (75 shares)
Violet E. Motz (25 shares)
Bernice Britton
40
Thomas N. Neale
Marian Harris
40
Thomas N. Neale
Paul De Shaw
40
Thomas N. Neale
John G. Sperling
40
Thomas N. Neale
Carl B. Sturzenaker
40
Thomas N. Neale (15 shares)
H. H. Wheeler, Jr. (12 shares)
F. A. Richardson (12 shares)
Henry Cassel (1 share)
Total
400
After Wheeler assumed control of LADG, he expanded its operations to include contracting to supply various improvements to real property in connection with the development and sale of such property by subdividers. Beginning with simple paving, the *508 services supplied by LADG grew to include sewers, curbs, gutters, sidewalks and water mains. LADG had a contractor's license from the State of California, and Wheeler, who had previously been in the contracting business himself, became experienced in the field of contracting for subdivision development. In 1937, Wheeler organized Park Water Company (sometimes hereinafter called "Park Water") as a California corporation and, on February 14, 1938, obtained a certificate of public convenience and necessity from the Public Utilities Commission of the State of California (sometimes hereinafter called "PUC") authorizing its operation as a public utility water corporation. Wheeler initially organized Park Water after drilling his own well to provide water service for some land purchased by another corporation which he owned, Highway Construction Company, after he had been unable to obtain such water service from an adjacent country water district. The stock of Park was issued and held in the following names: Date
Authorized
Issued
Wheeler
Motz
Collins
12-20-37
1,000
12-31 -38
1,000
200
400
400
2-2-39
4,000
12-31-39
3,000
1,300
1,300
400
6-28-40
10,000
400
12-31-41
3, 000
12-31-42
6,480
3,440
2,640
400
12-31-43
7,000
3,500
3,100
400
12-31-44
7,000
3,500
3,100
400
7-24- 45
20,000
12-31-45
13,500
10,000
3,100
400
12-15-46
40,000
3,100
12-31-46
14,000
10,500
3,100
400
12- 31-47
14,000
10,500
3,100
400
12-31-48
14,000
10,500
3,100
400
12-31-49
14,000
10,500
3,100
400
12-31- 50
14,000
10,500
3,100
400
3-1-51
80,000
5-17-51
62,000
46,500
13,729
1,771
12-17-51
62,400
46,900
13,729
1,771
1-15-52
68,000
51,000
15,057
1,943
2-29-52
80,000
60,000
17,715
2,285
2-23-53
1 footnote *
*509 footnote * On February 23, 1953, 2,284 shares held by Collins were transferred, 1,142 shares to Henry H. Wheeler, Jr. and 1,142 shares to Florence A. Richardson. These persons were Wheeler's son and daughter.
On January 20, 1963, the one share of stock held in the name of Collins was transferred to Wheeler. On September 21, 1964, 52,827 shares were cancelled and the remaining 27,173 shares were held as follows: Henry H. Wheeler
10,190
Title Insurance & Trust Co.
as trustee for Est. of Helen Wheeler
4,076
as trustee for children of H. Wheeler, Jr.
3,057
as trustee for children of Florence
Richardson Neal
3,057
Violet E. Wheeler
6,017
Henry Wheeler, Jr.
388
Florence Richardson Neal
388
Total
27,173
Violet (Motz) Wheeler graduated from high school in Waukesha, Wisconsin, in 1912 and came to California in 1918. She was employed as a bookkeeper for LADG from 1937 until early 1957. She prepared the corporate income tax returns for LADG for the years up to and including 1955. The corporate income tax return for LADG for the year 1956 was prepared by John G. Sperling, a certified public accountant, in early 1957. Sperling was one of the group of seven individuals who purchased all of the outstanding stock *510 of LADG in January 1957. Violet (Motz) Wheeler was the principal bookkeeper for Park Water Co. from its inception in 1937 until her marriage to Wheeler in 1956. During 1951 and thereafter, the firm of Lilly & Hackley, certified public accountants, was retained by Park Water as external auditors. Violet (Motz) Wheeler prepared the corporate income tax returns for Park until 1951, and the external auditors prepared them for subsequent years. Violet (Motz) Wheeler prepared the personal income tax returns for Wheeler and his first wife, Helen M. Wheeler, for several years until 1948, at which time Wheeler hired an accountant, Ralph McClure, to handle his personal tax returns. McClure prepared all of the individual income tax returns involved herein for the years 1949 through and including 1958. The individual income tax returns for the years 1959 to 1965 were prepared by the accounting firm of Price Waterhouse & Co.
The Federal estate tax return for the estate of Helen M. Wheeler was prepared by Ralph McClure and executed by Wheeler as Executor. Violet (Motz) Wheeler had no formal schooling beyond high school, where she received a classical education aimed at a teaching career. *511 She had no formal training in bookkeeping in high school and no specialized knowledge of tax matters. Her bookkeeping training was acquired on the job, through assistance from accountants and others, during her employment by a wholesale grocery company, a meat packing company, and a typewriter company, prior to her employment by LADG and Park. She also subscribed to a Prentice Hall Tax Service. In setting up the books of account for Park Water Co., when it commenced doing business as a public utility, Violet (Motz) Wheeler sought and received assistance and advice from representatives of the PUC (formerly Railroad Commission) and another water utility, Southern California Water Co.
Prior to 1955, Ralph McClure was a public accountant, but not certified. In 1955, he became a certified public accountant. He was a partner of Wilbur Lilly, who was a certified public accountant. Lilly handled the external audits of the books of Park Water Co. conducted by his accounting firm after 1951. McClure's preparation of individual income tax returns for Wheeler and fiduciary income tax returns for the estate of Helen M. Wheeler was based upon information supplied to him. The principal *512 source of such information was work sheets prepared by Violet (Motz) Wheeler submitted to McClure at the end of each year for use in preparation of the tax returns. II FACTS RELATING TO INCOME ALLEGEDLY TAXABLE TO WHEELER WITH RESPECT TO PAYMENTS RECEIVED BY LADG AND/OR PARK WATER CO. FOR THE INSTALLATION OF WATER SERVICE. A. Items of Income Adjustment. 1. LADG "Advance Account."
One of the principal adjustments to the individual income tax liability of petitioners in Docket No. 989-69 is described in the statutory notice as follows: (a) It is determined that you received income, which you did not report in your income tax returns, from L.A. Decomposed Granite Co., as cleared through the Henry H. Wheeler "Advance Account," in the following amounts and for the following years: Year
Amount - Taxable Increase
1949
$ 90,023.00
1950
115,645.65
1951
165,313.16
1952
124,741.05
1953
240,495.69
1954
181,032.26
1955
181,811.37
Said items of adjustment in each of said years 1949 through 1955 were specified by respondent in his Answer as items which he contends constitute income which taxpayers fraudulently failed to report. A similar item of adjustment was made to the individual income tax liability of *513 petitioners in Docket No. 987-69, for the year 1956 only, increasing income by the sum of $209. 2. Park Water Co. "Stock Subscription Account."
A major adjustment to the individual income tax liability of petitioners in Docket No. 989-69, is described in the statutory notice as follows: It is determined that you received income, which you did not report in your income tax returns, from Park Water Co., as cleared through the "Stock Subscription Account" in the following amounts and for the following years: Year
Amount - Taxable Increase
1949
$221,000.00
1950
513,650.00
Said items of adjustment in each of said years were specified by respondent in his Answer as items he contends constitute income which taxpayers fraudulently failed to report. 3."Advances in Aid of Construction," Park Water Co.
A further adjustment to the individual income tax liability of petitioners in Docket No. 989-69, is described in the statutory notice as follows: (c) It is determined that you failed to report advances in aid of construction, not recorded on books of Park Water Co., but diverted to you, in the following amounts and for the following years: Year
Amount - Taxable Increase
1949
$ 6,268.45
1950
13,799.66
1951
33,755.73
1952
7,215.84
Said *514 items of adjustment in each of said years were specified by respondent in his Answer as items he contends constitute income which taxpayers fraudulently failed to report. 4. Park Water Co. "Notes Receivable Account."
A further adjustment to the 1951 income tax liability of petitioners in Docket No. 989-69, is described in the statutory notice as follows: (i) It is determined that you received income from Park Water Co., as cleared through Notes Receivable - H. H. Wheeler Account, in the amount of $136,000.42. You did not report this income in your income tax return. Accordingly, taxable income is increased $136,000.42. Said items of adjustment in each of said years were specified by respondent in his Answer as items he contends constitute income which taxpayers fraudulently failed to report. B. General Background
As a public utility, Park Water Co. was and is subject to the rules and regulations of the PUC. The schedule of rates which Park is permitted to charge customers for water service is regulated by the PUC. In 1938, the PUC established rates for Park which remained unchanged as of September 1953, at which time Park applied to the PUC for a rate increase. Under rules *515 established by the PUC for the years in question, a utility's rates were based, in part, upon the amount of retained and invested capital of the utility which comprised what is termed the "rate base." The PUC considered funds advanced from shareholders in the form of capital contributed for stock or loans to be properly includable. Water mains and other depreciable property purchased by the utility with such funds were regarded as part of the rate base. Under the PUC's rules, funds received by a utility from non-shareholders, such as tract developers or individual water customers, as advances or contributions for construction and installation of water service, may not be included in the rate base.Such funds must be treated on the utility's books as either "advances in aid of construction," if they are subject to a refund contract, or "donations in aid of construction" (sometimes called "contributions in aid of construction"), if they are not subject to a refund contract. Water mains and other depreciable property purchased with donations in aid of construction may not be included in the utility's rate base. Water mains and other depreciable property purchased with advances in *516 aid of construction may not be included in the utility's rate base, except to the extent of refunds actually made by the utility of the advanced funds. The rules of the PUC in effect during the years in question required applicants for extension of water service to real estate tracts or subdivisions to deposit with the utility the estimated reasonable cost of the necessary facilities, exclusive of service connections and meters, before construction was commenced. The utility was required to enter into a contract with the subdivider providing for a refund of the funds advanced, payable on the basis of a percentage of annual revenue from the property served, over a designated period of years. Such refund was not to exceed the amount advanced. At the end of the designated period of years, no further refund was required even if the annual percentage payments had not fully repaid the advance. During some of the years in question, the PUC rules required that contracts for the refund of advances in aid of construction from subdividers be made on the basis of 35 percent of annual gross revenues from each consumer in the tract, for a period of 10 years, or until the entire advance had *517 been refunded, whichever was sooner. Subsequently, during other years in question, the refund contracts were to be on the basis of 22 percent of gross revenue over a period of 20 years, unless fully refunded sooner. Funds received by a water utility representing water facilities or cash given to the water company for a specific purpose did not fall within the PUC's subdivision extension rule and were not required to be refunded by the utility. Such funds were required by the PUC to be classified "donations in aid of construction" in the utility's books of account. From the inception of Park Water Co., a two-fold policy was adopted and consistently followed by Wheeler and Park's other stockholders of (1) not paying refunds of sums expended on the construction and installation of water service in subdivisions; and (2) attempting to build up Park's rate base on the company's books of account by treating monies which originated with subdividers and other nonshareholders as capital contributed by Park's shareholders. Violet (Motz) Wheeler set up the company's books of account in this manner, after being informed by representatives of the PUC of the critical importance to a utility *518 company of building up its rate base.
In order to carry out this policy without appearing to violate the PUC's rules, Park regularly employed LADG as the party which would enter into a contract for the construction and installation of water service to subdivisions. LADG's contracts with the subdividers did state that it would cause Park to install the water. The contracts did not provide for a refund of any portion of the contract price which the subdivider agreed to pay to LADG. LADG was not a public utility and was not subject to the jurisdiction or direct control of the PUC. An "Agreement" dated April 15, 1938, [7] was executed between LADG and its stockholders which read as follows: O. D. COLLINS, v. E. MOTZ and H. H. WHEELER, being all the stockholders of the L. A. Decomposed Granite Co., (hereinafter referred to as the stockholders), will make advances of money to the L. A. Decomposed Granite Co., a corporation, (hereinafter referred to as the company), for the purposes of financing and carrying their jobs, mostly in connection with the subdivision of land into recorded subdivisions. A part of such jobs is the causing of water service to be installed to each lot in such tracts, *519 for which the company will be entitled to refunds. In consideration of such advances, the company agrees to repay the stockholders such advances without interest, and as an added consideration agrees to make the requested order and assignment to the stockholders for all such refunds. An "Order and Assignment," also dated April 15, 1938, [8] *520 was executed by LADG to Park Water Co., and reads as follows: TO PARK WATER COMPANY We will make advances from time to time to your company for purposes of Park Water Company making capital outlays, for which advances we are entitled to refunds. We hereby authorize and direct you to accumulate all said refunds to be credited toward the purchase of your Company's common stock. For valuable considerations, we hereby assign all right to said credits to O. D. Collins, V. E. Motz, and H. H. Wheeler, to be employed by them as part payment in their purchase of common stock from your company. We further direct you to employ such refund credit for that purpose. On June 30, 1955, Park Water Co. filed a brief with the PUC in connection with its rate application hearing. In its brief, Park contended that sums paid by LADG to Park and recorded in an account on Park's books designated as "Account No. 19: Installment Stock Subscription," constituted "advances in aid of construction" by LADG in compliance with the PUC's subdivision extension rule. It was further contended, in effect, that such advances were refunded in compliance with such rule and then contributed by Park's stockholders for additional capital stock of the company by virtue of the aforesaid "Agreement" and "Order and Assignment," dated April 15, 1938. Another effect sought through the interposition of LADG between the subdivider and Park was to avoid the PUC's deposit requirement imposed upon the subdivider. Many of the subdividers with whom Wheeler and LADG dealt preferred not to have to deposit in advance the cost of constructing and installing water service to the tracts they developed, as required by the PUC rules and desired an extension of credit whereby they would not have to pay for the water installations until the individual lots in the tract were sold. LADG's *521 contracts with subdividers did not require the subdivider to deposit in advance the cost of installing water service, but rather provided that the subdivider would pay a stated price upon completion. Customarily, LADG received security for the contract price in the form of a deed of trust on the real property and received payments directly from escrow in a certain amount per lot as the lots were sold by the subdivider. From as early as 1946, LADG was entering into contracts with tract developers and subdividers to provide services of various types to new tracts. There were two types of contracts entered into between LADG and the subdividers. One type was known as a "multipe service" contract, which provided for the installation of streets, curbs, sewers and a water system, all for a specified lump sum.The other type of contract was known as a "water only" contract, which merely provided for the installation of a water system for a specified sum. In all cases, LADG acted as a general contractor and the work required for the performance of its contracts was subcontracted by LADG to various subcontractors, except for some instances where LADG supplied decomposed granite from its own *522 pit for street paving. In most cases, the contracts between LADG and subdividers provided that LADG would cause Park to install the water system called for in the contract. This was true under both the multiple service and water only type of contracts. After execution of such contracts, the work involved in extending Park's water system to the tract was performed mostly by employees of Park, using materials and supplies purchased by Park.Upon completion of such work, the actual cost thereof was capitalized on Park's books. An account was maintained on LADG's books for each tract to be improved in a subsidiary job ledger. The expenditures by LADG on a particular tract were entered in the tract account in the subsidiary job ledger as were the receipts from the subdividers. These were posted from the check disbursements journal and the cash receipts journal wherein disbursements or receipts pertaining to tract improvements were related to a particular tract. The job ledger accounts were closed by adding the debits and credits and transferring the difference between them to LADG's profit and loss statement. From time to time LADG issued checks for substantial sums of money to Park *523 which were recorded in LADG's check disbursement journal and related therein to a particular tract by number. These amounts were later posted to the appropriate account in LADG's subsidiary job ledger as an offset against the receipt from the subdivider.
C. Facts Concerning LADG's "Advance Account."
For the period from 1937 through 1956, Wheeler made repeated advances of substantial sums of money to LADG. During some of this period, LADG maintained an account on its books referred to herein as the "Wheeler Advance Account," in which these advances were recorded. LADG also recorded in the Wheeler Advance Account deposits to its corporate bank account of certain receipts from subdividers paid under "water only" type contracts. It was a general practice for Wheeler to include in deposits to LADG's bank account a check drawn on his personal bank account which, along with certain checks from subdividers on water only contracts, would aggregate an even amount of money. Such even amount would be recorded in the Wheeler Advance Account, in accordance with his instructions to the bookkeeper. Illustrative of this practice is a deposit made to LADG's bank account on January 9, 1953, in the *524 total amount of $62,172.46. Of said total deposit, the sum of $35,000 was recorded in the "Wheeler Advance Account," and consisted of two checks from subdividers for water lines aggregating $3,849.50, plus a check in the sum of $31,150.50 drawn on Wheeler's personal bank account. Certain records of LADG were substantially destroyed by a fire at the company's offices in May of 1957. During respondent's investigation and audit in connection with these cases, the actual ledgers which comprised the Wheeler Advance Account on the books of LADG were unavailable and were not examined by the respondent.
In connection with the application for a rate increase filed by Park Water Company, auditors for the PUC examined records of LADG and prepared a transcript of the Wheeler Advance Account on the books of LADG, covering the period from April 1946 through the year 1953. The transcript shows credits and debits to the Advance Account. For the years 1949 to 1953, the credits for cash advances are in total figures and it cannot be ascertained therefrom how much of the sums credited were advances by Wheeler of his personal funds; nor can the amount or nature of credits from sources other than Wheeler *525 be fully determined. The PUC auditor who prepared the transcript of the Wheeler Advance Account on the books of LADG was unable to testify as to the source of the cash credits to the account shown on his transcript. The total credits to the Wheeler Advance Account for cash advances during each of the years 1949 to 1952, reflected in the transcript of that account prepared by the PUC, were as follows: 1949
$259.912.00
1950
332,691.61
1951
778,254.04
1952
145,597.97
For each of the years 1937 to 1952, Wheeler made deposits to the bank account of LADG, of checks drawn on his personal bank account, in the following known amounts: 1937
$ 10,371.39
1938
3,050.00
1939
9,500.00
1940
13,197.20
1941
17,000.00
1942
23,916.97
1943
15,250.00
1944
1,315.49
1945
1946
61,191.20
1947
135,835.13
1948
68,474.74
1949
186,438.31
1950
194,639.78
1951
671,351.84
1952
22,238.98 The income adjustments in Docket No. 989-69 attributable to the Advance Account are predicated on respondent's theory that all credits to such account not representing actual advances by Wheeler of funds from his own bank account constituted taxable income to Wheeler which he constructively received at the time the funds were deposited in LADG's bank account and credited *526 to the Advance Account. Respondent's statutory notice asserted the additions to income for the years 1949 to 1952 by deducting from the total credits to the Advance Account for each year, as shown in the PUC's transcript of that account, all personal checks of Wheeler to LADG known to respondent at the time of the adjustment. Such additions to income were as follows: 1949
$ 90,023.00
1950
115,645.65
1951
165,313.16
1952
124,741.05
Subsequent to making the adjustment reflected in the statutory notice, respondent learned of the existence of additional checks from Wheeler to LADG during this period which respondent concedes should be deducted from the income attributed to Wheeler from the credits to the Advance Account. The total reduction conceded by respondent for each year is as follows: 1949
$ 8,952.94
1950
9,093.82
1951
58,380.96
1952
1,382.06
LADG's bank deposit slips were available for the years 1953 to 1956, but not for periods prior to September 1952. Using the deposit slips, the PUC auditors' transcript of the total credits to the Wheeler Advance Account, and information obtained by contacting certain subdividers, respondent reconstructed a breakdown of the amounts credited to the Advance *527 Account for the year 1953. According to such reconstruction, the total sum received by LADG and credited to the Wheeler Advance Account for the year was $530,500 of which $290,004.31 constituted funds from Wheeler and $240,495.69 constituted funds from others, consisting primarily of payments by subdividers on "water only" contracts. For the years after 1953 no transcript of credits to the Wheeler Advance Account on the books of LADG was available. However, a reconstruction and breakdown of assumed credits to the account was made by respondent for the years 1954 through 1956, as follows: Year
Credits
Funds From
Funds From
Wheeler
Others
1954
$ 257,512.10
$ 76,479.84
$ 181,032.26
1955
391,067.52
209,256.15
181,811.37
1956
1,209.00
$ 1,000.00
209.00 The funds from others consisted primarily of payments by subdividers to LADG on "water only" contracts. Respondent's reconstruction of the Advance Account for the years 1954 through 1956 was premised upon his assumption that the general pattern developed with respect to the year 1953, as reflected in the reconstruction for that year, would be applicable to the subsequent years. Without knowledge of the extent to which deposits to LADG's bank account *528 may have been credited to accounts other than the Advance Account, respondent, nevertheless, started with the Advance Account's ending balance for 1953, and worked toward a figure shown in LADG's 1956 corporate income tax return as being the balance in the Advance Account as of December 31, 1956. By following the aforesaid 1953 general pattern, respondent reviewed the deposit slips for LADG's bank account and constructed therefrom an assumed transcript of the Advance Account which came within $360 of the 1956 ending balance stated for such account in the LADG 1956 tax return. Because of the volume of deposits to LADG's bank account, respondent did not verify the underlying contractual sources of all of the payments which he treated as being from subdividers during the years 1953 through 1956. Respondent's income adjustments in Docket Nos. 989-69 and 987-69 attributable to the Advance Account for the years 1953 to 1956 were based upon the premise that all sums received by LADG and assumed by respondent to have been credited to the Advance Account for those years, identified as not coming from Wheeler, constituted taxable income to Wheeler which he constructively received at the time *529 the funds were deposited in LADG's bank account and credited to the Advance Account.The additions to income thus determined by respondent on the basis of such adjustment were as follows: 1953
$ 240,495.69
1954
181,032.26
1955
181,811.37
1956
209.00
Respondent's special agent, Mr. Sullivan, concluded and recommended that taxpayers' failure to report the income additions determined with respect to the Advance Account for the years 1949 through 1956 was due to fraud. Mr. Sullivan concluded that the "rounding operation," in which Wheeler's odd amount checks on his personal bank account were added to checks from subdividers to make an even amount of money, which even amount was then recorded in the Advance Account on LADG's books when deposited in LADG's bank account, constituted evidence of an intent on Wheeler's part to conceal what he knew to be his taxable income. Mr. Sullivan was aware of what he termed "a basic picture of the modus operandi" whereby Wheeler, LADG and Park Water Co. attempted to treat monies paid by subdividers for water installations as "advances" from Wheeler, in order to avoid the PUC's refund requirements while also avoiding classification of the funds as "donations in *530 aid of construction" which the PUC would not permit to be included in Park's rate base. Park Water Co. performed the service of installing water facilities for the subdividers who made payments to LADG for such services. If the subdividers' payments had been given directly to Park for such installations and properly recorded in Park's books, they would not constitute taxable income. They would, however, have to be refunded by Park or treated as donations excludable from the rate base under the PUC's rules. The LADG Advance Account was employed, rather than direct payment to Park, in order to avoid the refund and rate base requirements. There was no significance, insofar as the PUC was concerned, to the "rounding operation." Sullivan concluded that the significance to the aforementioned "modus operandi" was concealment of taxable income. [9] *531 A considerable amount of money was paid by LADG to Park Water Co. up to 1951.No checks were issued by LADG to Park in any substantial amounts after 1951 and that money went from LADG to Wheeler subsequently. Although Sullivan did not know "where it went from Mr. Wheeler," there were some checks which Wheeler subsequently issued to Park. However, they did not equal the money Wheeler received from LADG. During the period January 1, 1946 to May 31, 1951, funds were paid by LADG to Park Water Co. in substantial amounts and charged to various accounts on the books of LADG. According to an audit by the PUC in connection with the rate hearing, such payments were charged on the books of LADG as follows: Year
Total Advances By LADG
Charged To Tract Improvement Costs
Charged To Wheeler Adv. Account
Charged To "Water System" Account
1946
$ 80,998.60
$ 73,498.60
$ 7,500.00
1947
313,500.00
293,500.00
20,000.00
1948
324,000.00
125,000.00
199,000.00
1949
261,500.00
209,000.00
52,500.00
1950
491,500.00
None
25,000.00
466,500.00
1951
137,500.00
None
12,500.00
125,000.00
Total
$ 1,608,998.60
$ 700,998.60
$ 316,500.00
$ 591,500.00
During the period 1938 through 1955, Park received from Wheeler's personal funds, *532 as evidenced by his personal records, advances in the following amounts: 1938
$ 7,350.00
1939
3,324.50
1940
20,350.00
1941
15,502.85
1942
16,100.00
1943
9,600.00
1944
7,736.04
1945
39, 571.80
1946
77,780.70
1947
27,747.87
1948
32,492.49
1949
20,165.96
1950
100,250.00
1951
11,337.36
1952
225,084.21
1953
402,148.67
1954
119,617.51
1955
62,525.00
Total
$ 1,198,684.96
Wheeler believed that his many advances to LADG of his personal funds, commencing several years prior to 1949 and continuing through 1956, entitled him to withdraw funds from LADG for his personal use from time to time. Funds withdrawn by Wheeler from LADG and used for his personal purposes were charged to the Advance Account, as were some of the funds which were passed on to Park Water Co.
With respect to the income adjustments by respondent for the years 1949 through 1956, attributed to the LADG Advance Account, respondent does not seek to tax Wheeler only on monies withdrawn by Wheeler from LADG, determined to be in excess of Wheeler's own personal advances to LADG and determined to have been used by Wheeler for his personal benefit. Rather, respondent treated all gross receipts of LADG credited to the Advance Account, other than known advances from Wheeler, *533 as taxable income to Wheeler at the time LADG received such money. D. Facts Concerning Park Water Co. "Stock Subscription Account" and "Notes Receivable Account."
During the period from 1946 through 1950, an account was maintained on the books of Park Water Co. under the designation "Installment Stock Subscriptions, a/c No. 19." Such account was used principally by Park to record the receipt of advances from Wheeler and funds received from LADG for Park's installation of water service in various subdivisions for which LADG had contracted to cause such installations. By May 1951, the balance credited to said account was $1,818,400. According to the PUC's audit in connection with Park's rate hearing, the credits to the Stock Subscription Account and sources of such funds received by Park for the years 1946 through 1950, were as follows: Year
Total Receipts Credited to Stock Sub. Acct.
Total Received From LADG
Total Received From Other Than LADG (unidentified)
1946
$ 182,500.00
$ 80,998.60
$ 101,501.40
1947
372,000.00
313,500.00
58,500.00
1948
381,500.15
324,000.00
57,500.15
1949
283,513.18
261,500.00
22,013.18
1950
606,000.00
491,500.00
114,500.00
Total $ 1,825,513.33 footnote 10 $ 1,471,498.60
$ 354,014.73
footnote *534 10 Respondent determined that the credit balance remaining in this account as of May 1951 was $1,818,400, after taking into account certain adjustments. That figure has been accepted by petitioners in the Stipulation of Facts as the correct May 1951 balance.
One of the income adjustments in Docket No. 989-69 was based upon the sums credited to the Stock Subscription Account on the books of Park. Respondent asserted that of the funds received by Park and credited to the Stock Subscription Account during the years 1949 and 1950, Wheeler constructively received taxable income determined as follows: 1949
1950
Total Credits to Account
$ 283,513.18
$ 638,900.00 footnote *
Less Total Wheeler Checks
20,000.00
$ 100,250.00
to Park
$ 263,513.18
$ 538,650.00
Balance of Funds from LADG;
261,500.00
499,000.00
Unidentified Sources
2,013.18
39,650.00
Less LADG Checks Charged to
35,000.00
25,000.00
Wheeler Adv. Acct.
$ 228,513.18
$ 513,650.00
Less Debit for "wells"
7,513.18
$ 221,000.00
$ 513,650.00
footnote * This gross amount does not reflect debit adjustments in total amount of $32,500 representing two checks drawn by Park and paid to LADG in 1950.
Respondent's theory with respect to this income adjustment was that Wheeler *535 constructively received the funds (other than those coming from Wheeler personally) at the time they were credited to the Stock Subscription Account. The "fraud" with respect to such adjustment item was the same as in the case of the adjustment involving credits to the Wheeler Advance Account on the books of LADG, to wit: "concealment of the actual funds comprising the credits to Mr. Wheeler's accounts on both corporations' books," i.e., the fact that it was labeled Wheeler's money when it in fact appeared to be subdividers' money or payments by LADG for tract improvements. After 1950, the installment stock subscription account was not used by Park to record receipts of funds from LADG or Wheeler. During the period January through May 1951, such receipts were recorded in an account on the books of Park described as a "Notes Receivable H. H. Wheeler a/c No. 4." According to respondent's audit, the total credits to the notes receivable account in Park's books for said period were $153,350, of which $5,349.58 was received directly from Wheeler, $12,500 was received from LADG and charged to the Wheeler Advance Account, and $136,000.42 was received from "others," primarily LADG.Respondent *536 treated the sum of $136,004.42 as an addition to Wheeler's income for the year 1951 in Docket No. 989-69. During early 1951, Park negotiated a loan from two insurance companies in the sum of $2,000,000, secured by trust deeds, a chattel mortgage and a pledge of stock which was to be issued in elimination of the stock subscription account. The insurance companies requested the issuance of stock as a replacement for the stock subscription account. Park Water Company's articles of incorporation provided for shareholders' preemptive rights on a pro rata basis. In connection with said 1951 loan, Park filed an application on March 30, 1951, with the PUC, seeking permission to issue stock and securities. By such application, Park sought to issue 66,000 shares of its $25 par value capital stock at par for cash in the sum of $1,650,000. Permission was also sought to issue promissory notes in the aggregate sum of $2,000,000 to the two insurance companies. The application stated that the purposes for which Park intended to use the proceeds from such issues were as follows: 1. To pay outstanding loans payable in the sum of $1,818,400; 2. To pay accounts payable and/or bank loans in the *537 sum of $158,000; 3. To pay for monies actually expended from income and from other money in the treasury for capital additions and betterments in the sum of $449,500; 4. To pay for additions and betterments to be made in the future in the aggregate sum of $1,196,100; 5. To pay for expenses incidental to the financing estimated at $28,000.
By its decision dated May 8, 1951, the PUC granted Park's application to issue its promissory notes in the aggregate amount of not exceeding $2,000,000 and to issue to its stockholders not exceeding 66,000 shares of its common capital stock at the aggregate par value of $1,650,000. Park was ordered to use the proceeds to be received through the issuance of the notes and stock for the purposes set forth in the application. In May of 1951, subsequent to the PUC's approval of its application, Park and its shareholders carried out the following simultaneous transactions: (a) Park issued two checks, numbers 1770 and 1722, for $1,200,000 and $618,400, payable to Wheeler. Park credited the $1,818,400 to cash and debited the installment stock subscription account in the same amount, thereby eliminating said account. (b) Wheeler issued three checks, *538 one for the amount of $900,000, payable to Park, one for $265,725, payable to Violet E. Motz, and one for $34,575, payable to O. D. Collins. (c) Violet E. Motz issued her personal check number 1187 for $265,725, payable to Park. (d) O. D. Collins issued his personal check for $34,275, payable to Park. (e) Park issued stock certificates for a total of 48,000 shares (par value $1,200,000); 36,000 shares (par value $900,000) were issued in the name of Wheeler, 10,629 shares (par value $265,725) were issued in the name of Violet E. Motz and 1,371 shares (par value $34,275) were issued in the name of O. D. Collins. (f) All of the aforesaid checks were deposited in the bank accounts of the named payees. On May 31, 1951, Wheeler wrote a check to LADG on his personal bank account for the sum of $300,000. Subsequently, from June 15, 1951 to November 15, 1951, Wheeler wrote additional checks to LADG on his personal account in the aggregate sum of $167,000. On February 20, 1952, Park issued an additional 5,600 shares of stock (par value $140,000) as follows: 4,100 shares in the name of Wheeler, 1,328 shares in the name of Violet Motz and 172 shares in the name of O. D. Collins. This *539 stock was paid for by three checks drawn by LADG dated January 15, 1952, as follows: Check No.
Payee
Amount
1540
H. H. Wheeler
$ 102,500
1541
H. H. Wheeler
33,750
1542
H. H. Wheeler
3,750
$ 140,000
These checks were endorsed by Wheeler and deposited on February 20, 1952, in Park's bank account. The sum of $140,000 was charged against Wheeler's advance account on LADG's books. On February 29, 1952, Park's records show that 12,000 shares of stock (par value $300,000) were issued as follows: 9,000 shares (par value $225,000) in the name of Wheeler, 2,658 shares (par value $66,450) in the name of Violet Motz and 342 shares (par value $8,550) in the name of O. D. Collins. As of this date, there were 80,000 of Park's stock issued and outstanding. Park's records reflect receipt of payment for the stock issuance on or about February 29, 1952, in the aggregate sum of $300,000. In fact, however, such sum was not paid at that time. Wheeler wrote a check, dated February 29, 1952, in the sum of $225,000, but it was not deposited until December 31, 1952.
On December 31, 1952, the sum of $300,000 was deposited to the capital account of Park Water Co. at Compton National Bank. The deposit consisted of the *540 aforementioned check from Wheeler in the sum of $225,000, a check from Violet Motz in the amount of $66,450, and a check from O. D. Collins in the amount of $8,550. The check in the amount of $66,450 from Miss Motz was returned for insufficient funds. On January 6, 1953, a $30,000 deposit was made to Park's capital account at Compton National Bank, consisting of a personal check from Wheeler, The same day, a check in the amount of $274,701.40 was charged to the account and deposited in Wheeler's personal account at Security First National Bank. On January 9, 1953, Wheeler deposited in his personal account a check in the amount of $66,450 drawn on Miss Motz' account. In February 1953, Wheeler issued a check on his account to Park Water Company for the sum of $300,000, which was deposited in Park's capital account at Security First National Bank. The books of Park reflect that in February 1953, the sum of $300,000 was transferred from Park's capital account at Compton National Bank to Park's capital account at Security First National Bank. E. Facts Concerning Donations ("Advances") In Aid of Construction. Respondent's income adjustment items in Docket No. 989-69, referred to *541 as "advances in aid of construction not recorded on books of Park Water Co., but diverted to you" in the years 1949 through 1952, were derived from stipulated amounts received directly by Park as donations in aid of construction in those years. Such adjustments are not fraud items. A PUC auditor, Mr. Entwistle, could not recall finding an account on Park's books entitled "donations in aid of construction" at the time of his audit. However, it was customary for a company of Park's size to have some donations which did not fall within the main extension (i.e., refund) rule. Park received and recorded such advances, but failed to account for them in accordance with the PUC's rules and regulations. F. Additional Facts Concerning PUC Rate Application of Park Water Co. and Subsequent Adjustments to Park's Books. On November 14, 1955, after an extensive audit and lengthy hearing, the PUC denied Park's application for a rate increase. The PUC determined that substantial amounts of non-refunded monies, originating from subdividers and individual water customers, had been used to purchase portions of Park's capital plant; and that said monies had been incorrectly reflected on Park's books *542 as having come from Park's stockholders by way of loans and stock purchases. Following the PUC's ruling of November 14, 1955, Park was required to make certain entries and adjustments to its books and records to bring them into conformity with the PUC's rules and regulations. Park's auditor, Wilbur Lilly, worked with auditors of the PUC over an extended period of time, and their joint efforts produced the following adjustments which were made to Park's books: 1. On December 31, 1958, Park debited earned surplus and credited its "Contributions in Aid of Construction" Account, in the amount of $1,068,892.16. 2. On December 31, 1960, Park debited an account entitled "Reserve For Asset Adjustment" and credited contributions in aid of construction, in the amount of $72,167.83. 3. On December 31, 1961, Park made the following adjustments to its books: Dr.
Cr.
Capital surplus
$ 361,264.92
Contributions in Aid of Construction
262,150.01
(Deprec)
Earned surplus
312,660.73
Contributions in Aid of Construction
$ 920,075.66
"To record additional contributions in aid of Construction.
Previously recorded by Co. per Order #52239-12-31-58
1,068,892.16
Previously recorded by Co. per Order #52239-12-31-60
72,167.83
Above 12-31-61
920,075.66
Total per work papers furnished by Mr. Gieleghem of PUC Staff"
$ 2,061,135.65
Following *543 an audit by Mr. Harry C. Pace, a certified public accountant with the firm of Price Waterhouse & Co., Park made the following additional adjustments to correct its records: On May 31, 1961, Park debited its "Accounts payable - H. H. Wheeler" account, in the amount of $90,000, and its "Notes Receivable - H. H. Wheeler" account, in the amount of $283,318.52. Park credited its "capital surplus" account, in the amount of $373,318.52. The purpose of the adjustment was to record amounts collected by LADG for water installations and various subdivisions for Park, and the assumption by Wheeler of LADG's liability to Park for said sum. The balance was adjusted to $361,264.92, by a correction.These adjustments were reviewed and agreed to by Lilly and an auditor of the PUC. In accordance with the above adjustments, Wheeler executed a note to Park for the sum of $283,318.52, which was paid in full by Wheeler (including the adjustment of $12,053.60 referred to previously) by January 1968. The sum of $90,000 credited to capital surplus, referred to previously, represented money previously paid to Park by Wheeler. On December 31, 1964, a further adjustment was made to Park's books, as required *544 by the PUC. Park's capital stock account was debited by the sum of $1,320,675, which sum was credited to its capital surplus account. This recorded the cancellation of 52,827 shares of Park's outstanding stock. III FACTS RELATING TO ADDITIONAL INCOME ADJUSTMENTS FOR 1953 IN DOCKET NO. 989-69 WHICH RESPONDENT SPECIFIED AS FRAUD. A. Items of Income Adjustment. 1. Park Water Co. "Capital Account."
Another adjustment to the individual income tax liability of petitioners in Docket No. 989-69 involves a determination by respondent that petitioners received an unreported distribution of corporate income in the year 1953 from Park Water Co. in the amount of $11,407 from Park's capital account maintained at Compton National Bank. This item of adjustment was not specified by respondent in his Answer as one which he alleged involved fraud. However, during the trial, respondent contended that this adjustment represented a fraud item. 2. "Commissions" From Southern California Water Co.
A further adjustment to the individual income tax liability of petitioners in Docket No. 989-69 for the year 1953 is described in the statutory notice as "commissions" from Southern California Water Co. *545 in the sum of $7,490, not reported in petitioners' 1953 tax return. Respondent did not specify this income adjustment in his Answer as one which he alleged involved fraud. However, during the trial, respondent advised that he considered this to be a fraud item. 3. "Additional Funds" From LADG. An additional adjustment to the individual income tax liability of petitioners in Docket No. 989-69 for the year 1953 is alleged unreported income in the amount of $55,500 which respondent determined was received by petitioners from LADG. The income thus received as determined by respondent is comprised of the following items: (a) $40,000 which respondent determined was paid by LADG to M. Miller Co. and improperly charged to LADG's profit on a job and which respondent further determined constituted a loan by Wheeler to Miller. (b) $6,000 which respondent determined was improperly credited to the Wheeler Advance Account on LADG's books and charged to a tract account. (c) $9,500 which respondent determined represented checks from LADG received or cashed by Wheeler, not charged to the Advance Account on LADG's books. Those items were not specified by respondent in his Answer as involving *546 fraud in Docket No. 989-69.However, items (a) and (b) were designated as fraud items in respondent's Answer in the case involving LADG's liability (Docket No. 990-69) and in Mr. Sullivan's testimony and Special Agent's Report. B. Facts Concerning Park Water Co. Capital Account. Respondent examined the deposits to and withdrawals from a bank account, designated as a "capital account", maintained by Park Water Co. at Compton National Bank for the period from October 1952 to January 1953, and concluded that in 1953 Wheeler received therefrom unreported taxable income in the sum of $11,407. [11]
Some of the monies flowing through said bank account of Park Water Co. during this period were involved in Park's pro rata issuance of stock for money paid out by Park and received back through a circuity of checks involving its shareholders, Wheeler, O.D. Collins and Violet E. (Motz) Wheeler. Also involved was a transfer of funds by Park Water Co. from its bank account at Compton *547 National Bank to another capital account maintained by Park at Security First National Bank. C. Facts Concerning Southern California Water Co. "Commissions."
Wheeler received two checks in the amounts of $6,060 and $1,430 from Southern California Water Company during 1953, which were not reported in his income tax return for that year. The payments were made pursuant to the terms of a written agreement which had been entered into between Southern California Water Company and Wheeler in 1940. The payments were for prior right easements, enabling Southern California Company to lay pipe in a particular subdivision. The 1940 agreement between Southern California Water Company and Wheeler, pursuant to which the 1953 payments were made, arose out of a dispute between Wheeler and that company. The initial dispute which produced the agreement involved a tract owned by a subdivider with whom Wheeler had numerous dealings, Milton Kauffman. When Wheeler later received the two payments from Southern California Water Co. under the agreement, they were made in connection with another tract which Kauffman was then developing in which Southern California Water Co. was supplying the water service. *548 As Kauffman's efforts were apparently instrumental in Wheeler's obtaining payments from Southern California Water Co., Wheeler credited the payments from Southern California Water Co. against monies which were due him from Kauffman. [12]
IV. FACTS RELATING TO ADDITIONAL INCOME ADJUSTMENTS FOR 1956 THROUGH 1958, WHICH RESPONDENT SPECIFIED AS FRAUD ITEMS (DOCKET NO. 987-69). A. Items of Income Adjustment.
1."Excess Withdrawals" from LADG Advance Account (1956).
An adjustment to the individual income taxes of petitioners involves a determination by respondent that petitioners received $112,194.43 as "excess withdrawals" from the Wheeler Advance Account maintained on the books of LADG, which constituted diverted corporate funds taxable to petitioners in the year 1956. This item of adjustment was specified by respondent in his Answer as one which he alleges constituted income which petitioners fraudulently failed to report in the year 1956. 2. "Unreported Income" from LADG (1957, 1958).
An additional adjustment to the individual income taxes of petitioners involves a determination *549 by respondent that petitioners received unreported income from LADG in the years 1957 and 1958 in the amounts of $192,300 and $45,910, respectively. These items of adjustment were specified by respondent in his Answer as ones which he alleges constituted income which petitioners fraudulently failed to report in their income tax returns for these years. 3. "Unreported Income" from Modern Housing, Inc. (1957, 1958) and MacArthur Heights, Inc. (1957).
Respondent also determined that petitioners received unreported income in the years 1957 and 1958 from Modern Housing, Inc. in the sums of $24,500 and $3,500, respectively, and from MacArthur Heights, Inc. in the year 1957 in the sum of $41,500. These items of adjustment were not specified as fraudulently unreported income in respondent's Answer, but were considered to be fraud items by Mr. Sullivan in his testimony and in the Special Agent's Report. 4. Unreported Capital Gain Income from Milton Kauffman Property Sale (1956).
Respondent also determined that the taxable income of petitioners for the year 1956 should be increased by the sum of $98,293.28 due to unreported property sales. In respondent's Answer he alleged that during *550 1956 petitioners received taxable income from property sales in the amount of $83,144.20 which they failed to report, and respondent specified such item as one which he contends involved fraud. The statutory notice reveals that the item of $83,144.20 represents unreported profit on proceeds collected by taxpayers in 1956 in connection with a 1950 installment sale of property to Milton Kauffman. Respondent offered no evidence respecting the fraudulent nature of this item. B. Background Facts Concerning Items (1) through (3).
During 1954 Wheeler approached two individuals with whom he had had business dealings, Thomas N. Neale and Herald Williams, and requested that they do him a favor by purchasing his stock in LADG. Wheeler advised both men that he was having difficulty with the Public Utilities Commission and desired to divest himself of any stock in LADG. Wheeler advised both Williams and Neale that he would assume full responsibility with respect to the subdivision tract operations then being carried by LADG and would wind them up. Williams and Neale were to have no responsibility concerning such tract activities. Wheeler also represented to Williams and Neale that he would *551 endeavor to find another buyer who would be interested in buying LADG's stock in order to acquire the corporation's granite pit operation and related equipment. Neale and Williams each agreed to purchase Wheeler's stock in LADG as a favor to Wheeler. Neale and Wheeler executed an agreement dated July 12, 1954, providing for the sale by Wheeler to Neale of 175 shares of stock of LADG for the sum of $20,000, payable on or before November 1, 1954. The agreement also provided that Wheeler agreed to remain in the service of LADG for a period of 18 months after November 1, 1954, or for a lesser period at the option of the purchaser. A similar agreement was executed between Wheeler and Williams, dated August 3, 1954. Wheeler transferred his 350 shares of LADG stock to Neale and Williams (175 shares each) on the books of the corporation, effective October 28, 1954. Thereafter, Neale became president of LADG and executed numerous corporate documents as such, including the corporation's 1954 and 1955 tax returns. Wheeler remained an employee of LADG during the years 1955 and 1956 in order to wind up the company's subdivision activities. LADG did not take on any new subdivision contracts *552 after 1954. In his income tax returns for the years 1955 and 1956 Wheeler reported a salary from LADG. Prior to January 1957, a group of seven individuals, including John G. Sperling, a certified public accountant, negotiated, primarily with Wheeler, for the purchase of all of the outstanding stock of LADG. The group understood that Wheeler did not then own any stock in the company but regarded him as the "spokesman" or "agent" for the sellers. Wheeler acted as spokesman for the sellers pursuant to his promise to Williams and Neale that he would locate another buyer for the stock he sold to them. The Sperling group purchased all of the LADG stock in January 1957. The Sperling group was interested in acquiring only LADG's gravel pit operation and related equipment; they did not want to assume the subdivision operations of LADG. Wheeler was an indemnitor on the completion bonds for the subdividers. As such, he would remain liable until the bonds were discharged, which would occur only after the subdivision had been approved and released by the county or city building authorities. At the time of the sale of LADG's stock to the Sperling group the corporation transferred to Wheeler *553 the bank account [13] which it had maintained at Security First National Bank in Compton, California. Thereafter, during the years 1957, 1958 and 1959, Wheeler continued to use the bank account, under the name of LADG, for the deposit of checks received from certain subdividers which were made payable to LADG on the subdivision contracts. He also withdrew funds by checks written on the account. During the years she kept books with respect to LADG's tract operations, Violet (Motz) Wheeler reported gain or loss on subdivision contracts, for tax purposes generally, on a type of completed contract method of accounting. She would credit a particular job account with receipts and debit it for expenses on a cash basis, but would not close out the account and transfer the credit (or debit) balance to profit and loss until the job was "completed." Her understanding and practice was not to consider a job completed until all sums owed by the subdivider under the contract had been received, and all expenses owed by LADG to the subcontractors who performed the work *554 had been paid.Moreover, with respect to jobs on which LADG or Wheeler had indemnified completion or performance bonds for the subdivider, she would not consider the job completed until the County of Los Angeles had inspected and approved the job, releasing the subdivider and indemnitor from any potential liability under their bond. It usually took a year or more after construction was completed before the County accepted a job.Hence, even though the physical work on a job might be finished in one year, gain or loss on a job was often deferred and reported in a later year because of these contingencies.
As of December 31, 1956, records of LADG reflected six contracts with subdividers in the category of "jobs in progress," as that term was used in Mrs. Wheeler's accounting method, which jobs were considered by Mrs. Wheeler and the Sperling group as assigned to Wheeler on that date.The six jobs, listed by the subdividers names, were: Modern Housing, Inc.
Tract No. 15007
Ward and Stiller
Tract No. 18217
Ajax - Imperial
Tract No. 18377
MacArthur Heights, Inc.
Tract No. 16726
Homes of Merit, Inc
Tracts 18182, 19760 and 18193
Williams Construction Co.
Tract No. 19243. In the 1956 corporate income tax *555 return for LADG, prepared and filed by Sperling, the aforesaid six jobs were listed as "jobs in progress sold to H. H. Wheeler." In addition, several other jobs were listed in the return as completed during the year and the profit or loss therefrom was reported. In connection with the preparation of petitioners' income tax return for the year 1958, Violet (Motz) Wheeler provided several work sheets to the accountant who prepared the return, Ralph McClure. Included in the work sheets was a sheet entitled "Jobs Assigned to H. H. Wheeler 12-31-56" containing the names of the aforementioned six jobs and various figures pertaining to each job. The work sheets reflected itemized "receipts" from Modern Housing, MacArthur Heights and Williams Construction Co. in the following total amounts: Modern Housing
1957
$ 24,500.00
1958
3,761.88
Total
$ 28,261.88
MacArthur Heights
1957
$ 226,500.00
1958
23,082.75
1959 (Feb.)
1,000.00
Total
$ 250,582.75
Williams Construction Company - "credit on land purchase" (no date indicated) $ 36,700.00 The 1958 work sheets also contained the figures in two columns after the names of the six subdividers whose contracts had been assigned to Wheeler, as follows: Names
Modern Housing
$ 62,237.87
$ 62,237.87
Ajax Imperial
19,150.00
Homes of Merit
136,530.49
136,530.49
Ward Stiller
17,313.16
17,313.16
Williams Const. Co.
59,595.91
36,700.00
MacArthur Heights
279,659.95
279,659.95
Totals
$ 574,487.38
$ 532,441.47
McClure *556 made certain computations in his own handwriting on the work sheets and determined what he believed to be the correct taxable profit with respect to the six subdivision jobs which Wheeler should report in the 1958 income tax return. McClure determined that he should report long-term capital gain of $180,151.44. In petitioners' 1958 income tax return, McClure included in the schedule reporting capital gains and losses an item described as "contract," acquired December 31, 1956, and "sold June 1, 1958, at a "gross sales price" of $532,441.47. McClure deducted from such price a "cost" of $352,290.03, leaving a net of $180,151.44 which was reported as long-term capital gain. Additional income relating to Modern Housing, Homes of Merit and MacArthur Heights, reported in petitioners' individual income tax returns during the years 1955 through 1959 was as follows: Year
Item Reported as Received by Petitioners
Amount
1955
Interest From MacArthur Heights
$ 51,480.90 footnote *
1955
Principal From MacArthur Heights
166,950.00
1956
Interest From MacArthur Heights
53,836.27
1957
Interest From Modern Housing
2,030.58
1958
Interest From Modern Housing
455.00
1959
Interest From Modern Housing
392.67
1959
"Other Income" From Homes of Merit
8,000.00
footnote *557 * Petitioners' original 1955 return reported interest income of $43,059 from MacArthur Heights. Petitioners' amended 1955 return increased the total received from MacArthur Heights to $51,480.90, of which one-half ($25,740.45) was included in taxable income and the other one-half was allocated to the estate of Helen Mae Wheeler. Of the 1956 interest, one half ($26,918.14) was reported in petitioners' return and the balance by the estate. C. Facts Concerning Respondent's "Excess Withdrawals" Adjustment. Respondent's agent computed the adjustment described as "excess withdrawals" fom the LADG Advance Account, whereby he added the sum of $112,194.43 to petitioners' taxable income for the year 1956. He began his computation by "reconstructing," for the years 1954 through 1956, the "debits" and "credits" to the "Wheeler Advance Account" maintained on the books of LADG. He then computed various adjustments to the reconstructed Advance Account which he concluded "corrected" it to a figure which he believed it should have been. As the result of such "corrections," he concluded that by December 31, 1956, Wheeler had received from various sources $112,194.43 more than the amount due *558 him from LADG, which "excess payments" constituted taxable income to Wheeler in the year 1956. The first adjustment which respondent's agent made to the reconstructed Advance Account in making this computation was to deduct the sum of $29,626.50 from the "balance" as of December 31, 1954. This represented a LADG check which according to respondent was used to purchase land in 1954 by Florence A. Richardson, Wheeler's daughter, which land was then sold to Homes of Merit, Inc. Sullivan concluded that this constituted a repayment of funds owed by LADG to Wheeler and loaned by Wheeler to Mrs. Richardson, which should have been debited to the Advance Account but was not. For the years 1955 and 1956, Mr. Sullivan deducted from the reconstructed Advance Account various sums which, according to respondent, were received by Wheeler from Homes of Merit, Modern Housing and MacArthur Heights, and which, therefore, should have gone through LADG's bank account and been reflected as receipts by Wheeler reducing the balance in the Advance Account. In addition to sums advanced by LADG on behalf of Homes of Merit, Wheeler personally advanced funds to Homes of Merit for land purchases and other purposes *559 in the sum of $176,799.62. D. Facts Concerning Respondent's "Unreported Income from LADG" Adjustments. The adjustments adding alleged unreported income from LADG to petitioners' taxable income for the years 1957 and 1958 were based upon respondent's exhibits AK and AL showing that Wheeler received from the bank account bearing LADG's name checks totaling $192,330 in 1957 and $46,910 in 1958. Mr. Sullivan concluded that the total sum represented by the checks in 1957 and all but $1,000 in 1958 constituted taxable income which petitioners fraudulently failed to report. According to a schedule prepared by Mr. Sullivan, the records of MacArthur Heights and LADG reflected that MacArthur Heights made payments by check payable mostly to LADG in the sum of $226,500 during 1957 and $23,082.75 in 1958. Of said payments in 1957, $185,000 was deposited in the bank account at Security First National Bank in Compton, bearing LADG's name. The other $41,500 paid in 1957 represented two checks used by MacArthur Heights to purchase two cashier's checks, one of which was payable to Title Insurance and Trust Company in the sum of $25,000 and the other was payable to M. Miller Company in the sum *560 of $16,500. The total sum paid by MacArthur Heights in 1958, $23,082.75, was deposited in the LADG bank account. A schedule prepared by Mr. Sullivan showing deposits to the LADG bank account during 1957 reflected deposits to that account from Ward and Stiller (tract 18217, bank number 16-1) totaling $9,618.27 for the year.Also reflected in the schedule were the deposits from MacArthur Heights, Inc., referred to previously, totaling $185,000 for the year; $5,000 labeled as a refund of a deposit from Los Angeles County; and $1,551.88 from unidentified sources. The total deposits reflected for the year 1957 were $201,170.15. No evidence was presented as to the source or total amount of deposits to the LADG bank account for the year 1958, except with respect to the sum of $23,082.75 shown in respondent's exhibit BU as deposited in the account that year from MacArthur Heights, Inc. Mr. Sullivan regarded the checks written on the LADG bank account as taxable income to Wheeler which he fraudulently failed to report because they represented receipts from LADG to which he was not entitled. Sullivan acknowledged that the account was no longer a corporate asset, but had been taken over by *561 Wheeler from LADG in 1956 and was used thereafter by Wheeler as his own account; and that payments had been made into the account in 1957 and 1958 from MacArthur Heights and Ward Stiller with respect to certain of the six subdivision jobs previously specified. Receipts from MacArthur Heights deposited in this bank account bearing LADG's name in 1957 and 1958 were specifically itemized in the work sheets which Mrs. Wheeler provided to McClure for preparation of the 1958 income tax return. E. Facts Concerning the Alleged Unreported Income from Modern Housing and MacArthur Heights. According to a schedule prepared by Mr. Sullivan, the records of Modern Housing, Inc. reflect that it made payments directly to Wheeler during 1957, 1958 and 1959, as follows: Year
Principal
Interest
Total
1957
$ 24,500.00
$ 2,030.58
$ 26,530.58
1958
3,500.00
455.00
3,955.00
1959
2,000.00
392.67
2,392.67
The sums reflected as interest received from Modern Housing in each of said years were reported in petitioners' tax returns. The sums reflected as principal received from Modern Housing for the year 1957 and 1958 were itemized as such in the work sheets Mrs. Wheeler provided to McClure in connection with the 1958 return. *562 The adjustment of $41,500 from MacArthur Heights for the year 1957 represents two checks from MacArthur Heights which were not deposited in the LADG bank account that year, but which respondent determined constituted income to Wheeler. These sums were included in the itemized receipts from MacArthur Heights on Mrs. Wheeler's work papers given to McClure. F. Facts Concerning the Unreported Gain from Milton Kauffman Sale. The 1950 income tax return filed by Henry H. and Helen M. Wheeler reported an installment sale on April 14, 1950, of 113 acres of land (to Milton Kauffman) for a gross sales price of $397,800. The cost of the property was $25,000 and the amount received in 1950 was $53,400.The percentage of taxable profit reportable under the installment method was 93.71 percent. The remaining balance of the purchase price was represented by an interest bearing promissory note, in the principal sum of $344,400, secured by a deed of trust.Milton Kauffman's interest in the property was later passed to MacArthur Heights, Inc. which Kauffman owned. In 1955 and 1956 payments were made by MacArthur Heights to Wheeler in satisfaction of the note and deed of trust in the amounts of *563 $166,950 and $177,450, respectively, plus interest. Both the principal and interest received in 1955 were reported in petitioners' return for that year. In connection with the preparation of petitioners' individual income tax return for 1956, Violet (Motz) Wheeler supplied to Ralph McClure, the C.P.A. who prepared the return, work sheets of the type which she normally prepared for tax return purposes. The work sheets advised that in 1956 receipts of $177,450 had been collected on the 1950 installment sale, plus interest of $53,836.27. They also reflected the amounts collected and reported previously in 1950 and 1955. In preparing the 1956 return for the Wheelers, McClure reported the interest received but omitted the principal payments. However, he reported the full transaction in the separate 1956 fiduciary income tax return which he prepared and filed for the estate of Helen M. Wheeler on July 15, 1957, and included one-half of the taxable profit on the 1956 collections. V. FACTS RELATING TO REMAINING ADJUSTMENTS TO INDIVIDUAL INCOME TAXES FOR YEARS 1949 THROUGH 1958. Respondent made certain other adjustments to petitioners' individual income taxes in Docket Nos. 989-69 *564 and 987-69 for years 1949 through 1958 as follows: Item
Dkt. No.
Year
Amount
"Additional Receipts from LADG"
989-69
1949
$ 40,000.00
1950
20,000.00
1952
54,920.28
Cashier's Checks Purchased by LADG
989-69
1949
12,140.00
1950
19,938.48
1952
49,840.80
Park Water Co. Capital Account
989-69
1951
4,012.22
Park Water Co. "Notes Payable Account"
989-69
1953
2,851.33
Pilgrim Estates
989-69
1953
67,819.98
1954
1,111.75
1955
2,223.48
987-69
1956
1,111.75
1957
2,364.29
"Constructive Dividends" from Los Nietos Water Co.and Bellflower Land and Water Co.
989-69
1949
10,772.40
"Constructive Dividends"
989-69
1950
800.00
Los Nietos Water Co. and
Bellflower Land and Water
Co.
"Constructive Dividends"
989-69
1953
1,757.00
Los Nietos Water Co.
Increase in Long-Term
989-69
1953
34,272.11
Capital Gain (Property Sales)
"Corporate Funds Diverted"
989-69
1953
62,097.40
Los Nietos Water and Bellflower Land and Water Co. Unreported Receipts--
989-69
1953
$ 211.68
City of Manhattan Beach
"Constructive Dividends"
989-69
1954
4,361.06
Park Water Co.
"Corporate Funds Diverted"
989-69
1954
2,196.81
Park Water Co.
Interest--
989-69
1954
331.46
Homes of Merit, Inc.
"Constructive Dividends"
989-69
1955
700.00
Park Water Co.
Capital Gain Income In
989-69
1955
3,500.00
Connection with 1952
Installment Sale to Lewis Burford
Interest Income
987-69
1956
1,447.14
"Constructive Dividends"
987-69
1956
600.00
Use of Park Water Co.
1957
600.00
Automobile
1958
600.00
None *565 of these items was designated specifically as a fraud item. Petitioners presented no evidence with respect to any of them. However, with respect to income adjustments for 1956, respondent offered evidence only as to the $1,111.75 item from Pilgrim Estates.Respondent's evidence in this regard consisted of a schedule which reflects funds received by Wheeler from Pilgrim Estates, Inc. in 1956 in the stated amount. VI. FACTS RELATING TO ADJUSTMENTS TO CORPORATE INCOME TAXES OF LADG (DOCKET NO. 990-69). A. Items of Income Adjustments (1953). Respondent made certain determinations and adjustments to the income of LADG for the year 1953 as follows: (1) That LADG improperly wrote off in 1953 the sum of $198.189.68, representing a portion of the cost of an uncompleted job incurred in connection with a tract referred to herein as MacArthur Heights Tract No. 16726. (2) That LADG improperly deferred a profit from a completed job in the sum of $69,584, realized in connection with a tract referred to herein as Rainspray Tract No. 17563, which should have been reported in 1953. (3) That LADG improperly failed to report and diverted to its principal stockholder, Wheeler, profit from a completed *566 job by charging to job cost, in connection with a tract referred to herein as Kauffman Tract No. 17369, the sum of $40,000 which respondent determined to be a loan to Miller, a sewer subcontractor. (4) That LADG improperly failed to report and diverted to its principal stockholder, Wheeler, profit from a completed job by crediting the sum of $6,000 to the Wheeler Advance Account and debiting a tract referred to herein as Milton Kauffman Tract No. 18555. (5) That certain funds in the sum of $9,500, representing income to LADG, were "received by principal stockholder not charged to him." All of the adjustments referred to above except item (5) were specified by respondent as fraud items in his Answer to the Petition. B. Background Facts.
Violet (Motz) Wheeler reported LADG's gain or loss on contracts, for tax purposes, on a completed contract method of accounting. She would credit a particular job account with receipts and debit it for expenses on a cash basis, but would not close out the account and transfer the credit (or debit) balance to profit and loss until the job was completed. Her understanding and practice was not to consider a job completed until all sums owned to LADG *567 by the subdivider under the contract had been received, and all expenses owed by LADG to the subcontractors who performed the work had been paid. With respect to jobs on which LADG had indemnified completion or performance bonds for the subdivider, she did not consider the job completed until the County of Los Angeles had inspected and approved the job, releasing the subdivider and LADG from any potential liability under their bond. It usually took a year or more after construction was completed before the County of Los Angeles accepted a job. Hence, even though the physical work on a job might be finished in one year, LADG's gain or loss on a job was often deferred and reported in a later year because of such contingencies. LADG's actual ledger sheets showing its tract operations were not available for the year 1953 or any other year. LADG's only available records relating to respondent's income adjustments for the year 1953 consisted of a partial set of work sheets prepared by Mrs. Wheeler, cancelled checks, deposit slips, a PUC transcript of the Wheeler Advance Account and miscellaneous invoices and correspondence. On the basis of the partial records of LADG available for *568 the year 1953, Special Agent Sullivan concluded that LADG's income for that year had been fraudulently understated as the result of four entries on those records which he regarded as improper. Because of the unavailability of complete records, Mr. Sullivan was unable to determine whether these items were reported in a year other than 1953. C. Facts Concerning MacArthur Heights Write-Off.
Mrs. Wheeler charged off the sum of $198,189.68 as a loss incurred for extraordinary grading costs with respect to MacArthur Heights Tract 16726. This was a special tract, being a side-hill subdivision which required considerable preliminary grading. Costs of $198,189.68 were paid by LADG to the principal grading contractor, H.B. Adair, but he incurred unanticipated difficulties caused by soil conditions and further grading had to be performed. Mrs. Wheeler believed the initial grading was completed in 1953. The reasons given by Mr. Sullivan in support of his conclusion that the grading loss was improper were that grading with respect to this tract continued after 1953; and that the tract was completed after 1953, with LADG being paid in full on its contract with MacArthur Heights, thereby reimbursing *569 LADG for the $198,189.68 written off. Mr. Sullivan did not know whether the original grading had to be redone or whether the grading that continued after 1953 was under a separate contract from the one on which the $198,189.68 had been incurred. D. Facts Concerning Rainspray Adjustment.
In examining the partial records available for LADG with respect to the year 1953, Mr. Sullivan determined that there were three jobs shown on a work sheet as having credit balances in their accounts as of December 31, 1953, which were not reported as completed jobs in that year. In his 1959 conference with Mrs. Wheeler he asked her why these three credit balances were not included in LADG's profits from completed jobs in computing its taxable income for 1953. Mrs. Wheeler replied that there were some outstanding charges or bills not yet received or the work was not completed. Mr. Sullivan did not press for a further explanation, but instead undertook to ascertain whether any additional LADG checks had been paid in subsequent years which could be identified as the payment of costs in connection with the three deferred jobs. He determined that in the case of two of the jobs additional costs were *570 paid after 1953, and hence made no adjustment for 1953. However, with respect to the third job, involving Rainspray Tract 17563, Mr. Sullivan found no LADG checks issued after 1953 which could be traced to that job. Accordingly, he concluded the credit balance at the end of 1953 represented taxable profit which was deliberately and fraudulently deferred when it should have been reported in 1953. Mr. Sullivan also relied on certain documents consisting of an invoice from subcontractor and several checks to subcontractors, bearing the work "complete" in Mr. Wheeler's handwriting, which were dated in 1953 and apparently related to tract number 17563. Mr. Sullivan concluded that this further supported his belief that the work was finished and no further bills were to be paid at the end of 1953. Mrs. Wheeler did not report the credit balance in the Rainspray account at the end of 1953 as taxable profit that year because she did not consider the job complete at the end of 1953, either because it had not been accepted by the County of Los Angeles or the money had not yet been collected from the subdivider. Rainspray was a corporation owned by a tract developer by the name of William *571 Lansdale. Lansdale developed several tracts with LADG during this period of time and LADG was paid a specified sum for the installation of off-site improvements out of the escrows from the sale of individual lots. LADG was given a deed of trust on all of the tracts as security for such payment so that each tract was security for all of the others.Wheeler also had indemnified completion bonds on all of these tracts. At least one tract being developed by Lansdale, which was across the river from Rainspray tract number 17563, was not fully sold until after 1953. Although the physical work on Rainspray tract 17563 was completed in 1953, the County did not accept the job and release Rainspray and Wheeler from potential liability on their completion obligations until more than a year later. E. Facts Concerning "Miller Loan" Adjustment.
Mr. Sullivan, upon examining LADG's partial records for 1953, concluded that an item identified as "Miller", showing a debit balance of $40,000, represented three payments by LADG to M. Miller Co., a sewer contractor, in February 1953.In Mrs. Wheeler's closing entries for the year 1953, the "Miller" debit balance was eliminated; also a credit balance *572 of $68,647.78 contained in a job account for Milton Kauffman Tract 17639 was reduced to $28,647.78. Mr. Sullivan concluded that the $40,000 Miller item had been eliminated by a charge against the Kauffman tract in that amount. The balance of $28,647.18 was included in profits reported for the year. Mr. Sullivan inferred that the three payments to Miller totaling $40,000 were responsible for the $40,000 reduction in the Kauffman tract credit balance because of the identity of the total amounts involved, even though they could not be positively identified as such without the actual tract ledgers. Mr. Sullivan further concluded that the payments of $40,000 from LADG represented a loan from Wheeler to Miller because it was reflected as such on Miller's books. Miller did practically every sewer job for LADG and all payments from LADG to Miller in 1953, except the $40,000 in question, were "identified" as being payments for sewer work. Mrs. Wheeler treated an advance of $40,000 to Miller as a charge against a job. She explained that it was common practice to advance funds to contractors against sums they would have coming on jobs. As far as she knew, this was a payment on account *573 of a sewer contract. Mrs. Wheeler made a bookkeeping error in the treatment of the item. F. Facts Concerning the $6,000 Item.
Mrs. Wheeler was unable to explain from the limited LADG records, the nature of the transaction reflected on the sheet of her work papers labeled "adjustments," crediting $6,000 to the Wheeler Advance Account at the close of the year 1953. Respondent's reason for treating the $6,000 credit to the Wheeler Advance Account as an increase to the income of LADG was that it appeared from Mrs. Wheeler's work papers that such credit was the result of a debit to a credit balance on a tract designated as MK 18555, which was a Milton Kauffman tract. In the course of the trial it developed that the $6,000 item was a payment by Milton Kauffman to LADG in April of 1953, relating to a tract bearing the number 15580. The payment was intended by Wheeler to be credited to the Wheeler Advance Account. Apparently, however, the payment was mistakenly credited by Mrs. Wheeler to Kauffman Tract 18555 when received, and then was transferred to the Advance Account at the end of the year. G. Items of Income Adjustment (1956).
Respondent made certain determinations and adjustments *574 to the income of LADG for the year 1956 as follows: (1) That LADG improperly claimed a loss on jobs in progress sold to H.H. Wheeler in the sum of $233,832.84. (2) That "commission income" of $6,626 was received by LADG in 1956 from Homes of Merit, Inc. but omitted from the return for 1956. Only the alleged improper loss was specified by respondent as a fraud item in his Answer to the Petition. H. Facts Concerning 1956 Adjustments.
In its return for the year 1956, LADG reported a net loss of $210,632.46. In a schedule attached to the return, in the handwriting of John G. Sperling, the C.P.A. who prepared the return, a loss of $233,832.84 was claimed with respect to an item designated as "Jobs in progress sold to H.H. Wheeler." On the basis of the claimed loss, Sperling prepared and filed refund claims for LADG for the years 1954 and 1955, based upon a carryback of the net operating loss claimed in the 1956 return. The refund was received by the corporation and used in its operations to help offset current losses. Such refund was claimed and obtained after all of the stock of LADG had been purchased in early 1957 by the group of seven individuals of which Sperling was a member. *575 Wheeler did not receive any of the refund, directly or indirectly. Sperling did not see the actual tract ledgers of LADG but in early 1957 he obtained from Mrs. Wheeler the figures and information which he used for the preparation of the schedule in which the loss was claimed. Mrs. Wheeler had not made the closing entries for December 1956 at the time of her meeting with Sperling, so she retained the LADG records until she had completed them for the year. Shortly after the meeting with Sperling, in early 1957, she gave the LADG tract records to Wheeler for delivery to the Montebello office of LADG. A fire occurred at the Montebello office of LADG in May 1957 which destroyed most of the records. Portions of the tract records were obtained by Mr. Sullivan and Mr. Abels from LADG's then owners during respondent's investigation, some of which records revealed fire damage.
There is no evidence as to what specific information Mrs. Wheeler gave to Sperling or whether he correctly understood the facts such information purported to reflect concerning LADG's tract operations. There is no evidence that Mrs. Wheeler made any representations or gave any advice to Sperling concerning the tax *576 treatment to be accorded the transfer to Wheeler of the six jobs, or that she had any knowledge of the manner in which Sperling chose to interpret and use the information. It was Sperling's decision to claim the loss after he and others of his group, including Mr. Sturzenaker, an attorney, had researched its availability. Their principal concern was whether a majority of the former stockholders were related to Wheeler, because Wheeler was the "purchaser" of the assets. [14]
The loss was computed in the return by deducting from a stated "sale price" of $340,654.54, the aggregate amount of "costs to date" on the six jobs in progress, listed in the return as *577 follows: Modern Housing
$ 62,237.87
Ward & Stiller
17,313.16
Ajax-Imperial
19,150.00
MacArthur Heights
136,530.49
Homes of Merit
279,659.95
Williams Const. Co.
59,595.91
Total
$ 5,744,878.38
Respondent's statutory notice disallowed the loss deduction of $233,832.84, thus computed, on the ground that "the accumulated costs of jobs in process was overstated to the extent of $399,255.86; and, further, any loss would be precluded by the provisions of section 267(a) of the Internal Revenue Code of 1954." Mr. Sullivan determined during his investigation that the LADG return for 1956 was in error in claiming the loss because: (1) the unrecovered costs shown in the return were overstated; (2) the "sale price" was overstated; and (3) the jobs in question were not in progress (except for MacArthur Heights) but had actually been completed as of December 31, 1956. With respect to the alleged overstatement of costs, it was determined that the Modern Housing tract figure of $62,237.87 stated in the return was overstated by $60,000 because respondent's exhibit By reflects payments of $60,000 by Modern Housing prior to December 31, 1956; that the Homes of Merit figure of $279,659.95 was overstated in that amount *578 since that contract had been paid off in 1956; that the Williams Construction Company figure of $59,595.91 was overstated in that amount because the contract had been paid off in 1955. Respondent conceded that the figures for Ward & Stiller ($17,313.16) and Ajax-Imperial ($19,150.00) had been verified as correct and represented amounts that had not been paid at that time. As for MacArthur Heights, the job was still in progress at the end of 1956, with continuing advances being made to MacArthur Heights, although some repayments had been made toward the total advances as of December 31, 1956. Mr. Sullivan determined that the "sales price" stated in the 1956 return was overstated in that it was based upon an amount which he assumed was shown on LADG's books as owing to Wheeler as of December 31, 1956, whereas he had determined that LADG did not owe Wheeler anything as of that date. The relevance, if any, of the alleged overstatement of the selling price in connection with LADG's tax liability was not explained. Mr. Sullivan determined that of the six jobs in question all were completed prior to December 31, 1956, except for MacArthur Heights. However, under Mrs. Wheeler's method *579 of accounting, the jobs were not complete for tax reporting purposes until all sums had been collected on the contracts, all bills had been paid and the County of Los Angeles accepted and approved the job, releasing the contractors and indemnitors from liability on their completion bonds. As of December 31, 1956, amounts remained to be paid with respect to Ward & Stiller and Ajax-Imperial; and amounts were paid after 1956 by Modern Housing and Homes of Merit. The full amount owed by Williams Construction Company was not collected. The tract records of LADG were not available, nor were any records of Homes of Merit, Modern Housing or Williams Construction Company produced to establish that LADG's records failed to correctly reflect the costs advanced on those three jobs as of December 31, 1956, or that any false or erroneous information was supplied by Mrs. Wheeler to Sperling concerning such costs. Mr. Sullivan had no reason to believe that Sperling was not filing a true and correct 1956 return for LADG. Sullivan did not question Sperling's intent. He knew Wheeler did not receive any of the refund produced by the loss deduction and refund claims filed by Sperling. Nevertheless, *580 he concluded that the 1956 underpayment of taxes by LADG was due to fraud, which he attributed to Wheeler, because Sperling relied on information supplied to him by Mrs. Wheeler. No evidence was offered by respondent with respect to the adjustment to LADG's 1956 income tax liability involving the alleged unreported "commission income" of $6,626.52 from Homes of Merit, Inc. VII. FACTS RELATING TO THE ESTATE OF HELEN M. WHEELER, DECEASED, DKT. NO. 986-69. A. Estate Tax Adjustments. In his notice of deficiency with respect to the Estate of Helen M. Wheeler the respondent determined the following adjustments to the taxable estate: Return
Determined
(a) Schedule A - Real Estate
Item 4-133.6024 acres (unimproved)
$ 133,802.40
$ 240,000.00
Less: 1/2 to community
66,901.20
120,000.00
Balance
120,000.00
Total included
66,901.20
Increase in estate
53,098.80
(b) Schedule B Stocks and Bonds
Item 2-60,000 shs. Park Water Co.
600,000.00
$ 1,912,500.00
(Common)
Item 3-46,000 shs. American Sulfur
none
4,600.00
& Refining Company (Common)
Triangle Rock note unpaid balance
17,500.00
Bay Water Co., 318-1/2 shs.
7,195.99
Local Improvement Bonds (Dist. #1)
708.46
Local Improvement Bonds (Dist. #2)
586.95
Local Improvement Bonds (City of Torrance)
497.80
L.A. Decomposed Granite Co., 350 shs.
40,000.00
Total
600,000.00
1,983,589.20
Total included
600,000.00
Balance
1,383,589.20
Less: 1/2 to community
691,794.60
Increase in estate
691,794.60
(c) Schedule C - Mortgages, Notes and Cash
Item 1 - Cash in Security First
5,810.69
28,788.82
National Bank
Item 2 - Mortgage Note, secured by
250,240.00
294,400.00
Deed of Trust = Milton F.
Kauffman, Inc.
Item 3 - Promissory Note, secured
126,423.30
148,733.29
by Deed of Trust Monterey
Disposal Co.
Item 4 - Promissory Note - William
77,020.20
90,612.00
Sales Corp.
Notes Payable - H. H. Wheeler
220,000.00
on Park Water Co. books
Notes Receivable-Milton Kauffman
15,000.00
Balance
797,534.11
Amount Included
459,494.19
459,494.19
Balance
338,039.92
Less: 1/2 to community
169,019.96
Increase in estate
$ 169,019.96
(d) Schedule F - Other Miscellaneous property
Insurance on Life of Widower
16,176.30
Natural gold - 1057 ounces
40,180.96
Advances: L. A. Decomposed Granite Co.
451,032.83
Florence A. Richardson
139,264.63
Henry H. Wheeler, Jr.
34,682.62
M. Miller Co.-P.&J. Artukovich
172,338.06
Total
853,674.50
Amount included
none
Balance
853,674.50
Less: 1/2 to community
426,837.25
Increase in estate
426,837.25
(e) Schedule J - Funeral expenses and expenses
incurred in administering property
subject to claims
Item 1 - Attorney fees
12,878.16
15,000.00
Funeral expenses
1,162.56
581.28
Total included
14,040.72
as corrected
15,581.28
15,581.28
Decrease in estate
(1,540.56)
(f) Schedule K - Debts of Decedent
Item 6 - Santa Monica Hospital
94.07
Item 7 - Dr. W. L. Mortensen
45.00
Total
139.07
139.07
Less: 1/2 to community
69.54
Increase in estate
$ 69.53
*581 In respondent's answer in Docket No. 986-69, he listed the following alleged assets which he asserts were fraudulently omitted from the estate tax return: Schedule B - Stocks and Bonds
1) Park Water Company
$ 82,500.00
2) L.A. Decomposed Granite Co.
20,000.00
Schedule C - Mortgages, Notes & Cash
3) Cash in bank
11,489.06
4) Kauffman note
7,500.00
Schedule F - Other Miscellaneous Property
5) Natural gold
20,090.03
6) Advances - L.A. Decomposed Granite
225,516.42
7) Advances - Florence Richardson Neal
62,313.25
8) Advances - Henry H. Wheeler, Jr.
14,341.31
9) Advances - Miller Co. - P.&J. Artukovich
86,169.03
$ 529,920.00
B. Background Facts. Helen M. Wheeler died January 9, 1955 after a lengthy illness. During the ordeal of her illness and continuing after her death, Wheeler's extensive business affairs were complicated by a dispute and expensive lawsuit brought by a man named Rosenthal to compel a sale of the Park Water Company stock. As executor of his wife's estate, Wheeler enlisted the services of his regular accountant, Ralph McClure, and his attorney, Thomas Webster, to prepare the necessary papers and returns for probate purposes, state inheritance tax purposes and Federal estate tax purposes. *582 Webster was familiar with Wheeler's business affairs from having represented him for some time in general matters and was a knowledgeable counsel to handle his wife's estate. Both McClure and Webster conferred with Wheeler from time to time and attempted to search out all of the assets of the estate. Both McClure and Webster relied primarily on Wheeler for their information and Wheeler answered all the questions put to him. Both Webster and McClure knew Wheeler to be a very busy man whose business affais were numerous and complex. While McClure had prepared other estate tax returns previously, he had never had one as complicated as the Wheeler estate. Wheeler would bring in bits and pieces of information from time to time and would sometimes ask Webster if a particular asset should be listed in the estate. Webster would advise him as to whether it should be reported. The meetings were generally short; Webster did not ever have Wheeler sit down at one time and go over all of the assets, but he advised him to include in the estate's inventory all property he owned or acquired with Helen Wheeler. Wheeler often gave him information for the estate tax return from his memory. McClure *583 found that it was sometimes not accurate, but he generally relied on it. Later, they discovered Wheeler had overlooked items. Wheeler attributed the oversights to the fact that he was busy and the ordeals of his wife's death and his legal fight to keep Park Water Company. Both Webster and McClure believed that they did everything they could to find all of the reportable assets and did not deliberately overlook anything. However, they discovered previously overlooked assets from time to time, including several which were discovered after the estate tax return was filed on June 29, 1956. But it was not uncommon in their practices to discover additional assets after the estate tax return had been filed. It was common in California probate practice to routinely file supplemental inventories with the inheritance tax appraiser and Probate Court, sometimes over a period of years, to report assets previously missed. The values reported for the assets listed in the Form 706 Estate Tax Return prepared by McClure were generally the same as the values established for state inheritance tax and probate purposes by the California Inheritance Tax Appraiser. It is the usual practice to report *584 the State Inheritance Tax Appraiser's values in the Federal estate tax return. McClure prepared a Form 704, Estate Tax Preliminary Notice, executed by Wheeler, which was filed on March 8, 1955. The form reported the approximate value of the property comprising the gross estate as $958,000. The estate tax return prepared by McClure, executed by Wheeler and filed on June 29, 1956, reported a gross estate of $899,815.67, and a net taxable estate of $571,279.36. The estate tax reported and paid, less a credit for state death taxes, was $155,396.61. The assets reported included: Real Estate (Schedule A)
$ 248,252.40
Community Property 1/2
124,126.20
Stocks and Bonds
1,037,500.00
(Schedule B)
Community Property 1/2
518,750.00
Mortgages, Notes & Cash
513,378.94
(Schedule C)
Community Property 1/2
256,689.47
Miscellaneous Property
500.00
(Schedule F)
Community Property 1/2
250.00
On December 31, 1956, McClure sent a letter addressed to the District Director of Internal Revenue advising that since the filing of the estate tax return, certain additional assets had been discovered and should be added to the gross estate. The assets were: (1) trust deed by Triangle Rock Co.
$ 17,500.00
(2) 318-1/2 shs. of stock Bay Water Co.
7,195.99
(3) Sonoma County Improvement Bonds (Dist. 1)
708.46
(4) Sonoma County Improvement Bonds (Dist. 2)
586.95
(5) City of Torrance Improvement Bonds
497.80
TOTAL
$ 26,489.20
Community Property 1/2
$ 13,244.60
These *585 assets were brought to McClure's attention by Wheeler or Webster, or both. In connection with the probate of the estate and appraisal for inheritance tax purposes, Webster prepared and filed an initial Inventory and Appraisement (Partial) on or about February 23, 1956. The document listed seven items of real property and household furniture. A Supplemental Inventory and Appraisement was filed June 26, 1956, listing a number of additional assets at a total appraised value of $1,552,378.94. A Second Supplemental Inventory was filed February 1, 1957. A Third Supplemental Inventory was filed April 15, 1959, reporting two additional assets consisting of an interest in an escrow valued at $37,599.33 and a promissory note and deed of trust valued at $20,000. A letter from an attorney, Clement H. Jacomini, who succeeded Thomas Webster as attorney for the estate, accompanied the Inventory and Appraisement. It explained that the estate was contesting the inclusion of the 350 shares of LADG stock in the estate, though it was included in the Inventory and Appraisement. In January 1970, a substitute Supplemental Inventory and Appraisement, with an explanatory letter from Jacomini, deleted *586 the LADG stock item and reaffirmed the estate's position that such stock was not properly an asset of the estate. On March 11, 1957, the estate tax return for the Wheeler estate was assigned by respondent to Milton McGrew for audit. Mr. McGrew was an attorney employed by the Internal Revenue Service as an estate tax examiner. When he received the case for audit, McClure's letter of December 31, 1956, reporting additional assets, was already in the file. In his estate tax examinations, McGrew customarily encountered a great many questions of evaluation, deductions and additions respecting assets of the estate. In the Wheeler examination, he recalled an addition to the estate representing the value of insurance on the life of the widower that was includible in the estate to the extent of the decedent's community one-half. It had been omitted from the assets reported and McGrew brought this item to the attention of the representative of the estate. As a response, he obtained a letter from Webster, dated May 9, 1957, reporting information and values pertaining to three insurance policies on Wheeler's life. McGrew stated that this was an item quite commonly overlooked in the preparation *587 of estate tax returns. The estate tax return followed the values used by the State Inheritance Tax Appraiser, which was customary. McGrew did not question the smaller items in the return, but did investigate the major items. He conferred with Wheeler, McClure and Webster, viewed various pieces of property, examined the probate files and Park Water Company records. Wheeler answered all questions asked of him about his property and McGrew thought Wheeler was candid and honest with him and had made no effort to withhold any information requested. At the conclusion of his audit, McGrew prepared a report which the estate's representatives accepted and agreed to, providing for an assessment of an additional estate tax of $63,361,36. The deficiency was attributable to the additionally discovered assets reported by McClure, the insurance discovered by McGrew and changes in the valuation of certain of the assets. On July 1, 1957, on the basis of McGrew's recommended adjustments and their acceptance by the estate's representatives, Wheeler executed an estate tax waiver of restrictions on assessment and collection of the $63,361.36 deficiency. McGrew knew it was quite common for an attorney *588 handling a probate estate in California to file supplemental inventories reporting after-discovered assets. It is also common for additional assets to be discovered after the estate tax return was filed. McGrew was transferred to the Appellate Division of the Internal Revenue Service in August of 1957. Subsequently, there was a review of McGrew's adjustments by a group supervisor. In connection with the review, additional materials were supplied to the Internal Revenue Service by the taxpayers' representatives relative to the payment of state inheritance taxes, the questionable value of an indebtedness to Wheeler from American Sulphur and Refining Company and stock he had received in that Company and the value of certain parcels of real property. The deficiency of $63,361.36 was paid by taxpayer on December 23, 1957 with interest thereon. On June 10, 1959, the estate tax return was transferred to the Intelligence Division of the Internal Revenue Service at Mr. Sullivan's request for audit in conjunction with the income tax investigation which was then in progress. C. Facts Concerning Park Water Co. Stock. The estate tax return reported as an asset the deceased's community *589 property interest in 60,000 shares of Park Water Co. common stock. This represented the number of shares issued and outstanding in the name of Henry H. Wheeler on the date of death as shown in the Company records. The stock was reported at a total value of $600,000, representing a value of $10 per share. This value was used by the California Inheritance Tax Appraiser, who had examined the company's balance sheet as of December 31, 1954. During his audit of the estate tax return, McGrew visited the offices of Park Water Company and obtained operating statements, profit and loss statements and balance sheets for a period of years. He ascertained that there was a total of 80,000 shares of Park Water Company stock outstanding. He did not recall the names of the other stockholders, but knew that the balance of the stock was not in Mr. or Mrs. Wheeler's name. McGrew also was aware of Rosenthal's lawsuit to acquire the stock, pending at the time of Helen Wheeler's death. McGrew filed a report recommending that the value of the Park Water Company stock at the date of death be fixed at $13 per share, which figure was accepted by the estate's representatives. He recommended an adjustment *590 increasing the taxable estate accordingly. Mr. Sullivan, in his audit of the estate tax return, considered that 14,615 shares of Park Water Company stock in the name of Violet Motz and 1,885 shares in the name of O. D. Collins on the date of death were in reality shares belonging to Wheeler which had been fraudulently concealed. For fraud purposes, the amount of the adjustment was computed at $82,500, representing a one-half interest in 16,500 shares, valued at the reported value of $10 per share (i.e., one-half of $165,000). The basis of this adjustment was that Sullivan had determined that the money received by Park Water Company for the issuance of these 16,500 shares of stock to Motz and Collins in February of 1952 actually came from Wheeler. The money, he thought, went from Wheeler to Motz and Collins, who in turn channeled the funds to Park and the stock was issued in their names. Mr. Sullivan conceded that Violet Motz and O. D. Collins were the true owners of the remaining shares standing in their names, but he did not consider them to be the owners of the 16,500 shares involved in his adjustment because of the manner in which they were acquired by them. But he denied *591 that any of the money received by Park for the stock involved in his adjustment had been borrowed from insurance companies. He knew that $2,000,000 had been borrowed by Park in 1951, but he did not see how that was germane to the issue of Wheeler's purchase of stock in 1952. The actual facts concerning the issuance of Park's stock to Motz and Collins include the following: (a) Prior to May of 1951, Violet Motz was the owner of 4,100 shares standing in her name and O. D. Collins was the owner of 400 shares standing in his name. (b) In May of 1951, 10,629 additional shares were issued to Miss Motz and 1,371 additional shares were issued to O. D. Collins. Such shares were part of a pro rata stock issuance and were issued, at par value, in exchange solely for funds which were first borrowed by Park from two insurance companies, then passed through Wheeler to Motz and Collins and back to Park through a circuity of checks. (c) On February 20, 1952, as part of another pro rata stock issuance, Park issued an additional 1,328 shares to Violet Motz and 172 shares to O. D. Collins, at par value. Such shares were issued in exchange for funds drawn from LADG, charged to the Wheeler Advance *592 Account, and paid first to Wheeler, then to Motz and Collins and finally to Park. (d) On February 29, 1952, Park made a further pro rata stock issuance which included an additional 2,658 shares to Violet Motz and 342 shares to O. D. Collins, at par value. On Park's books the stock was reflected as issued in exchange for money received at that time. However, the cash was apparently not actually received by Park until December of 1952. The funds for the stock issued to Motz and Collins came initially from them, although there was again a circuity of checks, in part because Miss Motz' first check was returned for insufficient funds and in part because the funds were transferred from one bank account to another through Wheeler's bank account during a period of approximately two months. (e) All of the aforesaid stock pro rata issuances commencing in May of 1951 through February, 1962, were made in accordance with the attempt by Park and its stockholders to build up a rate base for PUC purposes by converting monies received initially from subdividers into pro rata capital contributions from Park's own stockholders. Also, it was a condition of the loan, imposed by the insurance companies, *593 that stock be issued pro rata to eliminate the stock subscription account as a "liability" of Park.The Public Utilities Commission discovered these facts during Park's subsequent rate hearing and refused to treat the funds received for the 1951 and 1952 stock issuances as shareholder contributions. Subsequently, most of the stock issued in 1951 and 1952 was cancelled. The book value of Park Water Company stock was $27.70 per share. In 1953 Rosenthal of Citizens Utility Co. offered to purchase the stock for $25 per share. He sued for specific performance and the litigation was pending when Helen Wheeler died. The fair market value of the Park Water Company stock on the date of Helen Wheeler's death was $25 per share. D. Facts Concerning LADG Stock. The estate tax return did not report any stock of LADG as an asset of the estate on the date of death, January 9, 1955. Rather, the 1954 income tax return of Henry H. Wheeler and Helen M. Wheeler, filed January 17, 1955, reported a sale of Wheeler's stock in that corporation at a gross sale price of $40,000. Longterm capital gain on the sale in the amount of $8,250 was reported. In 1954, Wheeler executed written agreements to *594 sell his 350 shares of LADG stock to Thomas N. Neale and Herald Williams for a total price of $40,000. The stock was in fact transferred to them on the books of the corporation in 1954. Subsequently the stock was transferred to Violet Motz and in January 1957 to the Sperling group which acquired all of LADG's stock at that time. Both Neale and Williams did not have available the $20,000 which each agreed to pay for 175 shares of LADG stock. Neale borrowed $10,000 from Miss Motz and $10,000 from American Sulphur and Refining Corporation in which he was an officer and shareholder. Williams borrowed $10,000 from Miss Motz and $10,000 from Wheeler. Both Neale and Williams believed they subsequently surrendered the stock to Miss Motz in satisfaction of their purchase obligations. Wheeler told both Neale and Williams that it was desirable for him to divest himself of the LADG stock because of his difficulties with the PUC. During Park Water Company's rate hearing before the PUC, Wheeler took the position that he no longer owned any stock of LADG.Wheeler thought the Commission was not entitled to examine LADG's records because it was not under the Commission's jurisdiction. The Commission *595 attempted to serve a subpoena on Wheeler to force the production of the records, but could not do so because he had sold his stock to other individuals and no longer controlled the corporation. Later, however, the records were produced. The PUC's Opinion in the rate case, issued November 14, 1955, concluded that the transfer of LADG was for the purpose of hindering the PUC investigation.
Wheeler agreed with Williams and Neale that he would continue being responsible for LADG's subdivision activities and promised that he would find another buyer of the stock interested in acquiring the corporation's granite operation. When the stock was acquired by the Sperling group in 1957, they dealt with Wheeler rather than Williams or Neale; but they knew Wheeler was not a stockholder and regarded him as the spokesman or agent for the sellers.
Violet Motz Wheeler testified before the PUC that she also had sold her shares to Neale and Williams in March of 1955, and mailed her certificate to a local bank. In the trial of these cases she explained that the stock was escrowed at Valley Bank, but when Neale and Williams did not put up the money, her stock was returned to her. The 1957 income tax *596 return filed by Henry and Violet Wheeler reported the sale of her 25 shares of LADG stock on February 7, 1957 for $2,500. E. Facts Concerning Cash in Bank. The estate tax return reported as an asset the decedent's community property interest in cash in Wheeler's bank account at Security First National Bank in the sum of $5,810.69. The figure for cash reported in the return was obtained by McClure from Wheeler. McClure thought Wheeler had written it on a piece of paper. Webster generally asked executors for corroborating evidence of the bank account balance, and he sometimes contacted the bank directly himself. However, he could not remember what was done with respect to the bank account in the Wheeler estate. Wheeler gave McClure the figure for the bank account from the balance shown on his check stub as of the date of death. The balance shown on the stub of a check written on January 10, 1955, prior to deducting the amount of that check, was $5,810.69. Wheeler's check stubs also showed on a stub for a subsequent check written January 12, 1955, that a deposit of $23,188.70 was apparently made on January 6, but not added to the balance in the checkbook until January 12 check *597 was written. Mr. Sullivan's audit disclosed that the bank balance as of January 9, 1955 on the bank's ledger sheet was $29,544.15. An analysis of checks outstanding showed that they totaled $755.33. Thus, the figure reported in the return was understated by $22,978.13. When Sullivan asked Wheeler about the bank balance, Wheeler stated that he thought he had obtained the figure from his check stub. F. Facts Concerning Kauffman Note. Mr. Sullivan's examination of Milton Kauffman's records pertaining to tract development reflected a letter dated June 8, 1955, from Wheeler acknowledging repayment of all notes due Wheeler except for a note listed in the amount of $15,000, dated May 31, 1951. Mr. Sullivan found that a payment was received by Wheeler in the amount of $10,000 in February 1956, and the balance was paid out of Kauffman's probate estate in 1959. During Mr. Sullivan's interrogation of Wheeler, Wheeler stated that the $15,000 note had been overlooked in preparing the estate tax return. G. Facts Concerning Gold. During his examination, Mr. Sullivan discovered that in 1949 and 1950 Wheeler purchased a quantity of natural gold. When Mr. Sullivan asked Wheeler about the *598 gold purchases, he acknowledged that he had made them and that he still had all but the first amount purchased, which he had sold. Wheeler told Sullivan that he could not understand why the gold had not been reported in the estate tax return, and that it must have been overlooked. At the date of Helen M. Wheeler's death, Wheeler still owned $40,180 worth of gold. H. Facts Concerning LADG Advances. Mr. Sullivan determined that an asset of the estate which was fraudulently omitted from the return was the balance in the LADG Advance Account as of January 9, 1955. According to his reconstruction of the account, the balance on December 31, 1954 was $451,032.83. One half of that sum, $225,516.42, represents his adjustment to the estate. Sullivan admitted that this adjustment depends upon the accuracy of his determination as to the amount due Wheeler. LADG did not owe Wheeler the sum of $451,032.83, or any other sum, on January 9, 1955. Respondent merely assumed that the Wheeler Advance Account on the books of LADG should have contained a balance of $451,032.83 on the date of death, and that such balance represented monies which were due to Wheeler from the corporation. In fact, *599 however, the Advance Account did not represent only monies advanced to the corporation by Wheeler, but rather had been used over the years as a bookkeeping clearing house for receipts from a number of sources and disbursements for a number of purposes. In particular substantial sums of money received by LADG and recorded in the account represented money paid by subdividers for water installations which did not belong to Wheeler but was owed by LADG to Park Water Co. I. Facts Concerning Florence Richardson Neal Advances. Respondent's adjustments to the estate include the addition of the decedent's community property interest in indebtednesses owed to Wheeler by his daughter, Florence Richardson Neal. The total amount of the indebtedness determined by respondent to have been omitted from the return, as stated in the statutory notice, was $139,264.63. Mr. Sullivan determined that $124,626.50 represented the amount fraudulently concealed and omitted from the return. Included in the fraud portion, as determined by Mr. Sullivan, was an item of $29,262.50 representing a check from LADG, dated September 10, 1954, which was used in connection with the purchase of land from a man named *600 Griffith, in the name of Florence Richardson. The property was subsequently sold by Florence Richardson to Homes of Merit. The item represented a loan from Wheeler to his daughter. The balance of the alleged fraudulently omitted receivable from Florence Richardson consisted of $95,000, which Mr. Sullivan deemed to be a loan from Wheeler to his daughter. A check dated January 6, 1955 in the amount of $45,000, drawn on Wheeler's personal bank account, and a check from MacArthur Heights, Inc. in the amount of $50,000, were used to purchase a cashier's check in the amount of $95,000, payable to Florence Richardson. The $95,000 check was negotiated at Security First National Bank and a second check drawn on that bank in the amount of $96,219.53 was purchased, payable to Azusa Valley Savings Bank, and deposited in an escrow which represented another land purchase by Mrs. Richardson in connection with the Homes of Merit venture. No other evidence was offered concerning the transaction. The fact that the January 6 transaction occurred three days prior to Helen M. Wheeler's death indicated to Mr. Sullivan that this was an attempt by Wheeler to reduce the cash balance in his bank account *601 and give it to his daughter on the likelihood it would not later be discovered.
The 1954 income tax return filed by Henry H. and Helen M. Wheeler reported interest income received from Florence Richardson during the year in the sum of $1,125. The 1955 income tax return reported interest income in the sum of $149.98 from Florence Richardson. The 1956 return filed by Henry H. and Violet Wheeler reported interest income from F. A. Richardson in the sum of $7,509.78. The 1957 income tax return reported interest income from Florence Richardson of $8,458.57. The 1959 income tax return reported interest income from F. A. Richardson of $9,305.66.
J. Facts Concerning Henry H. Wheeler, Jr. Advances.
Respondent's adjustments to the estate included the addition of the decedent's community property interest in indebtednesses owed to Wheeler by his son, Henry H. Wheeler, Jr. The total amount of the indebtedness determined by respondent to have been omitted from the return was $34,682.62. Of said sum, respondent's Answer alleges that $28,682.62 was fraudulently omitted. The only evidence offered by respondent on which he relied in making this adjustment consisted of three exhibits and the *602 testimony of Henry Wheeler, Jr. concerning the transaction reflected in the exhibits. Exhibit CZ is a check signed by Henry H. Wheeler, Sr. on his personal bank account, for the sum of $25,826.62, payable to Azusa Valley Savings Bank, dated January 7, 1954. A notation on the back of the check shows that it was to close an escrow, number 1991. Exhibit DA consists of three pages: (1) Escrow Instructions, dated September 30, 1953, on a form prepared by Azusa Valley Savings Bank, in connection with Escrow No. 1991; (2) an Amendment to Escrow Instructions in Griffith-Homes of Merit Escrow No. 1991, dated January 7, 1954, instructing the escrow holder, Azusa Valley Bank, that Homes of Merit, Inc. substituted H.H. Wheeler as its nominee in the escrow, and that the deed from the seller should be made to him; (3) an Escrow Statement, dated January 11, 1954, for Escrow No. 1991, showing a total paid into escrow of $28,682.62. Exhibit DB is a Grant Deed dated December 14, 1955, from Henry H. Wheeler, Jr. and his wife to Homes of Merit, Inc., which appears to relate to the property involved in the escrow. Wheeler, Jr. borrowed the sums from his father in this transaction. He recognized the *603 figures. The check had been paid by his father on his behalf. He later paid the money back with interest. He was in Utah at the time this occurred and his father had paid the check on his behalf until he returned. His father knew of the transaction because they had discussed the possibility of it prior to Wheeler, Jr. going to Utah. Wheeler, Jr. did not know whether the amount of the check was the amount he borrowed. He believed it was an amount at least equal to that. He did not know whether the loan was still outstanding at the date of his mother's death. He repaid his father considerable money that he borrowed and interest in 1954 because of a land sale at that time. He also paid back some money in 1955. He did not remember to which loans the repayments related. The 1954 income tax return of Henry H. and Helen M. Wheeler reported interest income from Henry Wheeler, Jr. in the sum of $3,312.50. The 1955 income tax return reported interest income from Wheeler, Jr. in the sum of $963.63. The 1956 income tax return filed by Henry H. and Violet Wheeler reported interest income from Wheeler, Jr. in the sum of $3,944.17. The 1957 income tax return reported interest income *604 from Wheeler, Jr. in the sum of $3,020.28. K. Facts Concerning M. Miller Co. - P. & J. Artukovich Advances.
Respondent's adjustments to the estate include the addition of an alleged asset consisting of the decedent's community property interest in an indebtedness owed to Wheeler by M. Miller Co. and P. & J. Artukovich. The total amount of the indebtedness determined by respondent to have been omitted from the return was $172,338.06, all of which was specified in respondent's Answer as a fraud item. In support of this adjustment, respondent offered the testimony of Revenue Agent Robert M. Abels, and Exhibit ED, a paper which Abels prepared in his own handwriting. The exhibit purports to reflect outstanding loans payable to Wheeler in the sum of $172,338.06 by two joint ventures of P. & J. Artukovich and M. Miller Co., as of the date of Helen M. Wheeler's death, January 9, 1955, as computed by Abels. The figures that appear on his exhibit were obtained by Abels from the books of the joint ventures, P. & J. Artukovich and M. Miller, joint ventures No. 1 and No. 2. The joint ventures' books examined by Abels were kept by Grace Flynn, who was Miller's bookkeeper. They were a set *605 of double entry books which appeared to be in good order, so Abels accepted them as being true and accurate. Abels did not at any time verify the accuracy of Grace Flynn's bookkeeping. He had no personal knowledge as to whether she was a competent bookkeeper or incompetent. Abels did not reconcile the figures on the joint ventures' books kept by Mrs. Flynn with Wheeler's records. Abels had no independent knowledge as to whether the basic data transcribed on Mrs. Flynn's books was reliably and accurately kept. He could not recall whether he found many corrections, erasures or changes in the books. He did remember some corrections or changes on one account in pencil, which he wondered about. However, Abels assumed that the penciled figure of $32,774 did not relate to the other entries and ignored it. The estate tax return reported an item described as "203 bonds issued by Park Construction Company formerly P. & J. Artukovich Company - face amount of bonds $1,935,000 at a reported value of $175,000." VIII. FACTS RELATING TO ADJUSTMENTS AND ISSUES ARISING OUT OF TRANSACTIONS WITH MILLER. A.Adjustments and Issues Involved. 1. Artukovich Loss - 1954. In Docket No. 989-69 petitioners *606 claim a loss for the year 1954, originally claimed incorrectly in 1956, with respect to a corporation known as P. & J. Artukovich, Inc. They claim that the loss is allowable as a deduction against ordinary income: (1) as a business bad debt, or (2) a loss incurred in connection with a trade or business, or (3) a loss incurred in a transaction entered into for profit, though not connected with a trade or business. The amount of loss claimed is $738,851.33. Such loss, if allowed, would produce a net operating loss, subject to the carryback and carryforward provisions of the Code. The loss was not claimed in the 1954 income tax return of petitioners, but was claimed in claims for refund for that year and other years affected. A carryback of the net operating loss is claimed for the years 1952 and 1953 and a carryforward for the year 1955. Alternatively, in Docket No. 989-69, the 1954 loss is claimed by petitioners as a capital loss in that year, with a carryover to 1955. In Docket No. 987-69, petitioners claimed a carryforward of the 1954 net operating loss to the years 1956 and 1957, by refund claims. Alternatively, the loss is claimed as a capital loss carryover for those years. *607 Respondent's statutory notices in Docket Nos. 989-69 and 987-69 disallowed any loss in 1954 and denied the refund claims for the years 1952 through 1957. 2. Park Construction Co., M. Miller Co. and D. Miller Losses - 1962, 1963, and 1964. In Docket No. 987-69, petitioners' income tax return for 1962 claimed a business bad debt loss in that year in the sum of $530,528.71 with respect to Park Construction Co., M. Miller Co. and D. Miller. Petitioners' return for 1963 claimed a further business bad debt loss in that year in the sum of $125,089. Petitioners' return for 1964 claimed a business bad debt loss of $57,246. Respondent's statutory notice determined that a loss occurred in 1962, but reduced the amount allowed to the sum of $343,997 and determined that such loss constituted a non-business bad debt, deductible only as a short-term capital loss. Respondent allowed the losses in 1963 and 1964 in the full amounts claimed, but determined that they were non-business bad debts deductible as short-term capital losses. During the trial, by amendment to his Answer, respondent alleged that the losses allowed as deductions in the statutory notice for the years 1962, 1963, and 1964 *608 in the amounts of $343,997, $125,089, and $57,246, respectively, were not realized by Wheeler, and hence are unallowable as deductions. On the basis of such determination, respondent now alleges increased income tax deficiencies in such years as follows: Year
Increased Deficiency
1962
$ 83,902.21
1963
35,446.48
1964
14,311.50
B. Facts Concerning Artukovich Loss. During the years in question, Wheeler was acquainted with a man named Daniel Petrovich, who was also known as Daniel Miller. Miller was a pipe and trenching contractor who operated through a corporation known as M. Miller Co., which did most of the sewer work for LADG as a subcontractor in connection with LADG's subdivision improvement contracting. Most of such work was done under a verbal agreement between Wheeler and Miller rather than written contracts. In the early 1950's, Wheeler and Miller became interested in a corporation known as P. & J. Artukovich, Inc., which was in the same type of business as M. Miller Co. P. & J. Artukovich had been in existence for some time and had suffered severe losses to the point where it was heavily in debt to Great American Indemnity Company on completion bonds issued by Great American. *609 The only assets which the corporation had of any value were various items of equipment usable in the trenching business which Miller was interested in acquiring. The equipment was of the same type as that owned by M. Miller Company, though M. Miller Company did not own as much equipment as did P. & J. Artukovich. In 1952, Miller and Wheeler made an agreement with Great American Indemnity Company to buy P. & J. Artukovich. The outstanding claims of Great American against P. & J. Artukovich were to be converted into debenture bonds. Miller was not interested in the bonds. The only thing he wanted was the use of the equipment. On or about December 31, 1952, Wheeler paid Great American the sum of $100,000. He and Miller also executed a joint promissory note to Great American in the principal amount of $1,075,000. Wheeler also made a payment on or about December 31, 1952, to a company named Crowell Weedon & Co. in the sum of $3,750, as a balance due on some bonds, as part of the arrangement to acquire all of the claims against P. & J. Artukovich. Judge Prentiss Moore, who represented John Artukovich (one of the Artukovich brothers who were then officers and shareholders of P. & *610 J. Artukovich, Inc.) participated in the negotiations between Wheeler and Great American Indemnity Company. Because of the Artukovichs' business failings, the bonding company called upon Wheeler to make good on his agreements with respect to the performance of their work. Miller took possession of the P. & J. Artukovich equipment in 1952 and began using it from then on. Miller signed P. & J. Artukovich's corporate Federal income tax returns for the fiscal years ending June 30, 1952, and June 30, 1953, as president of the corporation. In 1954, Wheeler settled the indebtedness created by the 1952 note. On or about April 1, 1954, he wrote a check for $240,000 which was used to purchase a cashier's check, payable to Title Insurance and Trust Company, in payment of the indebtedness to Great American. Also on April 1, 1954, Great American credited Wheeler with a payment of $120,198.88 in the form of funds paid by a company known as Stone and Youngberg, which funds had been assigned to Great American by P. & J. Artukovich. On or about April 13, 1954, Wheeler wrote a check for $570,101.33 which was used to purchase a cashier's check payable to Great American Indemnity Company to satisfy *611 his indebtedness. By virtue of his settlement with Great American, Wheeler believed he had become the owner of the P. & J. Artukovich assets as well as its indebtedness, even though he did not own any stock. There was no value to the indebtedness beyond the value of the equipment which secured it since the equipment represented the corporation's only tangible assets. On or about November 10, 1954, Wheeler entered into an agreement to sell P. & J. Artukovich's equipment and his claims against the company to Miller for a promissory note in the sum of $175,000. The bonds which were going to be issued for the claims had not yet been printed, but it was contemplated that they would be and that they would be delivered to Miller when issued. It was to be a sale to Miller of everything Wheeler owned in P. & J. Artukovich. Two promissory notes dated November 10, 1954, each in the principal sum of $175,000 bore the signature of Daniel J. Petrovich. One stated that it was payable on demand with no interest; it bore the words written across its face "replaced by new note." The other note stated that it was payable on or before four years, with interest at 6 percent per annum. Both notes *612 were made out in Wheeler's handwriting. Miller first executed the demand note on or about the date it bore. That same day, Miller decided he did not want the obligation to be payable on demand, so the 4-year, 6 percent note was executed by Miller and substituted for the demand note. A third note bearing the date February 15, 1956, was signed by Daniel J. Petrovich for the principal sum of $175,000. It was payable in two years with interest at 4 percent. The note covered the same transaction as the 1954 notes, and it was signed by Miller in 1956 as a substitute for the outstanding 1954 note. None of the notes were ever paid, but a $5,000 credit in 1958 was reflected on the back of the 1954 note. Miller agreed to buy the equipment of P. & J. Artukovich from Wheeler in 1954 and executed a note in the sum of $175,000 on or about November 10, 1954, representing the price he was to pay for the equipment. He recalled having discussions with Wheeler about his objection to payment on demand and about interest and that he got better terms from Wheeler by replacing the original note. He acknowledged his signature on the 1954 notes but did not remember when he signed them. During a bankruptcy *613 proceeding, Miller said that he acquired the equipment, stock, and debentures of P. & J. Artukovich for a note in the sum of $175,000, but that the transaction occurred in 1956. But he also admitted that he had signed a note for the same purpose in 1954 and acquired the assets then, but said the 1954 note was cancelled and replaced by a new one in 1956. Wheeler wrote the word "cancelled" on the old 1954 note.
At the trial of this case, Miller reaffirmed that in 1954 he signed a note for $175,000 for the P. & J. Artukovich equipment. He added, however, that in 1956 or 1957, when a new note replaced the one he had signed in 1954, Wheeler not only wrote "cancelled" on the 1954 note, but actually tore it up in Miller's presence. The new note Miller signed at that time was dated 1956. He denied that he signed a new note dated 1954 when the first note was torn up. He agreed both the 1954 and 1956 notes related to the same equipment of P. & J. Artukovich. In Miller's opinion the equipment of P. & J. Artukovich was worth about $1,000,000 in 1952 when he and Wheeler agreed to buy it from Great American. This was the same equipment he later agreed to buy from Wheeler for $175,000, except *614 that it had aged because of abuse. Although the equipment was old and not in good condition, Wheeler thought Miller got a "bargain" on the price. The schedule of depreciation contained in Park Construction Co.'s income tax return for the fiscal year ended June 30, 1952, reflected equipment acquired at "various" times, with "various" useful lives, having an aggregate "cost" of $1,363,528. The depreciation claimed on the equipment in prior years was $529,028, and the depreciation claimed for the fiscal year ended June 30, 1952, was $172,619, leaving an undepreciated balance of $661,881 on June 30, 1952. The depreciation schedule in the Park Construction Co. return for the fiscal year ended June 30, 1954, shows "various" equipment at a cost of $1,396,569. The depreciation claimed in prior years was $845,178 and the depreciation claimed in the current year was $172,187, leaving an undepreciated balance of $380,203 as of June 30, 1954. Miller had the use of P. & J. Artukovich's equipment in 1952, although, in his view, he did not "own" the equipment. He regarded the 1954 transaction with Wheeler as an oral conditional sale agreement, i.e., that title to the P. & J. Artukovich assets *615 would not pass to him from Wheeler unless and until he paid Wheeler the agreed purchase price. Property taxes on the equipment of P. & J. Artukovich in 1954, 1955, and 1956 were paid out of job profits of M. Miller Co. or a joint venture of P. & J. Artukovich and M. Miller Co. Miller's bookkeeper, Grace Flynn, kept books on two joint ventures between M. Miller Company and P. & J. Artukovich, which were in existence during the years 1953 and 1954. The equipment of P. & J. Artukovich and M. Miller Co. was used interchangeably and operated by the same employees. An income tax return filed by P. & J. Artukovich for the fiscal year ended June 30, 1954, signed by Grace Flynn as secretary and treasurer, showed that Miller was the president and owner of 1/3 of the stock of the corporation. Later in 1954, the name of the corporation was changed to Park Construction Company and its tax return for the fiscal year ended June 30, 1955, was filed under the new name. The company's principal office was also changed from 11305 South San Pedro Street to 877 North Bunker Hill Street, which was also Miller's address. Park Construction Co.'s income tax return for the fiscal year ended June 30, 1956, *616 showed that Miller was president and owner of 82-1/3 percent of the corporation's stock, acquired 1952-1956. Park Construction Co. became inactive in 1955 and remained inactive until 1961. During that period M. Miller Co. remained solvent and actively engaged in the trenching business using the equipment of Park Construction Co. On the books of the two corporations the equipment was shown as being rented to M. Miller Co. by Park Construction Co. Miller regarded both companies as being one and the same. They were also treated as one combined entity for bankruptcy purposes. Pursuant to an application filed August 11, 1954, the California Commissioner of Corporations issued a permit, dated September 1, 1954, authorizing the issuance of debenture bonds of Park Construction Company to Henry H. Wheeler, Sr., in the face amount of $2,118,825, in cancellation of the corporation's indebtedness to him. By an order, also dated September 1, 1954, Wallace Scales, an attorney, was approved by the Commissioner as an escrow holder of the bonds in accordance with the escrow condition imposed by the permit. When the bonds were actually issued, there were 203 of them having a face value of only *617 $1,935,000, rather than the $2,118,825 authorized in the permit. In 1955, Park Construction Co. borrowed $125,000 from Gladding, McBean & Co. on its equipment. Wheeler was required to guarantee the loan and to execute an agreement to pledge debentures of Park Construction Co. in the principal amount of $1,935,000. Approval of such a pledge arrangement had to be obtained from the California Commissioner of Corporations because of the outstanding escrow condition. In February 1956, Wheeler and Miller signed a formal agreement by which Wheeler purported to sell the Park Construction Co. debenture bonds to Miller for a $175,000 note to be executed by Miller. Wheeler was also to obtain a release from his guaranty of the Gladding, McBean & Co. loan. Again, because of the outstanding permit and escrow condition imposed in September 1954, the consent of the California Commissioner of Corporations was required and obtained. The Federal estate tax return for the estate of Helen M. Wheeler, prepared by McClure and filed in mid-1956, reported as an asset of the estate on the date of death (January 9, 1955) bonds issued by Park Construction Co., formerly P. & J. Artukovich, in the face amount *618 of $1,935,000. The bonds were valued at $175,000. Wheeler's 1956 income tax return, prepared by McClure, reported a sale of P. & J. Artukovich bonds on February 15, 1956. An allocation of the sales price and cost was made, showing bonds acquired December 31, 1952 at a cost of $107,500, being sold for $20,282.50; bonds acquired April 12, 1954, at a cost of $820,101.33, were reported sold for $154,717.50. Thus, the aggregate cost reported was $927,601.33 and the aggregate sales price $175,000. The aggregate loss, reported as longterm capital loss, was $752,601.33. The sale of the debenture bonds was not an item included in Mrs. Wheeler's work sheets submitted to McClure for the year 1956. McClure was not sure where he obtained the information for reporting the bonds in the 1956 return, but thought he must have received it from Wheeler or Mrs. Wheeler. Sometime after the 1956 income tax return had been filed, Wallace Scales, the attorney and escrow holder for the bonds, advised McClure that the bonds had been sold by Wheeler to Miller in 1954. McClure went to Scales' office and Scales showed him that the bond certificates were dated 1954. Scales also showed him the contract *619 dated November 10, 1954. After that, McClure asked Wheeler about the matter and Wheeler affirmed that the sale had occurred in 1954. Accordingly, McClure thought the sale should have been reported in 1954, rather than 1956. He recommended that a refund claim be filed for the year 1954 and he prepared the claim that was subsequently filed. McClure gave a statement to Special Agent Sullivan in 1959 to the effect that the 1956 income tax return was erroneous because Wheeler had told him that the sale was in 1954, not 1956; that the estate tax return (Form 706) was also prepared in error because it listed the asset as bonds rather than a note receivable; and that the proof Wheeler showed him was a "bill of sale" dated November 10, 1954. Exhibit 43 is a document on the letterhead of Henry H. Wheeler, bearing the date November 10, 1954, executed by Wheeler and Daniel J. Petrovich. It is entitled "sales agreement" and reads as follows: I hereby sell and set over to Daniel J. Petrovich all the bonds which I hold of P. & J. Artukovich, and Park Construction Co., for the sum of $175,000, which amount has been evidenced by note as of this date. It is agreed that I herewith release all *620 machinery and equipment pledged as security for said bonds and that as soon as Mr. Scales, my attorney, delivers the bonds to you, the said amount will bear interest. The "sales agreement" was signed by Wheeler and Miller and it was prepared in Wheeler's office on his stationery by one of his employees and sent to Miller. Wheeler stated that the document was "dated November 10, 1954"; that was the time he sold the bonds, machinery and all; that the sale was accomplished or consummated in 1954; and that the sale was "consummated by this document, Exhibit 43," and the promissory note. When the bonds were printed, Scales was to implement the sale and transfer that Wheeler had made to Miller. Exhibit 43 (the "sales agreement") was not actually prepared on or about November 10, 1954. An expert witness for respondent stated that the code markings on the stationery indicated the paper was manufactured somewhere between July 1955 and July 1956. Thomas Webster, the attorney who represented Wheeler, advised Wheeler sometime after the death of Helen M. Wheeler that the note signed by Miller on November 10, 1954 was insufficient evidence of the transaction that occurred at that time. Webster *621 told Wheeler that he should have a written agreement, evidencing the sale and the date on which it occurred. The claim for refund prepared by McClure for the year 1954 sought a refund of $28,864.45 for that year and stated that the basis for the claim was that a sale of bonds of P. & J. Artukovich, Inc., on November 10, 1954, was omitted from the original return in error. The schedule attached to the claim reflected a capital loss of $752,601.33 on the sale, computed in the same manner as the loss claimed in the 1956 return. Of the total loss claimed, $114,103.54 was applied against long-term capital gains in that sum reported in the 1954 return and an additional $1,000 was deducted from ordinary income. The date the claim was filed does not appear in the record, but it shows April 7, 1958 as the date of execution and July 1959, as the date it was received by the Audit Division of the Internal Revenue Service. The refund claim prepared by McClure for the year 1955 was filed with an attached amended return for that year. The amount sought to be refunded was $63,858.91. The claim and amended return were executed April 10, 1959 and filed April 15, 1959. They were received by the *622 Audit Division on July 19, 1959. Schedule D of the amended return reported a 1954 loss carryover of $687,069.77 deductible as a capital loss in 1955. Of said loss, $109,872.24 was applied against long-term capital gain reported in that amount in the amended 1955 return, and $1,000 was applied against ordinary income. No refund claim was filed for 1956 inasmuch as the loss had originally been claimed in the return for that year, thereby eliminating all long-term capital gain reported in the 1956 return. Petitioners' 1957 income tax return was prepared by McClure and filed on or about April 15, 1958.The return showed net long-term capital gains of $51,595.13. The still available capital loss carryover claimed previously by McClure was omitted as a deduction in the 1957 return. The 1958 return prepared by McClure for petitioner, filed on or about April 15, 1959, contained a schedule showing the available capital loss carryover from 1954, after crediting amounts reflected as used in 1954, 1955, 1956, and 1957. The schedule showed an available carryover for 1958 of $170,671.16. Since capital gain reported in the 1958 return exceeded that amount, the entire loss was exhausted in *623 that return. On or about April 15, 1961, a new refund claim was filed on behalf of Henry H. Wheeler and the Estate of Helen M. Wheeler for the year 1954, seeking a refund in the sum of $30,969.99, representing the total tax paid with the return filed for that year. The ground stated in the claim was that a net operating loss, resulting from business baddebt and/or business loss aggregating approximately $1,000,000 had been sustained during the year but not reported on the original return. Also, on or about April 15, 1961, claims for refund were filed for the year 1952, seeking a refund of $36,291.10, representing the total tax paid for that year; for the year 1953, seeking a refund of $55,033.20, representing the total tax paid for that year; for the year 1955, seeking a refund of $84,618.04, representing the amount of tax paid with the original return filed for that year; for the year 1956, seeking a refund of $24,931.90, representing the total tax shown as due on the 1956 return and paid for that year. All of the claims were based upon the carryback and carryover provisions of the Internal Revenue Code applicable to a net operating loss claimed for the year 1954. On the same *624 date, April 15, 1961, a refund claim was filed for the year 1957, seeking a refund of $42,838.60. Of said sum, $35,316.74 represented the tax paid for the year 1957 as shown on the return. The balance of $7,521.86 represented an overpayment claimed on the return for 1956 which petitioners sought to have applied to their estimated tax but neglected to include in computing credits for estimated tax payments for the year 1957. The claim asserted a carryover of the net operating loss from 1954 and a carryback of a net operating loss claimed for the year 1958. D. Facts Concerning Claimed Loss Deductions for 1962, 1963 and 1964
During the years 1952 through 1964, Wheeler advanced monies to or on behalf of Daniel Miller, M. Miller Co. and Park Construction Co. Wheeler also received some payments from time to time credited against the advances, but as of December 31, 1962, the amount repaid was substantially less than the amounts advanced to that date. Petitioners' 1962 income tax return was prepared by Price Waterhouse and Co., by or under the direction of an auditor named Harry Pace. The return claimed a deduction against ordinary income in the sum of $530,528.71, described as a *625 business bad debt loss, D. P. Miller, et al. Petitioners' 1963 and 1964 income tax returns were also prepared by Price Waterhouse and Co. The 1963 return included a deduction against ordinary income in the sum of $125,089, described as business bad debt loss, Park Construction. The 1964 return claimed a deduction against ordinary income in the sum of $57,246, described as business bad debt - Park Construction Co.
In respondent's audit of petitioners' returns for the years 1962 and 1963, Mrs. Frances O. Leviton, an Internal Revenue Agent, conferred with Harry Pace of Price Waterhouse in reviewing the petitioners' substantiation of the bad debts claimed in those years. Her report with respect to the 1962 Miller, et al. bad debt loss reads as follows: Taxpayers claimed a business bad debt in the amount of $530,528.71 from D. P. Miller, et al. D. P. Miller, et al are the successors to P. & J. Artukovich Co. from which taxpayer is claiming a bad debt deduction in 1954 in the amount of $1,034,050. Taxpayer is not in the business of lending money. Therefore, these loans to M. Miller Co., Park Construction and Dan Miller are either in the nature of nonbusiness loans or, investments *626 in the corporations. Taxpayer alleges that he sold a claim which he held to D. Miller in 1954 for $175,000, which he holds became worthless in 1962. The bad debts from this source are corrected as follows: M. Miller Co. 1955-1961
$ 626,575
Park Construction Co. 1961, 1962
198,884
D. Miller - 1954
175,000
TOTAL ADVANCES
$ 1,000,459
1955-1962
Collections of principal
656,462
Non-Business Bad Debt in 1962
343,997
The report for the year 1963 states, in part, with respect to the Park Construction Co. business bad debt claimed in that year: Taxpayer guaranteed a Park Construction contract; and when Park Construction Co. became insolvent, taxpayer was called upon to pay additional costs as indemnitor on the contract. Payments made as guarantor or indemnitor on behalf of a corporation are considered to be non-business bad debts…. Accordingly, this deduction is disallowed as a business bad debt and allowed as a nonbusiness bad debt. Mr. Herb Frentz, a Manager in the Tax Department of Price Waterhouse, worked with Harry Pace from time to time on matters pertaining to the Wheeler account. Pace is now deceased, but Price Waterhouse maintained in its possession numerous workpapers and schedules which *627 he prepared in the course of auditing Wheeler's business affairs. Pace was originally assigned to the task of auditing Wheeler's business affairs in connection with the tax investigation pending against him. He was specially selected for the job by Price Waterhouse because that firm regarded him as a mature, experienced and highly competent auditor. In selecting Pace and providing him with instructions as to the manner in which he was to conduct his audit of Wheeler's complex business affairs, Price Waterhouse had the dual purpose of performing a service for the client and of satisfying itself that Wheeler should be retained as a client. Price Waterhouse did retain Wheeler as a client and continued to represent him. The $530,528.71 bad debt deduction claimed in the 1962 return was computed by Pace on the basis of three separate items of indebtedness: (1) the sum of $186,883.57, representing the amount determined by Pace to have been owed to Wheeler by Park Construction Co. as of December 31, 1962; (2) the sum of about $170,000, representing the amount determined by Pace to have been owed to Wheeler by M. Miller Co. as of December 31, 1962; and (3) the sum of $175,000, representing *628 the amount determined by Pace to have been owed to Wheeler by Miller personally, based upon the note Miller had signed agreeing to pay for the assets of P. & J. Artukovich. The sum of $186,883.57 owed by Park Construction Co. was reflected as a balance in a ledger account maintained by Mrs. Wheeler, in her handwriting, which bore the heading "Park Construction Company, Woodlake." The ledger reflected advances by Wheeler on behalf of Park Construction Co. in connection with the performance of a particular construction job (referred to herein as the Woodlake job) and the receipt by Wheeler of funds treated as a repayment of such advances. The payments by Wheeler and receipts reflected on the schedule were independently verified by Frentz from cancelled checks and other available records. The first entry reflected was a payment by Wheeler, debited August 20, 1961 in the sum of $2,500. The ledger shows additional debits and credits during 1962 with a debit balance of $186,883.57 as of December 31, 1962. That sum was shown as written off as a bad debt at the end of 1962. The sum of $170,000 owed by M. Miller Co. was a figure determined by Harry Pace to be the balance due from M. Miller *629 Co. to Wheeler as of December 31, 1962, by reconciling the books of M. Miller Co. to a ledger sheet maintained by Mrs. Wheeler. The sum of $125,088.95, deducted in petitioners' 1963 return, represented additional payments by Wheeler on behalf of Park Construction Co. during 1963, in connection with the Woodlake job. This sum included $38,831.24 Wheeler paid in March 1963 for the C.I.T. chattel mortgage. The payments were shown on Mrs. Wheeler's ledger account headed "Park Construction Co., Woodlake." The debit balance at December 31, 1963 was $125,088.95, which sum was shown as written off as a bad debt for that year. Mr. Frentz independently verified each of the payments comprising that balance and itemized them in a schedule which he prepared. The sum of $57,246.31, deducted in petitioners' 1964 return, represented additional payments by Wheeler on behalf of Park Construction Co. during 1964 in connection with the Woodlake job. Mrs. Wheeler's ledger for the "Park Construction Co. Woodlake" account showed a debit balance of $34,168.81 as of December 31, 1964. Mr. Frentz verified each of the payments comprising that balance and itemized them in a schedule which he prepared. *630 He also identified on his schedule the payment by Wheeler of legal fees, totaling $23,077.50, to the law firms of Monteleone and McCrory and Hill, Farrer & Burrill during 1964, which were added by Harry Pace to the sum of $34,168.81 to arrive at the deduction claimed in the return of $57,246.31. Both law firms performed business legal services for Wheeler in that year. Revenue Agent Leviton identified a schedule which was prepared jointly by herself and Harry Pace, from information supplied by Pace, to reflect the amounts which she had agreed were substantiated as amounts owing to Wheeler from M. Miller Co., Park Construction Co. and D. Miller at the end of the years 1962 and 1963. The schedule showed amounts advanced to M. Miller Co. from 1955 through 1961 in the aggregate amount of $626,575; amounts advanced to Park Construction Co. in 1961 and 1962 in the aggregate amount of $198,884; and the note of D. Miller for $175,000. Hence, the total advances were $1,000,459.Credited against such total advances were "collections of principal" during the years 1956 through 1962, aggregating $656,462. The balance of $343,997, representing advances in excess of collections as of the end *631 of 1962, was the amount which Mrs. Leviton allowed as a non-business bad debt for that year. The schedule also showed "additional costs in 1963 as indemnitor on Park Construction contract" in the sum of $125,089, which Mrs. Leviton allowed as a non-business bad debt in 1963. Exhibit 61 contains detailed figures for advances made by Wheeler to or on behalf of Park Construction and M. Miller Co. and payments received on account of such advances for the calendar years 1952 through 1962. The schedule shows total advances through 1962 in the sum of $3,322,273.62; payments received by Wheeler, including interest, in the sum of $1,848,939.54; and an excess of advances made over payments received in the total of $1,483,334.09. Mr. Frentz was able to identify and independently verify most of the items on Exhibit 61. He prepared a schedule entitled "Henry H. Wheeler - Loans to or on Behalf of Park Construction Co. (formerly P. & J. Artukovich, Inc.) and M. Miller Co.", which represented advances for 1952 through 1963, which he was able to verify through available records consisting of check stubs, cancelled checks and/or the cash disbursements journal maintained by Mrs. Wheeler. The schedule *632 also segregated certain items shown on Exhibit 61 which were not verified or which were identified as funds not coming directly from Wheeler. E. Additional Facts Relating to Respondent's Disallowance of 1962-1964 Losses. During the trial, by Amendment to his Answer in Docket No. 987-69, respondent alleged that the bad debt losses previously allowed in the statutory notice for the years 1962, 1963 and 1964, with respect to Miller, et al., should be disallowed in their entirety. This is based primarily upon allegations that the losses were originally allowed because of the bankruptcy of the debtors, whereas respondent now claims that Wheeler and his agents caused such bankruptcy by taking over the debtor's business and assets, without consideration, for the purpose of establishing a fictitious tax loss, and that Wheeler did not incur any loss. In late 1961, after being inactive since 1955, Park Construction Co. was reactivated and acquired a large sewer construction contract from the City of Los Angeles (referred to herein as the Woodlake job). Park Construction Co.'s bid for the job was made by Miller. Wheeler personally guaranteed Park Construction Co.'s performance of the *633 contract as an indemnitor of the labor and material bond for the job issued to Park Construction Co. as principal. At that time M. Miller Co. became inactive. On or about November 9, 1961, a promissory note in the sum of $185,585.71, payable in installments, was executed by Park Construction Company, M. Miller Company, Daniel J. Miller and his wife, Rose Marie Miller, in favor of Wheeler. The note was secured by an agreement and mortgage of chattels executed by the same parties in favor of Wheeler. The document provided that M. Miller Company mortgaged to Wheeler certain described construction equipment. The equipment was stated to range in age from one year to twenty years, with most being in the range of from ten to twenty years. The agreement recited that the $185,585.71 note was a renewal of a $175,000 note, dated November 10, 1958. It also stated that it secured additional advances by Wheeler for the maintenance or preservation of the property and additional advances up to $500,000 to or on behalf of the mortgagors, and any other subsequent indebtednesses incurred by the mortgagors to Wheeler. No evidence was offered as to whether the value of the equipment included the *634 total equipment owned by M. Miller Co. The mortgage did not purport to cover any equipment or property of Park Construction Co. or Daniel Miller or his wife. The note and chattel mortgage dated November 9, 1961, represented a renewal or modification of the November 10, 1954 note Miller had signed, which, in turn, had been renewed or modified by a November 10, 1958 note. The renewals were necessary because of the statute of limitations.The difference in amount from the original $175,000 was attributable to an accumulation of interest. The agreement acknowledge payment of $22,000 interest. On or about December 18, 1961, a chattel mortgage was executed by Park Construction Co. in favor of Union Bank and recorded. The chattel mortgage covered certain listed machinery and equipment and, together with a deed of trust on certain real property, also dated December 18, 1961, provided security for an indebtedness of Park Construction Co. to Union Bank evidenced by a promissory note dated December 18, 1961 in the principal sum of $294,999.84. Wheeler guaranteed this indebtedness, up to $100,000. On or about January 9, 1962, a chattel mortgage in favor of C.I.T. Corporation was executed *635 by Park Construction Company and recorded. On the same date, a chattel mortgage was executed by M. Miller Co. in favor of C.I.T. Corporation which was also recorded. Both chattel mortgages recited that they secured an obligation of Park Construction Company and/or M. Miller Co. to pay C.I.T. Corporation the total sum of $67,200. All of the machinery and equipment listed in both chattel mortgages was stated to be located in the State of Hawaii. The labor and material bond which Wheeler agreed to indemnify for the Woodlake job was issued by United States Fire Insurance Company to Park Construction Co., dated March 27, 1962. On or about March 30, 1962, a written agreement was entered into between Wheeler, Park Construction Co. and M. Miller Co. Daniel Miller signed the agreement for both corporations. The agreement recited that Park Construction Co. and M. Miller Co. were indebted to Wheeler for obligations past due, for advances and because of Wheeler's guarantees and indemnification of various notes, payment and performance bonds and other obligations; that an agreement with United States Fire Insurance Company had been made whereby Wheeler would advance $100,000 to Park for working *636 capital, pledge certain shares of stock in Park Water Co. as collateral security and also indemnify the insurance company against loss, all in order that Park Construction Co. could obtain payment and performance bonds on construction contracts. In consideration, Park Construction Co. was to deliver to Wheeler, on demand, a bill of sale covering all personal property equipment which it owned situated in the State of Hawaii, including machinery and equipment encumbered by a chattel mortgage in favor of C.I.T. Corporation; Park Construction was to assign to Wheeler all accounts receivable, including all sums owing in the State of Hawaii under existing contracts; and Park Construction Co. was to deliver to Wheeler a deed of trust covering the Montebello land owned by it currently encumbered by a deed of trust to Union Bank and chattel mortgage covering equipment currently encumbered by a chattel mortgage to Union Bank. M. Miller Company was to deliver to Wheeler, on demand, a bill of sale covering personal property and equipment in the State of Hawaii and to assign to Wheeler all accounts receivable in the State of Hawaii. In exchange for the promises of Park Construction Co. and M. *637 Miller Co. in the March 30, 1962 agreement, Wheeler promised: (1) to credit to the balances owed to him the difference between the fair market value of the Hawaiian equipment and the balance owing to C.I.T.; (2) credit all sums collected upon accounts receivable assigned to Wheeler; (3) discharge past due debts of Park Construction and M. Miller Co. in Hawaii; and (4) reconvey the Montebello land covered by the Union Bank trust deed and release the equipment subject to the Union Bank chattel mortgage, when the obligation to Union Bank (guaranteed by Wheeler up to $100,000) was fully discharged and all other sums owing from Park Construction to Wheeler had been paid in full. In accordance with the agreement of March 30, 1962, Park Construction Co. and M. Miller Co. on or about September 26, 1962, executed bills of sale to Wheeler with respect to the equipment located in the State of Hawaii, subject to the chattel mortgages in favor of C.I.T. Corporation. On or about September 30, 1962, Wheeler executed a bill of sale to David D. Pearson, which was not recorded, transferring to Pearson all of Wheeler's right, title and interest in and to the equipment in the State of Hawaii, covered *638 by the bills of sale to Wheeler from M. Miller Co. and Park Construction Co. Wheeler also assigned to Pearson all right, title and interest in and to a contract between Park Construction Company and Capital Builders, Inc. for the construction of certain projects in the State of Hawaii and all right, title and interest in and to accounts receivable due and owing to M. Miller Company, by reason of its activities in the State of Hawaii. The 1962 transaction involving the Hawaiian equipment involved David Pearson and his company, Waikiki Construction Company. Pearson entered into an agreement to buy this equipment from Wheeler for $50,400 and Wheeler executed the bill of sale to Pearson for the equipment. At the time the C.I.T. mortgages were still outstanding. Pearson never paid anything on the $50,400 purchase price for the equipment. Pearson later transferred the same equipment to Waikiki Construction Company at an indicated value of $275,000. Wheeler subsequently learned that seven items of the equipment in Hawaii were seized by the State and sold for taxes in 1968. An attempt was later made to recover such equipment through a lawsuit filed by a man named Repovich in the name *639 of a corporation, Chavez Ravine Gasoline Services, Inc., as an assignee from Wheeler. Repovich had approached Wheeler to obtain the assignment on the promise that he would split the proceeds with him if he recovered anything. In early 1971, a summary judgment was entered in favor of the State of Hawaii, dismissing the action brought by Chavez Ravine Gasoline Services, Inc. Wheeler did not ever receive any money for the Hawaiian equipment or from the Hawaiian accounts receivable. On or about October 26, 1962, Wheeler wrote a check on his own bank account in the sum of $98,125.96, which was used to purchase a cashier's check payable to Title Insurance and Trust Co. This payment represented a purchase by Wheeler of the Union Bank loan to Park Construction Co. In October 1962, Union Bank executed written assignments to Wheeler of the chattel mortgage and deed of trust which Park Construction Co. had executed in December, 1961. The sum of $98,125.96 expended by Wheeler to acquire the Union Bank's position as a secured creditor of Park Construction Co. was not included in the sums recorded in the ledger account maintained by Mrs. Wheeler for advances on behalf of Park Construction *640 relating to the Woodlake job. Sometime in 1962, the Woodlake contract was losing money and Miller and Wheeler had a falling out. Miller walked off the job and Wheeler completed it. In early 1963, bankruptcy proceedings were commenced involving both M. Miller Co. and Park Construction Co. Miller signed a Summary of Debts and Assets for both corporations as president. The bankruptcy was initiated on the advice of Wheeler, David Pearson and Miller's own attorney, Dana Murdock. In March 1963, Wheeler paid the sum of $38,831.24 to purchase the loan owing by Park Construction Co. and M. Miller Co. to C.I.T. Corporation. This sum was recorded in the ledger account maintained by Mrs. Wheeler for Park Construction Co. relating to the Woodlake job, and was included in the sum of $125,088.95 deducted in petitioners' 1963 return and allowed by Mrs. Leviton. On March 18, 1963, Wheeler filed a proof of claim in bankruptcy against Park Construction Co. claiming an indebtedness of $205,537.62. The consideration for the debt was stated to be cash advances on an open account by reason of liability under an indemnity agreement. Later in 1963, in the bankruptcy proceedings, Miller, through his *641 new attorney, James J. Arditto, sought to vacate the adjudication as to Park Construction Co. and filed various documents alleging that Wheeler was in fact Miller's partner and that Wheeler had defrauded Miller into entering into various transactions and transfers constituting voidable preferences. During 1964 and 1965, the trustee in bankruptcy commenced proceedings involving both corporations alleging that various transfers were preferential or fraudulent involving the mortgages and trust deeds on the property of the debtors and the 1962 transfer of the Hawaiian equipment. In 1965, the trustee in bankruptcy applied to the court for authority to compromise the controversy.The controversy was described to include a dispute between the trustee and Florence Neal as to the ownership of two items of real property, and disputes concerning the transfer of the Hawaiian assets in September 1962, and Wheeler's chattel mortgage dated November, 1961. The application and attached notice to creditors recited, among other things, that because of the outstanding chattel mortgages and other liens, there was little, if any, monetary value to the estates even if the transfers could be set aside as *642 preferential or fraudulent. It was also recognized that there was a distinct possibility that litigation would be resolved against the trustee's allegations. Accordingly, it was proposed that the matter should be compromised. Among other things, the compromise called for the payment by Wheeler of $7,000 in cash to the trustee in exchange for which the trustee would convey to Wheeler all of his right, title and interest as trustee in and to all of the machinery covered by the various chattel mortgages and certain equipment located in Northern California, and all choses in action including lawsuits and potential lawsuits. Wheeler was also to withdraw his bankruptcy claims, and the trustee would withdraw any claim to the Montebello yard. Such compromise was approved by an order of the bankruptcy referee dated March 17, 1967. The bankruptcy trustee, Mr. Smith, believed there was no question as to who owned the equipment of the corporations covered by the various chattel mortgages which had been acquired by Wheeler. It was Miller's attorney, Arditto, who alleged that the equipment was not Wheelers. Smith and his attorneys were of the opinion that the chattel mortgages were valid. *643 For bankruptcy purposes, Smith treated Park Construction Co. and M. Miller Co. as one entity. The appraised value of property of a bankrupt debtor is generally less than the book value or inventory value placed on the assets by the debtor. Moreover, a bankruptcy sale of the debtor's property generally brings a distress price which is less than the appraised value. In the Miller-Park bankruptcy, because of the "cannibalized" condition of the equipment and its age, the small amount of equipment that was not encumbered by valid chattel mortgages was sold at prices well below the inventoried value. Equipment located at the Montebello yard, not encumbered by chattel mortgages, was inventoried at $33,403, appraised at $6,075 and sold for $7,500 after a prior offer of $4,100. The free and clear equipment located on the Bunker Hill property was inventoried at $4,286, appraised at $2,500 and sold for $1,000. Wheeler settled the bankruptcy dispute by a payment of cash and withdrawal of his claims against the debtors in order to stop the expenses he was incurring for attorneys fees and to enable him to make such disposal as was possible of the equipment. In 1966, Wheeler sold the equipment *644 and land which he had acquired by purchasing the Union Bank's chattel mortgage and deed of trust on the equipment and land of Park Construction Company. The land, known as the Montebello yard, was sold to Hercules Container Corporation for $117,500. The equipment located at the Montebello yard was sold to a man named Dale Buse, who paid $14,000 in cash. The remaining equipment, most of which was located in Northern California, was sold to five different parties for an aggregate of $21,800. Mrs. Wheeler maintained a ledger account for Wheeler entitled "Park Construction Co., Miller's equipment, Aetna Mortgage on Mon. Yard." The account reflected the acquisition by Wheeler of the land and equipment referred to above on October 26, 1962, for a cost of $98,125.96. It also showed other items of cost incurred in connection with such property and the amounts realized on the disposition of the property in 1966. The total received on foreclosure of the land and equipment was $152,145. The total cost basis claimed for such property was $119,915.The gain thus realized, in the amount of $32,230, was reported in Wheeler's 1966 income tax return. In connection with this trial, Mrs. Leviton *645 conducted a further examination into the bad debt losses which she allowed in her original audit for 1962 and 1963. Based upon her present information, she would recommend complete disallowance of such losses. Mrs. Leviton examined the trial record in this case and learned that Miller alleged the $175,000 note he signed was a sham transaction - that there was no body to the debt; she learned that the $175,000 note was renewed by the note and chattel mortgage dated November, 1961, in the sum of $185,585.71. Accordingly, she did not now regard the $175,000 note as a worthless debt in 1962. At the time of her audit, Mrs. Leviton discussed the $185,585.71 note and chattel mortgage with Harry Pace and it was not included in the bad debts which she allowed. She did not know at that time that it was a renewal of the $175,000 note which was allowed as part of the debt. She had seen the note and chattel mortgage and knew that it secured equipment located in Hawaii, but she did not know what else it secured. Mrs. Leviton would not presently allow the amounts she had allowed as bad debts with respect to Park Construction Co. even though she reaffirmed that they were actually paid out by *646 Wheeler in connection with the Woodlake job. She identified a copy of a letter dated September 5, 1962 to Wheeler from an attorney in Richamond, California, which she obtained from Mr. Smith, the bankruptcy trustee. By virtue of the letter, she thought Wheeler received an assignment of Park Construction Co.'s interest in a joint venture with Richmond Pipe and Supply Co. In her view this assignment wiped out the debts of Park Construction Co. to Wheeler because he was then to be repaid through the joint venture profits. The September 5, 1962, letter to Wheeler stated that it confirmed several agreements made on that date. One of them was that M. Miller Company, in recognition of Wheeler's prior advances, assigned to him not less than one-half interest in all net sums recovered by M. Miller Co. in certain litigation pending against the C.C.C.S.D. (Central Contra Costa Sanitary District). It also recited that a joint venture of Park Construction Company and Richmond Pipe and Supply Company had four pending contracts. Forty-Five percent of the net profits of each of those contracts was assigned to Wheeler to discharge all past and future advances by Wheeler. Mrs. Leviton assumed, *647 in the absence of anything else, that the assignment letter of September 5, 1962 discharged all debts of Park to Wheeler. She did not know how much money was due and owing to Park on thse jobs. She was unable to find any information concerning them. She did not know how much was expended on the jobs and did not know whether Wheeler actually received any money by reason of the document. The lawsuit of M. Miller Co. against the Central Contra Costa Sanitary District, et al. was settled in 1963 with the approval of the Bankruptcy Court. The Trustee's application to the Bankruptcy Court for approval stated that the defendants would pay a total of $180,000 into the bankrupt's estate. Wheeler received a little over $100,000 out of the settlement by reason of his having paid for assignments of two liens against Miller's job. The original claimants were Western Concrete Pipe Co. and North Bay Construction Co. Wheeler wrote a check dated December 18, 1961, in the sum of $110,000, payable to an attorney, Ernest Shelander, as trustee, to handle the acquisition of the Western Concrete and North Bay claims against M. Miller Co. Mr. Frentz identified a ledger sheet maintained by Mrs. Wheeler, *648 which represented three separate accounts on one page. The third and last account on the ledger sheet was labeled "Contra Costa Bond Settlement." It reflected a debit of $110,000 on December 18, 1961, to Ernest Shelander, Trustee. It further reflected receipt of two sums in 1964 totaling $110,000. Thus, the receipts offset the disbursement and there was no gain shown on this transaction. This payment of $110,000 was not included in the amount of advances to M. Miller Co., et al, allowed by Mrs. Leviton as part of the 1962 loss which she approved in her original audit. The first account on the same ledger sheet was headed "M. Miller Co., Assignment, City of Richmond, $180,000." It showed disbursements by Wheeler in 1958 and 1959 totaling $150,000. The account also reflected credits in 1958 and 1959, for sums received by Wheeler, totaling $150,000. The difference of $30,000 was reported as ordinary income in 1959. The second account on the ledger sheet was labeled "M. Miller Co. Cupertino Assignment." It reflected a debit of $29,925 and receipts totaling $33,350 both in 1959. The net credit balance of $3,325 was reported as ordinary income in Wheeler's 1959 return. Both the *649 amounts disbursed by Wheeler and the amounts received by him in 1958 and 1959, as shown in the first two accounts of Exhibit 109, were taken into account by Harry Pace in his computation of the loss claimed by Wheeler in 1962. No part of the net loss claimed by Pace or allowed by Mrs. Leviton was overstated in any respect by reason of the transactions reflected in those accounts. With respect to the Woodlake job, Mrs. Leviton had evidence that the job was "assigned" to Wheeler in September, 1962, and that he in fact received the final payment on the job in 1967. She identified Exhibit FD as a transcript of the final two-payments on the job obtained from the City of Los Angeles. The next-to-the-last-payment in August, 1967, was to Wren and Van Allen, Inc. in the sum of $28,886.10. She was unable to trace that payment further. Wren and Van Allen, Inc. was listed on Exhibit FB as the trustee for Park Construction Co., care of the Union Bank. The last payment shown, in the sum of $106,350, was to Wheeler on October 13, 1967. Wheeler's 1967 income tax return did not report that figure. The balance of the Woodlake contract price was received by Park Construction Co. and was so reflected *650 on Park's books prior to September, 1962. In Mrs. Leviton's view the so-called assignment of the Woodlake job to Wheeler eliminated the losses she had allowed him as an indemnitor. She did not know how much additional money Wheeler expended to complete the job. Wheeler completed the Woodlake job sometime in 1963, but there were a great many liens and claims by labor and materialmen and tax claims arising out of the job which had to be satisfied. These claims were settled and paid by Wheeler in various amounts and at different times with the last claims being settled in 1967. Mrs. Wheeler continued to maintain her Park Construction Co. Woodlake job ledger account for disbursements and receipts in connection with the job during the years 1964 through 1967. The account reflected amounts paid by Wheeler in those years to settle the claims. In October 1967, upon settlement of the last of the claims arising out of the Woodlake job, the City of Los Angeles paid to Wheeler the sum of $106,350.64. Concurrent with such payment, the City and Wheeler executed a document entitled "Full Settlement Release and Indemnity Agreement." The ledger account for the Park Construction Co. Woodlake *651 job maintained by Mrs. Wheeler reflected receipt of the $106,356.64 paid to Wheeler by the City of Los Angeles in October 1967, and certain other smaller credits received in that year. The ledger showed a debit balance of $17,195.92 as of December 31, 1967. From the standpoint of tax accounting there was a mistake in the ledger and actually a gain of approximately $17,000 was realized in 1967 upon recoupment of the $106,356.64 because of the prior bad debt deduction. At the end of 1964 there was a debit balance of $34,168.81 which was deducted as part of the bad debt claimed in the return for that year. However, such debit balance was not written off, as had been the practice with respect to the debit balances at the end of 1962 and 1963, when those amounts were deducted as bad debts. Hence, the year 1965 began with an overstatement of the debit balance by the sum of $34,168.81, which overstatement remained through the years 1965, 1966 and 1967, since no further bad debt deductions were claimed at the end of those years. Thus, while there was an economic loss on the Woodlake job, even after the 1967 recoupment because Wheeler did not recover all that he had paid out, the ledger *652 account should have shown a credit balance of $16,972.89 at the end of 1967 to reflect consistent tax accounting.
IX. FACTS RELATING TO PETITIONERS' CLAIM OF 1958 LOSS ARISING OUT OF ADVANCES TO AMERICAN SULPHUR AND REFINING CO. A. Facts Concerning Claim and Years Involved. On or about April 15, 1961, petitioners in Docket No. 987-69 filed a claim for refund for the year 1958 claiming a net operating loss resulting from business losses in the approximate amount of $900,000 sustained during the year, but not previously reported. The claim sought a refund of the sum of $74,043.51, representing the total income tax paid by petitioners for the year 1958. Also on April 15, 1961, petitioners filed claims for refund for the years 1955, 1956 and 1957, seeking a refund of all taxes paid for each of those years based upon a carryback of the 1958 net operating loss. Respondent's statutory notice in Docket No. 987-69 disallowed the refund claims on the ground that no net operating loss was sustained in 1958. Respondent did not allow any part of the loss claimed for 1958 or for any other year, either as an ordinary loss or as a capital loss. In their petition herein the petitioners alleged *653 that they were in the business of lending money during the years involved and that they sustained a loss in 1958 by reason of a worthless debt owed by American Sulphur and Refining Co. to Wheeler in the sum of $832,587.32. B. Facts Concerning Claimed American Sulphur Loss. Harry Pace of Price Waterhouse and Co. prepared a schedule reflecting his computation of the loss sustained by Wheeler due to the worthlessness of Wheeler's loans to American Sulphur and Refining Co. The schedule listed by dates and amounts "six percent notes issued to Mr. Wheeler by American Sulphur and Refining Co." covering the period March 1, 1952 to November 5, 1958 in the total amount of $913,414.45. Of that sum, $107,769.51 represented notes dated prior to the death of Helen M. Wheeler on January 9, 1955, and $805,644.94 represented notes dated after her death. Mr. Pace's schedule also indicated that he had identified the sum of $881,587.45 as funds advanced by Wheeler to American Sulphur, but $31,827 was listed as having come from unidentified sources. The schedule showed the following summary, representing the American Sulphur loss which he computed: Advances to Date of
$ 107,769.51
Spouse's Death
Less 50% Reduction as
53,884.75
valued in Spouse's
Estate Tax Return
53,884.76
Less 1/2 applicable to
26,942.38
Estate
Balance Applicable To
26,942.38
H. H. Wheeler
Advances From Date of
Spouse's Death to 11/58
805,644.94
Total Loss Due To Worthlessness in 1958
$ 832,587.32
*654 The Federal estate tax return filed on behalf of the Estate of Helen M. Wheeler, deceased, reported in Schedule C ("Mortgages, Notes and Cash") an item described as "promissory notes from American Sulphur and Refining Co., dated March 1, 1952 through November 16, 1954, face value $107,769.51, fair market value $53,884.75." Mr. Frentz of Price Waterhouse was able to independently verify, from available records, most of the entries on Mr. Pace's schedule. During the trial Mr. Frentz made a further review of the records and prepared a separate schedule of his own relating to the American Sulphur advances by Mr. Wheeler. The schedule listed by number, date and amount, the promissory notes which American Sulphur executed, payable to Wheeler. It also listed the date and amount of each check from Wheeler representing an advance to American Sulphur and showed the source of available data, i.e., whether the loan was recorded as such in the cash disbursements journal and/or Wheeler's check stubs and whether cancelled checks and/or promissory notes were available. Year
Note Numbers
Face Amount on Notes
Wheeler Checks To American Sulphur
1952
1-6
$ 62,769.51
$ 34,140.85
1953
7-12
30,000.00
30,000.00
1954
13
15,000.00
25,000.00
1955
14-41
199,437.20
199,437.20
1956
42-78
196,100.00
195,800.00
1957
79-123
261,772.64
194,472.64
1958
124-146
102,735.00
101,235.10
TOTAL
$ 867,814.35
$ 780,085.79
*655 American Sulphur and Refining Co. was organized in 1952 as a Nevada Corporation to develop a process for the economical processing of surface sulphur deposits and to take advantage of a sulphur boom in progress at the time. The corporation's stock was owned 46 percent by Wheeler, Sr., 44 percent by Thomas Neale and 10 percent by Wheeler, Jr. The corporation's initial stock issuance of 100,000 shares was made in exchange for certain patent rights. The initial cash requirements of the corporation were budgeted at approximately $50,000. The corporation first constructed a small pilot plant in California to attempt to develop its patents. The first pilot plant the corporation constructed was not successful. A second larger pilot plant was built by the company in Sulphurdale, Utah, which the officers also hoped would become a commercially operating plant. The corporation also acquired additional patents. American Sulphur and Refining Co. was engaged in business during 1958 and continued in business throughout 1959 and most of 1960. Its Federal income tax returns continued to report deductions for salaries and wages paid during the fiscal years ended February 28, 1959 and February *656 29, 1960. The returns also reported deductions for payroll taxes paid during its fiscal years ended February 28, 1959 and February 29, 1960. During May 1958, American Sulphur obtained a release of all claims against it held by the Continental Sulphur and Phosphate Corp. The Federal income tax return of American covering this year shows a reduction of depletable assets as well as long-term bonds, notes and mortgages payable of approximately $650,000. On April 21, 1959, American Sulphur as one of the locators, filed of record in Milland County, Utah, a Notice of Location of Placer Claim described as the "Sulphurdale Mining Co. Claim No. 1, Placer Mining Claim." On June 9, 1959, American Sulphur quit claimed 20 mining claims, including the above claim and 19 other claims filed between April 21, 1959 and May 8, 1959, to Sulphurdale Mining Co. This quitclaim mining deed was recorded in Millard County, Utah, on July 15, 1959. American Sulphur was active in acquiring an interest in mining claims during the early part of 1959. The Federal income tax return of American Sulphur for its fiscal year ended February 29, 1960 shows that its plant at Sulphurdale, Utah, was sold on August 31, *657 1959. It was not until sometime during 1960 that the patents belonging to American Sulphur were sold. American Sulphur's plant and equipment were sold on August 31, 1959. American Sulphur was leasing its land from Thomas Neale and Wheeler, Jr. as lessors. The cancellation of the lease was recorded on February 1, 1960. American Sulphur's income tax return for the year ended February 28, 1954, reflected an indebtedness for notes outstanding with a maturity of less than one year in the sum of $87,669.51 as of the beginning of the taxable year (March 1, 1953) and $102,019.51 at the end of the tax year. American Sulphur's income tax returns for the years ended February 28, 1957 and February 28, 1958, reflect that its plant was still in the construction and experimentation stage, and that the corporation realized no income in those years. The return for the year ended February 28, 1959 showed that the corporation's outstanding indebtedness at year end totaled $1,564,890. The return for the year ended February 28, 1959 reflected income from "scrap sales," in the amount of $787.61 and indebtedness totalling $1,244,143.43. American Sulphur's income tax return for the year ended February *658 29, 1960, also showed income from the sale of scrap metal, in the sum of $3,250, and rentals of $787. It further reported a sale of the corporation's sulphur mine, plant and equipment on August 31, 1959 for a gross sales price of $62,507.37, representing a net loss on the sale of $932,264.61. The return also showed that at the beginning of the taxable year the corporation had outstanding notes payable in the sum of $1,244,143.43, but at the end of the year the figure had been reduced to $13,263.07 in current notes payable. Also, the corporation's outstanding common stock carried on the books at $100,000 was reduced to $100, of which 81 percent was stated to be owned by Thomas Neale. During the tax year, preferred stock was issued to Wheeler in the sum of $1,358,750. American Sulphur's final income tax return was filed for the period March 1, 1960 to February 28, 1961. The return shows that the corporation did not engage in any business during the last three months of the year and had no intention of engaging in any business during the year commencing March 1, 1961. The return reported a 1960 sale of patents for a gross sale price of $8,369.09, reflecting a loss of $119,277.97. *659 On or about May 16, 1958 a corporation known as Continental Sulphur, for a recited consideration of $1, released American Sulphur of all claims Continental Sulphur had against it. On June 9, 1959, American Sulphur executed a Quit Claim Deed to a corporation known as Sulphurdale Mining, relating to certain listed mining claims.In January 1960, American Sulphur formally acknowledged in writing that all of its leases had been cancelled and that a contract with Continental Sulphur had been cancelled and a release obtained. X. ADDITIONAL FACTS RELATING TO CLAIMED BAD DEBT DEDUCTIONS. A. Income Adjustments. In Docket No. 987-69 petitioners claimed in their returns for the respective years the following deductions as business bad debts: Deduction Claimed Year
Debtor
1960
Margaret M. Willis
$ 25,368.34
1961
H. B. Adair
3,000.00
1962
Margaret M. Willis
18,957.35
In Docket No. 988-69, relating to the year 1965, petitioners claimed business bad debt deductions in their return as follows: Ernest Shelander
$ 5,500
C. J. Rogers
83
Willow Glen Development Co.
3,400
TOTAL
$ 8,983
Respondent disallowed in its entirety the business bad deduction claimed for the year 1960. Respondent allowed the remaining bad debts *660 in the amounts and years claimed, but treated them as non-business bad debts deductible as short term capital losses on the ground that petitioners were not in the business of lending money. B. Facts Concerning Loans Made by Petitioners. From 1934 through 1963, Wheeler loaned money and otherwise extended or provided credit in varying amounts to various individuals, corporations, family members and business associates. Promissory notes were sometimes executed by the borrowers. Mr. Frentz of Price Waterhouse prepared a schedule (Exhibit 76) entitled "Henry H. Wheeler, Schedule of Loans" from Wheeler's check stubs, cash disbursements journals and available cancelled checks and promissory notes in Wheeler's possession. The schedule reflects transactions which were recorded as loans by Wheeler in one or more of the available sources of records during the years 1934 through 1963. However, for the years 1934 through 1948 Mr. Frentz was able to find only three notes to substantiate Wheeler's claim that the transactions represented loans. The following schedule reflects the claimed loans for the years 1949 through 1963: Number of Loans
Number of Identified Recipients
Number of Recipients Listed as Interest Payors on Tax Returns
Total Amount Year
1949
47
10
Not Known
$ 473,219.37
1950
43
14
1
747,405.00
1951
13
10
1
337,700.00
1952
22
9
4
199,087.80
1953
18
7
2
190,80 6.90
1954
11
8
3
61,888.13
1955
17
6
4
177,930.89
1956
17
13
5
119,346.03
1957
33
14
11
162,716.09
1958 32
12
6
189,275.00
1959
25
10
4
121,100.00
1960
15
9
0
185,844.65
1961
16
6
1
81,487.90
1962
13
7
2
23,680.09
1963
49
12
3
47,333.65
Totals
371
147
47
$ 3,118,821.50
Only *661 about one-third of the identified recipients paid interest to Wheeler during the years 1949 through 1963. Most of the interest income reported on Wheeler's income tax returns for the years 1949 through 1963 was received from bonds, bank accounts, savings accounts, insurance and installment sales of real property. The interest schedules show interest income from bank accounts and the capital gains schedules show most of the remaining payors of interest were purchasers of real property from the Wheelers. In particular, the capital gains schedules in the returns for the years 1960 through 1963 show that all the property buyers are also listed as interest payors. The following schedule is a comparison of the claimed loans shown on Exhibit 76 with the list of interest payors shown on the petitioners' income tax returns: Number of Interest Payors on Tax Returns
Number of Identified Recipients
Number Who Paid Interest Year
1949
Not known
10
Not known
1950
3
14
1
1951
2
10
1
1952
7
9
4
1953
7
7
2
1954
7
8
3
1955
6
6
4
1956
13 13
5
1957
23
14
11
1958
21
12
6
1959
20
10
4
1960
18
9
0
1961
17
6
1
1962
24
12
3
Total
168
140
45
The Wheelers' income tax returns show that there were only 19 identified payors of interest over a period of 16 years whose names *662 appear on Exhibit 76. XI. FACTS RELATING TO CRIMINAL PROCEEDING AGAINST HENRY H. WHEELER On January 11, 1961, a nine-court indictment was returned by the Federal Grand Jury at Los Angeles against Henry H. Wheeler. The counts included charges of income tax evasion with respect to Wheeler's individual income taxes for the years 1954, 1955, 1956, 1957 and 1958; estate tax evasion with respect to the Estate of Helen M. Wheeler; procuring the preparation and filing of a false corporate income tax return for LADG for the year 1956; and filing false claims for refund for 1954 and 1955. Wheeler entered a plea of nolo contendere with respect to two of the counts involving the charge of individual income tax evasion for the year 1955 and estate tax evasion. A Judgment of Conviction was entered as to those two counts and Wheeler received a fine of $2,000 on each count. The remaining seven counts of the indictment were dismissed. XII. FACTS RELATING TO STATUTE OF LIMITATIONS. With respect to Docket No. 989-69, involving the individual income taxes of petitioners for the years 1949 through 1955, the statutory notice of deficiency was issued on December 10, 1968.The returns for each of *663 those years were filed more than six years prior to the issuance of the statutory notice. Consents extending the statute of limitations were not executed by the petitioners for such years. With respect to Docket No. 987-69, involving the individual income taxes of petitioners for the years 1956 through 1964, the statutory notice of deficiency was issued on December 10, 1968. For the year 1956 the petitioners executed a consent (Form 872) on February 8, 1963, extending the period of limitations for assessment and collection of deficiencies and thereafter executed consents extending the statute through December 31, 1968. Petitioners' return for 1956 was filed more than three years, but less than six years, prior to February 8, 1963. The gross income reported on that return was $209,195.78. As to the year 1957 the return was filed more than six years prior to the issuance of the statutory notice. No consents extending the statute of limitations were executed by petitioners for that year. With respect to the years 1958 through 1964 in Docket No. 987-69, timely consents were executed by petitioners extending the statute of limitations for assessment and collection of the deficiencies. *664 With respect to Docket No. 986-69, involving the estate tax deficiency, the statutory notice was issued on December 10, 1968, more than six years after the estate tax return was filed. No consents were signed by the estate's representatives extending the statute of limitations for assessment and collection. With respect to Docket No. 990-69, involving the corporate returns of LADG for the years 1953 and 1956, the statutory notice was issued on December 10, 1968. The returns for each of those years were filed more than six years before the statutory notice was issued. No consents were executed on behalf of the corporation extending the statute of limitations for assessment and collection. ULTIMATE FINDINGS OF FACT 1. Respondent failed to prove by clear and convincing evidence that part of the underpayment of the income taxes of the individual petitioners for each of the years 1949 through 1958 was due to fraud. 2. Respondent failed to prove by clear and convincing evidence that part of the underpayment of income taxes of LADG for each of the years 1953 and 1956 was due to fraud. 3. A part of the underpayment of estate tax of the Estate of Helen M. Wheeler was due to fraud. *665 4. The individual petitioners were not engaged in the business of lending money or financing business enterprises by direct loans, advances, guarantees or indemnity agreements during the years 1949 through 1965. 5. The individual petitioners have failed to prove that they are entitled to business bad debt deductions or ordinary losses during the years in issue. 6. The petitioners have failed to carry their burden of proof with respect to all adjustments made by respondent in open years on which no evidence was offered. OPINION These cases and the deficiencies and additions to tax for fraud with respect thereto arose out of the complex business affairs of Henry H. Wheeler, Sr. Many of the issues relate to the extensive operations of L.A. Decomposed Granite Company (LADG) and Park Water Company. Wheeler owned a majority of the stock in both corporations for most of the years involved herein. The record in these cases is staggering--1,957 pages of testimony from 30 witnesses and 216 items of documentary evidence. There are lengthy and detailed requested findings of fact. There is sharp dispute between the parties with respect to many of the adjustments to the income and estate *666 taxes. By far the key issue is whether or not fraud has been proved by the respondent. Therefore, we will first consider the question of fraud in the income tax cases involving the Wheelers and LADG. This will be followed by our consideration of the fraud issue and adjustments in the estate tax case and the claimed loss deductions. Issue I. Additions to Tax for Fraud--Wheelers--Years 1949 through 1958. A. General Matters.
It is indisputable that the respondent has the burden of proof on the issue of fraud with intent to evade tax, and such burden must be carried by clear and convincing evidence. Section 7454 of the 1954 Code; Rule 142(b), Tax Court Rules of Practice and Procedure. To carry such burden, the respondent must do more than merely rely on the usual presumption of correctness of the determinations set forth in the statutory notice of deficiencies. Respondent "cannot sustain his burden of proof on a fraud issue by statements made in his notice of deficiency." Joseph v. Commissioner,32 B.T.A. 1192, 1204 (1935); Drieborg v. Commissioner,225 F. 2d 216, 219 (6th Cir. 1955). Hence, the failure of the taxpayer to contest or disprove the correctness of the deficiencies *667 determined by the Commissioner does not establish the existence of fraud. Drieborg v. Commissioner,supra at 218. Indeed, even the taxpayer's concession that all or part of the deficiencies were correct would not, without more, sustain the respondent's burden of proving fraud. Reherman v. Commissioner,240 F. 2d 953, 954 (6th Cir. 1957). Respondent may not rely on his presumption of correctness either for the purpose of sustaining deficiencies which would be barred by the statute of limitations but for the existence of fraud or for the purpose of sustaining the imposition of fraud penalties. Rather, the burden is shifted to respondent to show affirmatively, in years otherwise barred by the statute of limitations, that there were in fact deficiencies and that they were due to fraud. With respect to any year not barred by the statute, respondent's determination of a deficiency is presumptively correct, but respondent must prove that the deficiency determined was at least in part due to fraud in order to sustain the penalty. Toledano v. Commissioner,362 F. 2d 243, 247 (5th Cir. 1966); Valetti v. Commissioner,260 F. 2d 185, 188 (3rd Cir. 1958); Stratton v. Commissioner,54 T.C. 255 (1970); *668 Mayock v. Commissioner,32 T.C. 966, 974 (1959). The mere existence of deficiencies, even substantial and consistent over a period of years, does not establish fraud per se. Such deficiencies may arouse suspicion of fraud, but even a strong suspicion, without more, is insufficient to meet the respondent's burden of proving fraud by clear and convincing evidence. Toledano v. Commissioner,supra. The essential element which respondent must prove affirmatively is that Wheeler intended to defraud the government by calculated tax evasions, i.e., that his conduct had as its specific purpose the evasion of a tax known or believed to be owing. Mitchell v. Commissioner,118 F. 2d 308, 310 (5th Cir. 1941); Stratton v. Commissioner,supra;Mayock v. Commissioner,supra.
It is not enough for respondent to contend that Wheeler's explanation of the alleged underreported items is inadequate. Negligence, no matter how great, is not the equivalent of fraud. Hence, respondent must be able to affirmatively disprove the excuse with evidence so convincing as to demonstrate clearly that Wheeler intended to defraud the government of taxes known to be owing. Mitchell v. Commissioner,supra.
It is well *669 settled that a plea of nolo contendere by a taxpayer to a charge of criminal tax fraud and resulting conviction does not bar him from disputing the imposition of civil fraud penalties for the same taxable year. The doctrine of collateral estoppel raised by a plea of guilty to criminal tax fraud is not applicable to a plea of nolo contendere. Godfrey v. Commissioner,T.C. Memo. 1968-199; Broadhead v. Enochs,179 F. Supp. 876 (S.D. Miss. 1959). The nolo plea was admissible in this case as some evidence on the issue of fraud since the trial was held prior to the effective date of Rule 410, Federal Rules of Evidence.However, it has little or no probative value by itself. Godfrey v. Commissioner,supra. Here Wheeler was faced with criminal charges of a nature that would have produced a trial at least as lengthy as the trial we had in these civil cases. Even if he had prevailed and was acquitted in the criminal proceeding, the government would not have been barred from claiming civil fraud penalties, and Wheeler would have been forced to go through the same expensive defense a second time. See, e.g., Stratton v. Commissioner,supra, where that very situation occurred. Under the circumstances *670 it was far less onerous for Wheeler to accept the consequences and relatively small expense of a conviction on the basis of a nolo plea. He was then able to devote his full resources to a single defense in the civil cases which was by far the more important of the two because of the size of the potential deficiencies and penalties. In any event the nolo plea to two counts and dismissal of the other seven counts were plainly the result of negotiation and were accepted by Wheeler on the advice of counsel. Respondent has also offered as proof of fraud several events mentioned in our findings of fact which occurred after the filing of all or most of the returns which respondent contends were fraudulent. Petitioners vigorously dispute the assertion that such transactions were sham, false or fraudulent in any respect. In addition to claiming that respondent's contentions are factually incorrect, petitioners challenge respondent's position that tax fraud can be proved by alleged fraudulent conduct which occurred after the returns in question were filed. Where respondent seeks to impose fraud penalties with respect to alleged false and fraudulent returns, "the returns themselves" are *671 subjected to the test. Arnold v. Commissioner,14 B.T.A. 954, 974 (1928). "It is the return itself which is the basis of the imposition of the penalty." Drieborg v. Commissioner,225 F. 2d 216, 220. "The test is the intent at or before the time the return is filed, not some later date." Klemach v. Commissioner,T.C. Memo. 1971-169. Subsequent conduct of the taxpayer, after making the return, even though reprehensible, will not justify the imposition of the penalty, unless the fraudulent intent is shown to have existed when the return was made. Hauser v. Commissioner,T.C. Memo. 1970-207. B. Years 1949-1955 (Dkt. No. 989-69).
Certainly the most important area of alleged unreported income and asserted fraud involving the individual petitioners arises out of the water service installation activities of LADG and Park Water Co. The adjustments to Wheeler's income attributed to these activities are discussed in respondent's briefs and involve funds referred to by respondent as "no refund income." In addition to providing the major source of alleged deficiency income for the years 1949 through 1955, the treatment of these funds on the books of LADG and Park Water Co. is relied upon heavily *672 by respondent as an alleged "act of concealment" and "badge of fraud" to justify the individual fraud penalties in those years. Respondent points to Wheeler's much discussed use of "rounding checks" in connection with the deposit of subdivider money in LADG's bank account, and the recording of money originating with subdividers on both the books of LADG and Park Water Co. as "fictitious loans" from Wheeler, as evidence of fraudulent concealment of income. Petitioners have conceded that the manner in which monies originating with subdividers were recorded on the books of LADG and Park Water Co. was deceptive, and that it was an attempt (ultimately unsuccessful) by Wheeler to circumvent the California Public Utilities Commission's rules applicable to Park Water Co. However, they contend that this does not in any way justify respondent's assertion that Wheeler's "modus operandi" with respect to the treatment of subdivider money also proves an intent to conceal or underreport taxable income, for two reasons: (1) Wheeler's intention to circumvent the PUC's rules would not satisfy respondent's burden of proof, even if it had resulted in the concealment of taxable income, Toledano v. Commissioner,362 F. 2d 243, 247 (5th Cir. 1966); *673 and (2) in the instant cases the alleged acts of concealment did not in fact conceal income taxable to Wheeler because the subdivider monies received by LADG and Park Water Co. were not taxable to Wheeler. Obviously fraud may not be based on alleged acts of concealment where the funds "concealed" do not in fact constitute taxable income. Estate of Lloyd v. Commissioner,T.C. Memo. 1959-208. The four major income adjustments specified by respondent as fraud items all resulted from the receipt by LADG and Park Water Co. of certain monies which respondent says constituted taxable income to Wheeler at the time they were received by those corporations. The four categories of alleged income are: (1) sums received by LADG and credited to the "H.H. Wheeler Advances" ledger account on the books of that corporation; (2) sums received by Park Water Co. and credited to the "Installment Stock Subscription" ledger account on Park's books; (3) sums received by Park and credited to the "Notes Receivable - H.H. Wheeler" ledger account on Park's books; and (4) sums received by Park as "donations in aid of construction" from individual water customers. Petitioners contend that respondent failed to *674 prove either the existence of the alleged taxable income to Wheeler from these sources, or that such income, if it existed at all, was not reported by Wheeler due to a fraudulent intent to evade or defeat income taxes known to be owing. We agree with petitioners. In our judgment the evidence shows that these income adjustments were based upon presumptions, assumptions and inferences on the part of respondent's investigating agents, who misinterpreted both the facts and legal effect of the underlying transactions. The result is a unique theory of taxation that is untenable and a concept of fraud that has even less merit. 1. Credits to Wheeler Advance Account on LADG Books.
The largest of the income adjustments, covering each of the years 1949 through 1955, is based upon monies which respondent contends were received by LADG and credited to the ledger account maintained on LADG's books, denominated H.H. Wheeler advances. The income respondent attributed to Wheeler from this source is as follows: Year
Amount
1949
$ 90,023.00 1950
115,645.65
1951
165,313.16 1952
124,741.05
1953
240,495.69 1954
181,032.26
1955
181,811.37
The ledger account and most of the other records of LADG were not available *675 either during the trial or during respondent's investigation and audit. There was no evidence that petitioners were in any way responsible for the unavailability of these records. On the contrary there was uncontroverted evidence that the records were substantially destroyed by a fire in 1957 (prior to respondent's audit) while they were in the possession of the then owners of LADG, who were unrelated to petitioners. For the years 1949 through 1952 the only available record of the amounts recorded in the advance account was a transcript prepared by an auditor of PUC. With respect to these years, the only competent evidence offered as to the source of the credits shown in the PUC's transcript of the advance account was the amount of money known to have been advanced by Wheeler to LADG during each of those years. Such advances in each year, represented by personal checks from Wheeler deposited to LADG's bank account, were deducted by respondent from the total credits to the advance account in such year, as shown in the transcript. Respondent then assumed that the balance of the credits represented funds in fact received by LADG from sources other than Wheeler. Respondent further *676 assumed that such unidentified funds received by LADG represented income from taxable sources and concluded that such taxable income was constructively received by Wheeler. Following the issuance of the statutory notice, respondent conceded that additional checks from Wheeler to LADG during the years 1949 through 1952 had been discovered, besides those already deducted. Accordingly, respondent agreed that the alleged income attributed to Wheeler from the unidentified credits to the advance account, as shown by the PUC transcript of that account, should be reduced by the amounts of the newly discovered Wheeler checks. The reductions in income thus conceded were as follows: 1949
$ 8,952.94 1950
9,093.82
1951
58,380.96 1952
1,382.06
Thus, on these facts, we think respondent has failed to meet his burden of proof for the years 1949 to 1952. He has not established, by clear and convincing evidence, or any evidence whatever, that LADG received money in any specific sum from identified taxable sources, let alone that such income was constructively received by Wheeler or otherwise taxable to him. For the years 1953 to 1956, respondent was able to ascertain that LADG in fact received specific *677 sums of money on the basis of its bank deposit slips, which were obtained from the bank but were not available for periods prior to September 1952. Using those bank deposit slips, respondent undertook to reconstruct the advance account on LADG's books for the year 1953. Respondent determined that of the total figure of $530,500 shown as credited to the account in 1953 per the PUC transcript, $290,004.31 constituted Wheeler's personal checks deposited to the LADG bank account that year and $240,495.69 constituted funds from others consisting primarily of payments from subdividers on water only contracts. For years after 1953 there was no actual transcript of the LADG advance account. However, using the ending balance for December 31, 1953, determined by the PUC, and the bank deposit slips for the year 1954 through 1956, respondent reconstructed the assumed debits and credits to the advance account for those years. In so doing, respondent worked toward a figure of $340,654.54 as the assumed ending balance of the advance account as of December 31, 1956. That figure was obtained by respondent from LADG's 1956 corporate tax return, wherein it was identified as the "sale price" for "jobs *678 in progress sold to H.H. Wheeler." Special Agent Sullivan testified that respondent's assumptions regarding the years 1949 to 1952 were based upon the "patterns" which he developed for the years 1953 to 1956, by his "reconstruction" of the specific credits and debits assumed to have been made to the advance account in those years. In other words, Mr. Sullivan assumed that the unidentified credits in the 1949-1952 period represented monies received by LADG from subdividers as payment for the installation of water service under so-called "water only contracts." This was because that appeared to be the principal source of funds, other than funds coming from Wheeler himself, credited to the account in subsequent years, according to Sullivan's reconstruction. No evidence was offered by respondent to prove the true source, nature or purpose of the monies assumed to have been received by LADG and reflected in the unidentified credits to the advance account. We think respondent's reconstruction of the advance account for the years 1953 to 1956 was also based upon assumptions and inferences, though to a lesser extent than was true with respect to the years 1949 to 1952. Unlike the prior *679 years, however, the limited available evidence indicates the essential accuracy of respondent's basic assumptions insofar as they seek to establish a pattern for the source and amounts of credits to the advance account in the years 1953 to 1956. Petitioners acknowledge that during those years substantial sums of money were in fact received by LADG from subdividers for water installations, along with substantial sums of money which Wheeler personally advanced. Undoubtedly, some monies from both of such sources were credited to the advance account. With respect to such years, respondent determined that monies credited to the Wheeler advance account on LADG's books, not traceable to funds advanced by Wheeler personally, constituted taxable income to Wheeler at the time they were so credited. Although such alleged income was referred to in the statutory notice as having been "cleared through" the advance account, respondent did not prove or contend that the sums designated as taxable income to Wheeler were physically received by him in those years and amounts. On the contrary, it was conceded that the funds were physically received by LADG and respondent made no effort to trace or correlate *680 any of the deposits to withdrawals during the same year. Nor did respondent otherwise attempt to prove how much, if any, Wheeler actually received from LADG in the form of withdrawals of allegedly taxable and unreported income. Rather, respondent assumed that all funds credited to the advance account on LADG's books were constructivelyreceived by Wheeler at that time and taxable to him regardless of what actually happened to the funds themselves. Respondent's theory of constructive receipt is apparently based upon the premise that because the money was recorded on LADG's books as an advance by Wheeler, he thereafter "had the use of it." Respondent offered no evidence to demonstrate that Wheeler in fact had such absolute control and use of the corporate funds credited to the advance account to require or justify treating them as his for tax purposes. Certainly, as controlling stockholder, he would, and did, determine their ultimate disposition. But that fact alone did not make him the constructive recipient for tax purposes of these particular corporate funds, any more than corporate funds recorded in any other account on LADG's books.
A corporation is a separate legal entity from *681 its stockholders and is recognized as such for tax purposes. An exception is permitted, and the corporate structure may be ignored by respondent, where it is shown to be a sham, i.e., the purpose for its creation was not a business purpose and it did not actually engage in a real business activity. But where the corporation is real, and engages in true business activity, respondent must recognize its separateness from its stockholders; and the income of the corporation is not taxable to a stockholder even though he may own all of the stock and totally dominate its affairs. Moline Properties, Inc. v. Commissioner,319 U.S. 436 (1943); National Carbide Corp. v. Commissioner,336 U.S. 422 (1949); O'Neill v. Commissioner,271 F. 2d 44 (9th Cir. 1959). In the instant case, LADG was not a sham engaging in no business activity. It had extensive business activity, maintained corporate records and a corporate bank account, and filed tax returns and paid taxes on its income. Indeed, respondent recognized LADG as a separate taxable entity, asserting deficiencies against it in Docket No. 990-69. Certainly the available evidence as to the actual use and distribution of the funds credited *682 to the advance account in no way justified respondent's assumption that all funds so credited were ipso facto diverted to Wheeler's personal use. Accordingly, we conclude that there is no basis in the record upon which it can be found that the doctrine of constructive receipt is applicable to any of the "no refund income" received by LADG, which respondent seeks to tax to Wheeler in the "advance account" adjustment. LADG, as the contracting party with the subdividers, was the only party legally entitled to receive the money. The fact that the monies were recorded in the "advance account" on the books of LADG as loans or advances from Wheeler is immaterial. Even if the real purpose for recording the monies as an advance or loan from Wheeler is ignored, the mere creation of a liability in favor of Wheeler on the books of LADG would not create a present right in Wheeler to receive immediate repayment. The fact that he had the power to make the corporation pay him the money--a power possessed by every dominant shareholder over his corporation's funds--is likewise immaterial. Furthermore, the theory of constructive receipt presumes that the sums involved would in fact be taxable income *683 to the taxpayer who constructively received them. Here the true nature of the subdivider money received by LADG was that it represented payments for water installations which LADG was to cause Park Water Co. to provide and which Park in fact did provide. Respondent himself recognized that LADG was merely a conduit. 2. Credits to Stock Subscription Account on Park Water Co. Books. Another income adjustment, which is related to the LADG advance account issue, involves monies received by Park Water Co. in 1949 and 1950 and credited to a ledger account on its books bearing the name "Installment Stock Subscriptions." Respondent contends that of the funds received by Park and credited to the stock subscription account during the years 1949 and 1950, Wheeler constructively received taxable income determined as follows: Year
Amount
1949
$ 221,000
1950
513,650
Pursuing the same theory he applied to his adjustment regarding LADG's advance account, respondent determined that the monies credited to the stock subscription account on Park Water's books during the years 1949 and 1950, not traceable to funds advanced by Wheeler personally, constituted taxable income to Wheeler at the time such monies *684 were received by Park and credited to that account. He does not contend that in 1949 and 1950 Wheeler actually received physical possession of the monies credited to the stock subscription account, but that the money was constructively received by Wheeler at that time. Our conclusion regarding the alleged constructive receipt by Wheeler of the corporate monies credited to the LADG advance account applies equally here. Respondent offered no justification for his disregard of the separate legal and taxable existence of Park Water Co. from Wheeler, and in fact has always treated Park as a separate taxable entity.
Unlike the credits to the LADG advance account, the money credited to Park's stock subscription account was not labeled as having come from Wheeler exclusively. Rather, it was treated on Park's books as having come proportionately from all three of Park's then stockholders, Wheeler, Motz and Collins. The clear intent and purpose of recording money in this particular account was to support the position, vis-a-vis the PUC, that Park was accumulating the credits in the account as installment payments from its stockholders toward the purchase of capital stock. The money received *685 by Park from LADG which was credited to this account was deemed to represent "advances" by LADG which were to be refunded by Park to Wheeler, Motz and Collins, as assignees of LADG, in the form of credits for the issuance of stock to those three individuals. Thus the evidence is uncontradicted that at the time such money was received by Park it was intended to be retained by Park as contributed capital from its shareholders. Turning now to what actually happened to the money credited to the stock subscription account, respondent erroneously contends that Wheeler obtained "nearly $2,000,000 of the 'no refund' income for himself" by virtue of the 1951 transaction which resulted in the cancellation of the stock subscription account. Here again, respondent's statement of the facts concerning the purpose and effect of that transaction is inaccurate and incomplete. The evidence certainly does not support respondent's statement that "the fourth step for Wheeler was to get the portion of money flowing from LADG to Park out of Park and into his personal bank account." Although Park did issue two checks to Wheeler totaling $1,818,400 in May 1951 in cancellation of the stock subscription *686 account, $1,200,000 of the money went right back into Park immediately for stock. The sum of $900,000 went directly back into Park by virtue of Wheeler's check to Park, and $300,000 went back through checks which Wheeler wrote to Motz and Collins, who then wrote their own checks to Park. Park's stock was issued in exchange for the money in the following amounts: 36,000 shares (par value $900,000) to Wheeler, 10,629 shares (par value $265,725) to Violet E. Motz, and $1,371 shares (par value $34,275) to O. D. Collins. The May 1951 transaction was simply another step in Wheeler's efforts to accomplish Park's goals vis-a-vis the PUC. By issuing cash in cancellation of the stock subscription account and then issuing stock for the cash, it was hoped that Park's rate base would be increased by that amount on the theory that the money represented shareholder invested capital. As a result of this purely paper transaction, Park was able to shift into a capital account monies which had been received previously from subdividers through LADG and accumulated on Park's books in the stock subscription account. The actual dollars received from the subdividers from 1946 through 1950 had already *687 been spent by Park on water installations. The cash used for this shifting of dollars from one account to another on Park's books was generated by the $2,000,000 loan Park obtained from two insurance companies. However, the plan did not work. PUC denied Park's rate application in 1955. The PUC position was that the subdivider money flowing into Park from LADG had been improperly recorded as monies originating from shareholders. Park was required to cancel the stock which had been issued and to correct its books to reflect the money as non-refundable contributions in aid of construction from non-shareholders. As such, the money was excludable from Park's rate base. Under these circumstances Wheeler cannot be regarded as the recipient of taxable income merely because his bank account was used for the circular check transaction which sought to shift $1,200,000 on Park's books from one account to another. See Forster v. Commissioner,T.C. Memo. 1961-281. But, even though Park actually retained $1,200,000 out of the $1,818,400 purportedly distributed to Wheeler in May 1951, respondent apparently contends that Wheeler had the use and benefit of the $1,200,000 because it was converted *688 into stock. Respondent also argues that the transaction "had the additional benefit to Park of increasing its invested capital for rate fixing purposes." This contention is without merit for two reasons. First, the transaction did not in fact increase Park's invested capital for rate fixing purposes because the PUC denied Park's rate application and made Park change its books. Secondly, even if there had been some benefit to Park, we do not see how such fact would justify respondent's theory that Wheeler personally should be taxed as the constructive recipient of the subdivider money as it was received by Park from LADG. As a result of PUC's subsequent ruling, Park was required to squeeze this "water" out of its stock. Stock issued in 1951 and 1952 was cancelled and $2,061,135.65 was required to be reclassified on Park's books from capital and earned surplus accounts to contributions in aid of construction. It is our view that Wheeler did not realize any personal economic benefit as the result of the 1951 cancellation of the stock subscription account and circular flow of insurance funds out of Park and back in again. After the dust cleared, Park and its stockholders were in no *689 different position than they would have been in if the money paid by subdividers for water installations and received by Park from 1946 to 1950 had been recorded as contributions in aid of construction ab initio, instead of being recorded in the stock subscription account. [15] *690 Accordingly, on these facts, we think respondent failed to prove that Wheeler obtained the personal use or benefit of any of the subdivider money which had been recorded in the stock subscription account. The only money which he retained out of the funds distributed in cancellation of that account was less than his own previous advances to Park. Hence, there is no factual justification whatever for respondent's determination that Wheeler should be taxed in 1949 and 1950 as the constructive recipient of the subdivider monies paid to Park by LADG in those years. 3. Credits to Notes Receivable Account on Park Water Company's Books.
This adjustment is closely related to the advance account and stock subscription account. Using the same rationale, but with even less evidence, respondent determined that in 1951 Wheeler constructively received taxable income of $136,004.42 which was actually received by Park Water Co. and credited to its ledger account bearing the designation "Notes Receivable-- H. H. Wheeler." After 1950, the installment stock subscription account was not used by Park to record receipts of funds from LADG or Wheeler. However, during the period January *691 through May 1951, such receipts were recorded in the notes receivable account. The PUC audit determined that the total credits to the notes receivable account during that period were $144,350. Of that sum, $12,500 was received from LADG and charged to the Wheeler advance account, $125,000 was received from LADG and charged to the water systems account, and $6,850 was "unidentified." Respondent, on the other hand, determined that the total credits to the notes receivable account for this period were $153,350, of which $5,349.58 was received directly from Wheeler, $12,500 was received from LADG and charged to the Wheeler advance account, and $136,042 was received from "others," primarily LADG. Respondent treated the $136,004.42 received by Park from LADG and others as an addition to Wheeler's income for the year 1951. Respondent offered only Exhibit AN in support of this determination, without explanatory testimony. The only facts stipulated with respect to such exhibit were that "for the period January through May 1951, Park received some funds which were credited" to the notes receivable account as shown by the schedule. Respondent offered no evidence whatever to explain why *692 this money admittedly received by Park should be taxable to Wheeler. Respondent did not even explain what he believed the account description was intended to mean. Nor did he attempt to justify a constructive receipt theory by offering evidence as to what subsequently happened to the money itself or the account on Park's books. In short, there is no basis in the record to support the attribution of this money to Wheeler in 1951 or any other year. 4. Donations in Aid of Construction to Park.
Respondent determined that certain "advances" or "donations" in aid of construction not recorded on Park's books were "diverted" to Wheeler in the years 1949 through 1952, as follows: Year
Amount
1949
$ 6,268.45
1950
13,799.66
1951
33,755.73
1952
7,215.84
Respondent offered nothing more in support of this adjustment than Exhibit AM, a schedule entitled "Park Water Co. Donations in Aid of Construction," without explanatory testimony. The only facts stipulated concerning the issue were that "For the years 1948 through 1952 there were received directly by Park donations in aid of construction" in amounts as shown in the schedule. The only other evidence bearing on the matter was that Park did not properly *693 record its donations in aid of construction, as required by the rules of the PUC, until the PUC ordered Park to comply with its rules. Subsequently, Park's books were corrected. Thus, the record is devoid of any basis for respondent's assertion that this money was somehow "diverted" to Wheeler or otherwise taxable to him. 5. Additional Adjustments--1953.
Besides the four major adjustments previously discussed which respondent specified as being fraud items, respondent indicated during the trial that four additional adjustments to petitioners' income taxes for the year 1953 were being relied upon as proof of fraud. The four adjustments are: (a) An alleged unreported distribution of corporate income from Park Water Co. to Wheeler in the sum of $11,407, attributable to checks payable to Wheeler out of Park's "capital account" maintained at Compton National Bank, in excess of checks deposited by Wheeler to that account, drawn on his own bank account, during the period from October 1952 to January 1953. (b) The receipt by Wheeler of $7,490, representing alleged "commissions" from Southern California Water Co.
(c) Alleged additional income from LADG in the sum of $40,000 representing *694 a payment by LADG to M. Miller Co. reflected on Miller's books as a loan from Heeler. (d) Alleged additional income from LADG in the sum of $6,000, which respondent contends was improperly credited to the Wheeler advance account on LADG's books and charged to a tract account on the corporate books. (a) The Park Water Capital Account Adjustment.
In this adjustment respondent contends that Wheeler realized unreported income of $11,407 in 1953 by reason of a series of checks in and out of one of Park Water Co.'s bank accounts between the period October 1952 to January 1953. He simply asserts that he has proved that Wheeler received a specific amount of unreported income "cleared through the capital account of Park Water Co. during 1953." Petitioners, on the other hand, sumbit that respondent has not proved that income was in fact received by Wheeler in 1953 (or 1952, for that matter) by reason of this confusing circular flow of checks in and out of Park's bank account. Respondent did no more than show that Wheeler received funds from the account in excess of his own deposits during a limited period of time. The nature or purpose of the withdrawals was not shown by respondent, nor *695 did he establish any of the facts required for the withdrawals to be considered "dividends" from Park. But even if respondent could be deemed to have carried his burden of proof that this item represents taxable income, there is no proof of the required "other circumstances" or so-called "badges of fraud" required in order to support a finding that Wheeler knowingly or fraudulently failed to report such items. (b) The Southern California Water Co. "Commissions".
This adjustment is based upon the receipt by Wheeler of two checks totaling $7,490 from Southern California Water Co. in 1953, representing payments for prior right easements granted to Southern California Water Co. pursuant to a 1940 agreement. Respondent's cryptic discussion of the subject is contained in a statement that "a specific amount of unreported income received by Wheeler from Southern California Water Co. during 1953 was proven." Petitioners concede that the item represented unreported income to Wheeler but insist that it was simply omitted from their return through an erroneous belief that the payments were not taxable. We think respondent must do more than show an item of unreported income to sustain his burden *696 of affirmatively proving fraud by clear and convincing evidence. There is no evidence in this record of any attempt by Wheeler to conceal the receipt of these two checks, nor is there any evidence of other circumstances from which the Court could find that Wheeler intentionally failed to report this easily traceable item of income. (c) The $40,000 Payment by LADG to M. Miller Co.
This item involves not only the individual income tax liability of petitioners for the year 1953, but also the alleged deficiency against LADG for the same year. Respondent contends that the $40,000 paid by LADG to M. Miller Co. constituted an "understatement of profit on a completed job" by reason of the manner in which the transaction was recorded on LADG's books. His only basis for considering the item to also be taxable income to Wheeler is that the receipt of the money by M. Miller Co. was shown on that company's books as a loan from Wheeler. Petitioners assert that even if respondent were correct in his belief that the handling of this transaction on the books of LADG constituted an understatement of LADG's income (which he denied), respondent did not prove by clear and convincing evidence that *697 the $40,000 was income to Wheeler which he fraudulently failed to report. The evidence as to Miller's treatment of the money as a loan from Wheeler was both hearsay and totally irrelevant. The following language from Stone v. Commissioner,32 T.C. 1021, 1025 (1959), is applicable to this adjustment: Bookkeeping entries even of a taxpayer himself, though of some evidentiary value, are not conclusive and decision must rest on the actual facts. Doyle v. Mitchell Bros. Co.,247 U.S. 179. And this is even more true where the entries are made by parties over whom the taxpayer has no control. Moreover, the only theory by which a payment by LADG to Miller could be treated as taxable income to Wheeler would be if the payment was a constructive dividend to Wheeler. The absence of any evidence of LADG's earnings and profits would preclude that theory. (d) The Alleged $6,000 Credit to the Wheeler Advance Account on LADG's Books.
This adjustment, like the $40,000 payment by LADG to Miller, was considered by respondent to be taxable income to both LADG and Wheeler for the year 1953 in his statutory notices. Respondent's only discussion of the item in his opening brief is confusing, but apparently *698 he contends that the manner in which LADG's books reflected its receipt of a check for $6,000 from Milton Kauffman was both an improper reduction of LADG's income and an item of unreported income to Wheeler. In short, we think respondent has failed to show that Wheeler in fact realized any taxable income as a result of this transaction, let alone that such income was fraudulently omitted from his 1953 return. C.Years 1956-1958 (Dkt. No. 987-69).
1. Adjustments for the Year 1956.
Respondent specified only two adjustments for the year 1956 as being items allegedly involving fraud. They are: (a) Alleged unreported income of $112,194.43, described by respondent as "excess withdrawals" from the LADG advance account. (b) Unreported income received in 1956 from a 1950 installment sale of land in the amount of $83,144.20. With respect to item (b) above, respondent now concedes that there is no evidence of fraud. Thus, the only item of alleged fraud on which respondent continues to rely for the year 1956 is item (a) above. This adjustment is referred to by respondent as representing "diverted and intercepted funds belonging to LADG." Petitioners contend that the entire adjustment depends *699 upon numerous assumptions and speculations which are not warranted by the evidence and do not constitute clear and convincing evidence as to what the account actually reflected, or what it should have reflected.
It is important to note that Mr. Sullivan did not contend that during 1956 Wheeler actually received money in the sum of $112,194.43 under this adjustment. Rather, his testimony and the pertinent exhibits show that Wheeler is charged with having actually received in money only $60,909.97 in 1956, consisting of $35,000 from Modern Housing and $25,909.97 from Homes of Merit. The balance of $51,284.46 taxed to him in that year was actually received, if at all, prior to 1956. There seems to be no justification or rationale for pyramiding this income into the year 1956. Furthermore, we see no justification for the assumption that these sums received by or attributed to Wheeler during these years should be charged to the LADG advance account. For example, Mr. Sullivan "corrected" the account for the year 1954 by charging it in the sum of $29,626.50 for money paid by LADG to purchase land in the name of Wheeler's daughter, Florence A. Richardson, which land was then sold to Homes *700 of Merit. He inferred that this constituted a repayment of funds owed to Wheeler by LADG which he then loaned to Mrs. Richardson. There is no direct evidence that such is the proper interpretation of the transaction. The background and purpose of the payment has not been proved, and it is not known how it was charged on LADG's books. It may have been treated as an advance by LADG to Mrs. Richardson or it may have been an advance to Homes of Merit, using Mrs. Richardson as a mere nominee and conduit. The "corrections" to the advance account made by Mr. Sullivan for the years 1955 and 1956 related to alleged "payments due LADG on Improvement Contracts and Land Sale paid directly to Wheeler and deposited to his bank account or used for his personal benefit," which payments were made by Homes of Merit, Modern Housing and MacArthur Heights. In the cases of Modern Housing and MacArthur Heights it cannot be determined from the record whether such payments were actually owed to LADG or whether they constituted, in whole or in part, payments of monies due directly to Wheeler rather than LADG. Wheeler personally had money coming from MacArthur Heights for a land sale in 1950 to that corporation's *701 predecessor, Milton Kauffman, and he had personally advanced money to Homes of Merit. Even if Mr. Sullivan's "reconstruction" and "correction" of the advance account is considered to accurately reflect what actually occurred, we think the evidence does not warrant the further conclusion that the alleged "excess withdrawals" constituted taxable income to Wheeler. Respondent did not offer any evidence from which it could be determined that any withdrawals from LADG constituted taxable dividends, constructive or otherwise, as distinguished from loan repayments, a return of capital or payments of funds to Wheeler to be used for a corporate purpose. As we see it, the petitioners made a bona fide effort with McClure, their certified public accountant, to report in their 1958 tax return what they believed was the proper taxable gain realized from Wheeler's completion of LADG's jobs in progress, using a completed contract method of accounting. While they may have erred in their treatment of the transactions, there is no evidence that they deliberately sought to evade taxes in 1956 or any other year. Finally, it is significant that respondent has been unable to point to any alleged acts *702 of concealment or badges of fraud to support his contention of fraud with respect to this adjustment. The most that respondent can assert is that Wheeler realized income as the result of these very complex business transactions in excess of that which he reported. That, we believe, is simply not enough to satisfy respondent's burden of proving fraud. 2. Adjustments for the Years 1957 and 1958. The years 1957 and 1958 are the last income tax years for which respondent has determined additions to tax for fraud. The only adjustments in those years which he has specified as being fraud items are as follows: (a) Alleged unreported income from LADG in 1957 and 1958 in the sums of $192,300 and $45,910, respectively. (b) Alleged unreported income from Modern Housing, Inc. in 1957 and 1958 in the sums of $24,500 and $3,500, respectively. (c) Alleged unreported income from MacArthur Heights, Inc. in 1957 in the sum of $41,500. With respect to item (a) above, respondent determined that petitioners received taxable income from LADG in the sum of $192,300 in 1957 and $45,910 in 1958, which they fraudulently failed to report. This adjustment was based upon the theory that all checks in *703 those years and amounts, drawn on the bank account which LADG conveyed to Wheeler at the end of 1956, constituted income to him. Of course, the bank account was Wheeler's own account after 1956, even though it continued to bear the name LADG for the sake of convenience. Thus, he was not taxed on monies taken from or belonging to LADG, but rather checks written on his own bank account. Moreover, most of the money deposited in the account and withdrawn during 1957 and 1958 was identified as having come from two of the subdividers whose contracts were assumed by Wheeler--MacArthur Heights and Ward and Stiller. Petitioners reported these sums to McClure for the preparation of their 1958 return. Respondent did not prove the nature or purpose of the remaining unidentified receipts deposited in the account and withdrawn in 1957 and 1958, and hence did not prove that they constituted unreported taxable income. A fortiori, respondent did not prove that such receipts constituted income which Wheeler knew he should report and fraudulently omitted from his returns. With respect to item (b) regarding alleged unreported income from Modern Housing, respondent determined that in 1957, 1958 and *704 1959 the petitioners received directly from Modern Housing the following payments: Year
Principal
Interest
Total
1957
$ 24,500.00
$ 2,030.58
$ 26,530.58
1958
3,500.00
455.00
3,955.00
1959
2,000.00
392.67
2,392.67
The interest was in fact reported by petitioners in their returns for these respective years. The principal payments for 1957 and 1958 were itemized by Mrs. Wheeler on the work sheets she gave to McClure to prepare petitioners' 1958 return. The 1959 principal payment was not reported in petitioners' 1959 return, and is included as an adjustment for that year, which adjustment petitioners do not dispute. Respondent did not assert that any of the deficiency in 1959 was due to fraud, but only contends that the 1957 and 1958 principal payments from Modern Housing constitute fraudulently unreported income. The evidence refutes such contention. With respect to item (c) regarding the alleged unreported income from MacArthur Heights in 1957, respondent determined that two payments totaling $41,500 were made directly to Wheeler in 1957 from MacArthur Heights and constituted fraudulently omitted income. These payments were in fact included in Mrs. Wheeler's 1958 work sheets in the itemized sums *705 received from MacArthur Heights on the improvement contract assumed by Wheeler. There is no evidence of fraud, and respondent does not mention the item in the argument portion of his opening brief. 3. Respondent's Theory of Fraud. Respondent did not offer any evidence of concealment of any of the items of alleged unreported income for the years 1956 to 1958. On the contrary, the evidence shows that all of these items were at all times out in the open. All receipts and payments relating to these issues were by check, easily traceable by bank records and the records of the payors. There were no dealings in cash. Moreover, petitioners fully disclosed and attempted to report the alleged income from these subdividers in their returns for all of these years. Income from MacArthur Heights was identified and reported in 1955 and 1956, income from Modern Housing was identified and reported in 1957, 1958 and 1959, and income from Homes of Merit was identified and reported in 1959. In addition, petitioners reported to McClure, their CPA, all of the information which they believed was needed by him to correctly compute and report the income they realized on the six jobs assumed from *706 LADG, and McClure attempted to report such income to the best of his ability in petitioners' 1958 return. Despite this evidence, respondent concluded that Wheeler's tax returns for 1956, 1957 and 1958 were false and fraudulent. Incredibly, he even contended that petitioners' very act of reporting gain on the assumed contracts in 1958 proved their returns were fraudulent. We realize, and so do petitioners, that following the 1954 sale of Wheeler's LADG stock and decision to wind up the subdivision activities, the handling of the subdivision affairs were somewhat confused and imprecise. It may well be that under proper tax accounting the transactions should have been reported differently. Some errors were made. But mere errors, even if they are caused by improper or inadequate bookkeeping, or a careless attitude about financial affairs, do not amount to fraud. See, e.g., Iley v. Commissioner,19 T.C. 631 (1952); Ouellette v. Commissioner,T.C. Memo. 1971-98. Accordingly, we conclude that the record fails to show that the Wheelers attempted to conceal any income or that the returns filed for the years 1956 through 1958 were intentionally and fraudulently incorrect. Petitioners *707 concede that other income adjustments for the year 1958, on which respondent does not rely for proof of fraud or on which the petitioners have offered no evidence, must be sustained because assessment for that year is not barred by the statute of limitations absent fraud. Issue II. Additions to Tax for Fraud--LADG--1953 and 1956. Respondent determined that LADG fraudulently failed to report all of its taxable income for the years 1953 and 1956. He makes three assertions in support of his fraud allegations: (1) "The claimed loss or destruction of LADG's records" was an act of concealment. (2) For the year 1953 three specific items of omitted income and the charging off of $198,189.68 of costs on an uncompleted job, are evidence of fraud. The alleged "badges of fraud" relied upon by respondent were Mrs. Wheeler's bookkeeping entries which respondent contends were false. (3) For the year 1956 respondent contends that Wheeler used "one of his fictitious loss schemes to eliminate all income." 1. The LADG Records. Respondent's contention that Wheeler falsely claimed the loss or destruction of LADG's records is not supported by any competent evidence in the record. It was no more *708 than an unfounded suspicion. The evidence shows that LADG's records were delivered by Wheeler to the new purchasers of LADG in 1957; and that during 1957, after the records were in the possession of the new owners and prior to any tax investigation, a fire broke out which destroyed most of them. In any event, the fact that respondent's special agent could not bring himself to believe that LADG's most critical records were actually destroyed in the fire is immaterial. It is clear beyond question that fraud may not be sustined on the basis of mere suspicions. 2. The Year 1953. In essence, each of the adjustments involved for the year 1953 is based solely on Mr. Sullivan's disagreement with Mrs. Wheeler's treatment of the transactions on her work papers from which LADG's 1953 tax return was prepared. Retitioner argues that respondent has not proved by clear and convincing evidence that Mrs. Wheeler was in fact wrong in what she did on a single one of these questioned bookkeeping entries. Hence, it is argued that it has not been proved that LADG's income was understated. We agree with petitioner. There is no evidence of fraud. Even if it could be assumed that Mrs. Wheeler was *709 wrong on the entries in question, and LADG's income was understated as respondent contends, that would not be sufficient to establish fraud. The mere existence of unreported income in 1953, if any, is not, standing alone, evidence of fraud. Respondent has established no pattern of similar understatements for any other LADG tax years. As for Mrs. Wheeler's bookkeeping entries, incorrect entries are not the equivalent of false entries intended to conceal taxable income. Respondent's suspicion that the entries were intentionally incorrect is not backed up by any objective evidence of such intent. This is not a situation where records have been altered with an attempt to conceal the alteration. The entire area of dispute involves matters of judgment on Mrs. Wheeler's part under a complicated system of accounting (completed contract method) which necessarily required some judgment--i.e., as to whether a job was completed, when there may still be outstanding contingent liabilities against the job. Mistakes in judgment, or even negligence, do not constitute fraud. Respondent has not carried his burden of proof by clear and convincing evidence with respect to LADG's 1953 tax adjustments. *710 3. The Year 1956. The disputed item here involves the loss of $233,832.84 claimed by LADG in its 1956 return with respect to the reported sale of jobs in progress by LADG to Wheeler. Respondent asserts that the loss was fictitious because, according to the special agent's reconstruction and computation, both the "sale price" and "costs" were overstated. Petitioner challenges this assertion as erroneous and contends that respondent has not proved fraud by clear and convincing evidence as to this adjustment. Again we agree with petitioner. First and foremost, the Wheelers did not prepare, execute or file LADG's 1956 return and were not officers, directors or shareholders at the time it was prepared and filed. The return was prepared and filed by one of the new owners, John Sperling, who was a CPA, and was executed by the new president of the corporation. Moreover, Sperling admitted that it was his decision to claim the loss which respondent says was fictitious. In fact, Sperling and another of the new owners, an attorney, researched its availability. The refund which the corporation subsequently received by a carryback of the net operating loss to 1954 and 1955 was used entirely *711 by the corporation in its business operations under the direction of the new owners. No part of the loss deduction or refund inured to the benefit of the Wheelers. Special Agent Sullivan was aware of these facts. Indeed, he testified that he did not question Sperling's intent and had no reason to believe Sperling was not filing a true and correct return for LADG as far as he knew. He concedes there was no intent to defraud by the one who prepared the return, and presumably no intent to defraud by any of the other officers, directors and shareholders of LADG at the time the return was filed. Rather, it was Mr. Sullivan's theory that the fraud was committed by Mrs. Wheeler because she knowingly supplied false information to Sperling, causing him to file a false return. We reject the theory. It was based on assumptions and inferences from very limited available records. We conclude that the 1956 return of LADG was not fraudulent. Issue III. Estate Tax Deficiency and Addition to Tax for Fraud
(Dkt. No. 986-69). Numerous adjustments to the Estate of Helen M. Wheeler were made by the respondent and they are set forth in our findings of fact. Respondent specified nine of them *712 in his answer to the petition as those he contends represented assets fraudulently omitted from the estate tax return. The alleged fraud items are as follows: Schedule B - Stocks and Bonds
1) Park Water Company
$ 82,500.00
2) L.A. Decomposed Granite Co.
20,000.00
Schedule C - Mortgages, Notes & Cash
3) Cash in bank
11,489.06
4) Kauffman note
7,500.00
Schedule F - Other Miscellaneous Property
5) Natural gold
20,090.03
6) Advances - L.A. Decomposed Granite
225,516.42
7) Advances - Florence Richardson Neal
62,313.25
8) Advances - Henry H. Wheeler, Jr.
14,341.31
9) Advances - Miller Co. -
86,169.03
P.& J. Artukovich
Total
$ 529,919.10 A. Respondent's Adjustments. 1. Park Water Company Stock. The estate tax return reported as an asset the deceased's community property interest in 60,000 shares of Park Water Company common stock, being the number of shares issued and outstanding in Wheeler's name on the date of Helen Wheeler's death. The stock was reported at a total value of $600,000, representing a value of $10 per share. The value of $10 per share used in the estate tax return was the same as that used by the California Inheritance Tax Appraiser. Milton McGrew, an experienced estate tax examiner for *713 the respondent, examined the operating statements, profit and loss statements and balance sheets of Park Water Company for several years and determined that the value of the corporation's common stock at the date of death was $13 per share. He recommended an adjustment on that basis and the adjustment was agreed to by the estate's representatives. Later, Special Agent Sullivan, in his audit, made two adjustments with respect to the Park Water Company stock. He determined that 14,615 shares of stock in the name of Violet Motz and 1,885 in the name of O. D. Collins, on the date of decedent's death, were in reality shares belonging to Wheeler, which had been fraudulently concealed and omitted from the return. He further determined that Park Water Company's shares should be valued for estate tax purposes at $25 per share (their par value). [16]
The book value *714 of the Park Water Company stock was approximately $27.70 per share. Furthermore, an offer was made in 1953 by Mr. Rosenthal of Citizens Utility Company to buy all the Park Water Company stock for $2,000,000 or $25 per share. Rosenthal sued for specific performance on the contract during 1954 and he pursued the litigation after Helen Wheeler's death. Under the circumstances we hold that respondent has not met his burden of proving fraud as to this adjustment, but that the petitioners have failed to carry their burden of proof as to the value of stock at the date of decedent's death. Therefore, we sustain respondent's determination, as contained in the statutory notice of deficiency, that the value of the stock was $25 per share at the time of Helen Wheeler's death. In his audit Mr. Sullivan determined that 16,500 shares of stock in the name of Motz and Collins in reality represented shares belonging to Wheeler, which he had concealed for estate tax purposes. In essence, Mr. Sullivan considered that the stock issued pro rata in 1951 and 1952, discussed previously in connection with the related income tax issues, belonged entirely to Wheeler because he believed the money for the *715 shares came from Wheeler. The evidence does not support that premise. Mr. Sullivan did not care what the real purpose was behind the circuity of checks used to pay for the stock. The stock issuance was merely a paper transaction; money changed hands from Park to Wheeler to the other shareholders, and back to Park solely in order to effect a transfer of capital from one account to another on the books of the corporation. Furthermore, even if Wheeler had paid for the stock with his own funds, as Mr. Sullivan assumed, it does not follow that he was the legal owner of stock which was issued formally and lawfully to the other two existing shareholders.Mr. Wheeler might have made a taxable gift or a loan by such a transaction, but he was not the owner of the stock. The inference by Mr. Sullivan that the stock was issued in the names of Motz and Collins to conceal assets for estate tax purposes (anticipating decedent's death by several years) is almost incredible under the circumstances. There is no evidence of such intent. The pro rata stock issuance had nothing whatever to do with taxes. It was part of Park's effort to build up the amount of shareholder invested capital on its books *716 in order to claim a higher rate base from the PUC.
We hold that no part of the value of the 16,500 shares of Park Water Co. stock held in the names of Motz and Collins is includable as an asset of the Estate of Helen Wheeler. 2. The LADG Stock. The estate tax return did not report any stock of LADG as an asset of the estate on the date of Helen Wheeler's death on January 9, 1955. Wheeler sold his LADG stock to Thomas Neale and Herold Williams in 1954 and reported a gain on the sale in his 1954 income tax return. Respondent determined that the sale was fictitious and that the failure to report the shares in the estate tax return was for the purpose of avoiding estate taxes. The reasoning on this issue is similar to that discussed previously in connection with the Park Water Company stock. Mr. Sullivan concluded first that the manner in which the sale was carried out suggests that Wheeler simply wanted to transfer the stock to someone else's name. He then concluded that the reason for doing so must have been to avoid taxes and, therefore, that Wheeler intentionally omitted the stock from the estate tax return, knowing that it was an asset of the estate.In pursuing this line of reasoning *717 with the LADG stock, Mr. Sullivan ignored the real motives for the transaction, just as he did in the case of the Park Water Company stock. It is clear from the record that Wheeler transferred the stock to Williams and Neale because of his difficulties with the PUC. Admittedly, this was a sale of convenience in the sense that they were doing it as a favor to Wheeler on the understanding that he would still run the company and would find another buyer for the stock (which he did two years later). But this does not mean that it was not a lawful sale and it certainly does not mean that Wheeler did not regard it as a legal transfer of ownership of the shares. Everything he did subsequently, including the reporting of the sale in his income tax return, indicates that Wheeler treated it as a true sale. While respondent may believe that Wheeler used Williams and Neale for his own purposes, and that they did not pay for the stock with their own money, he has no justification for his inference that Wheeler did it to avoid estate taxes or that he knew he still owned the stock and was required to report it in the estate tax return. We hold that none of the value of the LADG stock held in *718 the names of Neale and Williams is includable in the decedent's estate. Respondent has not met his burden of proving fraud as to this item. 3. Cash in Bank. The estate tax return reported cash in Wheeler's bank account at the Security First National Bank in the sum of $5,810.69. The figure was obtained by McClure from Wheeler. Wheeler, in turn, said he obtained the figure from the balance shown on his check stub as of the date of Helen Wheeler's death. The correct balance in the account on the date of death was understated by $22,978.13. The check stubs show that the balance reflected as of the date of death was erroneous because of a deposit which Wheeler failed to record for several days. We do not regard the omission of this substantial sum as being merely inadvertent and inconsequential. We think it was deliberate. Respondent has met his burden of proof on this fraud item. One-half of the amount, or $11,489.06, is includable as an asset in Helen Wheeler's estate. 4. The Kauffman Note. The estate tax return omitted as an asset a promissory note in the amount of $15,000 from Milton Kauffman, which had not been paid as of the date of decedent's death. The payment on *719 the note was made and acknowledged by Wheeler after Helen Wheeler's death. We think he knew about the asset and deliberately failed to call it to the attention of his lawyer and accountant who prepared the estate tax return. Respondent has met his burden of proof on this fraud item. One-half of the amount, or $7,500, is includable as an asset of the decedent's estate. 5. The Gold. The estate tax return did not report as community property one-half of 1,057.37 troy ounces of natural gold, worth $20,090.03, which Wheeler had bought in 1949 and 1950 for speculative purposes. We think the concealment of this gold and the failure to report it in the estate tax return was intentional and deliberate.We sustain respondent's determination on this item. It was fraudulently omitted as an estate asset. 6. The LADG Advances. The estate tax return did not include as an asset advances by Wheeler to LADG. According to respondent's reconstruction of the advance account, the balance on December 31, 1954, was $451,032.83. He concluded that this item represented a fraudulently omitted asset. Respondent's determination would be correct only if he were correct on his income tax adjustment wherein *720 he reconstructed what he believed was the balance in the advance account in the process treating all of the subdivider money credited to the account as taxable income to Wheeler. But respondent's income tax determination was not correct and the advance account balance on the date of decedent's death must be regarded as including monies from subdividers which did not belong to Wheeler. We hold that no part of the LADG advances is includable as an asset of the Estate of Helen Wheeler. 7. Florence Richardson Neal Advances . Respondent determined that Florence Richardson Neal owed her father, Wheeler, $124,626.50 at the time of the decedent's death and that one-half of that amount was a fraudulently omitted community property asset of the estate. Petitioners acknowledge the omission but contend it was not deliberate. We agree with respondent. This large unsecured indebtedness of Wheeler's daughter is an asset for which there would not be any public records or third party records to establish its existence. The information regarding the loans was furnished by Wheeler only after a request from the special agent. Interest on the indebtedness was reported on Wheeler's income tax *721 returns. Under the circumstances we are satisfied that Wheeler deliberately omitted this asset from the estate. Respondent has met his burden on this fraud item. 8. Henry H. Wheeler, Jr. Advances. This adjustment is similar to the preceding one involving Wheeler's daughter. The estate tax return did not report as an asset advances to Wheeler's son, Henry H. Wheeler, Jr. The amount of one-half of such loans was $14,341.31.We find that this amount was fraudulently omitted as an asset of the estate. 9. M. Miller Co.--P. & J. a/rtukovich Advances.
The estate tax return did not include as an asset any indebtedness of M. Miller Co. and/or P. & J. Artukovich to Wheeler. Respondent determined that as of the date of Helen Wheeler's death, there was an indebtedness in the sum of $172,338.06 owed to Wheeler by two joint ventures of P. & J. Artukovich and M. Miller Co. Respondent specified this indebtedness as a fraudulently omitted asset of the estate. Petitioners contend that respondent has not proved that it was a fraudulent omission. We agree with respondent. When the special agent asked why the balance of $172,338.06 was owed by Park Construction Company to Wheeler on the date *722 of Helen Wheeler's death, he was told by Wheeler that the item was contingent on the outcome of three or four lawsuits. However, he acknowledged that he loaned the money to P. & J. Artukovich (Park Construction Company). The $172,338.06 was actually the balance due on M. Miller Company's books from Joint Venture No. 1 between P. & J. Artukovich and M. Miller Company and Joint Venture No. 2 between the same principals. The Joint Ventures had commenced in 1952. Wheeler had advanced a substantial amount of money on these two Joint Ventures. The books and records of M. Miller Company reflected the balances of these advances and repayments as follows: Balance Loans Payable a/c on books of Joint Venture #1 as of 6-30-53
$ 841,259.89
Net discounted value of Sonoma Co. Bonds applied
723,722.95
Net remaining amount (transferred to P & J Artuk. Inc. books)
117,536.94
Balance 3-31-54 advanced to Jt. Venture #2
$ 250,000.00
Net proceeds of Pomona job paid to Great American by Stone and Youngberg
(120,198.88)
Balance of account 6-30-54
129,801.12
Balance due H. H. Wheeler 6-30-54
$ 247,338.06
Checks paid by M. Miller to Sec. 1st Nat'l Bk. on behalf of H. H. Wheeler in Dec. 1954, but not charged to Advance a/c on Jt. Venture #2 books until February 1955
75,000.00
Balance at January 9, 1955
$ 172,338.06
We *723 hold that one-half of $ 172,338.06 was an asset of the Estate of Helen Wheeler and respondent has met his burden on this fraud item. In summary, we conclude that respondent has proved by clear and convincing evidence that a part of the underpayment of estate tax was due to fraud with intent to evade tax. Many of the estate tax adjustments are not disputed by petitioners. Others have been resolved in this opinion. We sustain respondent's determination on all adjustments with respect to which no evidence was offered by petitioners and on those which are not contested. Issue IV. Statute of Limitations. Having decided that there was no fraud for the years 1949 through 1955 in Docket No. 989-69, it follows that the assessment and collection of income taxes for those years are barred by the statute of limitations. See section 275(a) of the 1939 Code and section 6501(a) of the 1954 Code. In Docket No. 987-69 we have held that there is no fraud for the years 1956, 1957 and 1958. The assessment and collection of income taxes for the year 1957 are clearly barred by section 6501(a). The year 1956 is barred by the statute of limitations because the respondent has not proved (1) fraud *724 or (2) that income was omitted by the Wheelers from their return in an amount in excess of 25 percent of their reported gross income for that year. The six-year period provided for in section 6501(e)(1)(A) is not applicable to the year 1956. All years from 1958 through 1964 are open by consents and assessment for each of those years is not barred by the statute of limitations. In Docket No. 990-69, involving LADG, we have decided that there was no fraud. Therefore, it follows that the assessment and collection of income taxes for all of the years 1953 through 1956 are barred by the statute of limitations. Section 275(a) of the 1939 Code and section 6501(a) of the 1954 Code. Having decided that a part of the underpayment of estate tax in Docket No. 986-69 was due to fraud with intent to evade tax, we hold that the assessment and collection of additional taxes from the Estate of Helen Wheeler are not barred by the statute of limitations. Section 6501(c)(1) of the 1954 Code. The statutory period for assessment of 1965 income taxes in Docket No. 988-69 is open by consent and is not barred by the statute of limitations. Issue V. Claimed Loss Deductions.
The remaining disputed *725 issues with respect to the individual income taxes of petitioners involve claimed loss deductions for (1) the alleged 1954 P. & J. Artukovich loss raised by a refund claim; (2) the alleged 1958 American Sulphur loss raised by a refund claim; (3) the losses for the years 1962 through 1964 claimed in the individual petitioners' tax returns relating to Park Construction Co., M. Miller Co. and D. Miller in the amounts of $530,528.71, $125,089 and $57,246, respectively; and (4) various business bad debt deductions in the years 1961, 1962 and 1965 claimed in the individual petitioners' tax returns arising out of various loans made by Wheeler. Petitioners contend that all of the losses claimed by them should be treated as business bad debts deductible against ordinary income under section 166 of the 1954 Code. Their primary argument is that throughout the years in question Wheeler was engaged, among other things, in the trade or business of lending money and these losses were all incurred in connection with that trade or business. Alternatively, they argue that Wheeler was in the business of financing business enterprises by way of direct loans or advances, guarantees and indemnity agreements. *726 Respondent, on the other hand, makes the following contentions: (1) The evidence fails to show that Wheeler indemnified the losses of P. & J. Artukovich which gave rise to the claims of Great American Indemnity Company against P. & J. Artukovich; (2) the loss involving American Sulphur did not occur in 1958 as claimed; (3) the losses to D. P. Miller, et al. and Park Construction Co. were greatly overstated and were probably nonexistent; and (4) Wheeler was not in the business of lending money and therefore any losses on loans during the years in question were nonbusiness bad debts. The controversy concerning the claimed losses does not appear to involve conflicting views as to the applicable legal principles. It is essentially factual. In our opinion this is basically a section 166 case. Section 166(a) provides that there shall be allowed as a deduction any debt which becomes wholly worthless within the taxable year. Subsection (d) provides, with respect to nonbusiness debts, that any loss resulting therefrom must be treated as a short-term capital loss. Paragraph 2 of subsection (d) provides that "the term 'nonbusiness debt' means a debt other than--(A) a debt created or acquired *727 (as the case may be) in connection with a trade or business of the taxpayer; or (B) a debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business." Section 1.166-5(b), Income Tax Regs. , lays down the test that a debt is deductible as a business bad debt if the creation of the debt was proximately related to the taxpayer's trade or business. This test was approved by the Supreme Court in Whipple v. Commissioner,373 U.S. 193 (1963). Moreover, the Supreme Court has held that the proximate relationship between a bad debt and a taxpayer's business that is necessary to qualify the loss as a business bad debt exists only where it is shown that the "dominant" motivation for the undertaking which gave rise to the debt was attributable to the taxpayer's business. United States v. Generes,405 U.S. 93 (1972). As to the P. & J. Artukovich loss, it is clear from the record that Wheeler did not indemnify the losses of P. & J. Artukovich which gave rise to the claims of Great American Indemnity against P. & J. Artukovich. He purchased the claims of Great American so that he could become the sole owner and convert the claims into a bonded indebtedness of $1,935,000 *728 to be paid out of future income. Later his entire investment in P. & J. Artukovich was claimed as a loss. At best it was a nonbusiness bad debt. As our findings of fact reflect, Wheeler had no loss in American Sulphur and Refining Company in 1958. It clearly occurred in a later year and, in our judgment, constituted a nonbusiness bad debt. All in all, we think the individual petitioners have failed to prove that Wheeler was engaged in the trade or business of lending money or in financing business enterprises. Consequently, any established losses constituted nonbusiness bad debts. We so hold. We agree with respondent's contentions (1), (2) and (4) above. We disagree with contention (3) above and hold that respondent has failed to meet his burden of proving that there were no losses in 1962, 1963 and 1964 resulting from Wheeler's dealings with Park Construction Co., M. Miller Co. and D. Miller. Therefore, we disapprove the claimed increased deficiencies for those years. Respondent's statutory notice of deficiency correctly allowed such losses as nonbusiness bad debts in the amounts specified. Issue VI. Other Adjustments.
There are several adjustments to income in open years *729 with respect to which the petitioners have offered no proof. All such adjustments are sustained as set forth in the statutory notices of deficiencies. To reflect the concessions made by the parties and our conclusions on the disputed issues, Decisions in all dockets will be entered under Rule 155. Footnotes
1. In view of the death of Henry H. Wheeler, Sr. on January 22, 1977, the Court granted petitioners' motion for substitution of parties in these consolidated cases pursuant to Rule 63, Tax Court Rules of Practice and Procedure. Specifically, Henry H. Wheeler, Jr. and Florence Wheeler Neal were substituted for Henry H. Wheeler, Sr. as executors of the Estate of Helen May Wheeler, Deceased in dkt. Nos. 986-69 and 989-69. Additionally, the Estate of Henry H. Wheeler, Sr., Deceased, Henry H. Wheeler, Jr. and Florence Richardson Neal, Executors, was substituted for Henry H. Wheeler, Sr. as a petitioner in dkt. Nos. 987-69, 988-69, and 989-69. ↩
2. Cases of the following petitioners are consolidated herewith: Estate of Henry H. Wheeler, Sr., Deceased, Henry H. Wheeler, Jr. and Florence Richardson Neal, Executors and Violet E. Wheeler, dkt. Nos. 987-69 and 988-69; Estate of Henry H. Wheeler, Sr., Deceased, Henry H. Wheeler, Jr. and Florence Richardson Neal, Executors and Estate of Helen May Wheeler, Deceased, Henry H. Wheeler, Jr. and Florence Wheeler Neal, Executors, dkt. No. 989-69; and L.A. Decomposed Granite Company, dkt. No. 990-69.↩
6. Petitioners, in dkt. No. 987-69, filed a consent extending the period of assessment for the taxable year 1956 on February 8, 1963. Since such consent was executed after the general 3-year statute of limitations period had expired, it was not effective to extend or reopen such period. See section 6501(c)(4) of the Code. However, the consent was executed prior to the expiration of the 6-year statutory period provided by section 6501(e) of the Code relating to substantial omissions from gross income. As such, it will extend the statutory period if a finding of a 25 percent omission from gross income for 1956 is made.↩
7. Although the existence and execution of this document was stipulated by the parties, there is some evidence that the document was prepared subsequent to April 15, 1938, and backdated.↩
8. See fn. 7, supra↩.
9. It should be noted that respondent was unable to show that in every instance subdivider checks deposited to LADG's bank account, assumed to have been credited to the Advance Account, were accompanied by a Wheeler odd amount check to round off the "advance." Nor did Wheeler deposit his own odd amount checks in LADG's bank account only to round off other deposits.
11. In arriving at this amount, respondent determined only that during the 4-month period in question Wheeler received checks from the account totaling $11,407 more than was deposited therein from his personal bank account.↩
12. The record is unclear as to the specific origin of Kauffman's obligation to Wheeler in this regard.↩
13. From the evidence of record we are unable to determine the "balance" in the account when it was taken over from LADG by Wheeler.↩
14. Under section 267 of the Internal Revenue Code of 1954↩, no deduction is allowed on a loss incurred in a sale or exchange of property between a corporation and an individual owning 50 percent or more of the corporation's stock. In determining such ownership, certain rules of constructive ownership between related persons are applied. Thus, if Neale and Williams were related to Wheeler, he would have constructively owned more than 50 percent of LADG's stock as of December 31, 1956, and no loss would be allowed to the corporation.
15. Alternatively, the petitioners contend that the record establishes that the funds received by LADG and Park Water Co. did not constitute taxable income to anyone. Their contention is that the funds paid by subdividers to LADG for water installations did not constitute taxable income to either LADG or Wheeler at the time they were received by LADG, regardless of the book account in which they may have been recorded. Nor did they subsequently become taxable to LADG, Wheeler or Park when they were paid to Park, either directly by LADG or through Wheeler as a conduit. Such funds, they argue, remained at all times a reimbursement to Park for the cost of installing capital assets used by Park to supply water service to specific customers. Under California law applicable to public utilities, such funds constituted "donations in aid of construction"-- i.e., contributions by non-stockholders to the capital of Park Water Company.
16. For fraud purposes the amount of the adjustment was computed at $82,500, representing a one-half interest in 16,500 shares, valued at the reported value of $10 per share. However, in the statutory notice the value placed upon Wheeler's Park Water Company stock was $1,912,500 representing 76,500 shares valued at $25 per share.↩